# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00676 (RC)** |
| **v.** | : | |
| | : | |
| **ROBERT CHAPMAN** | : | |
|   **a/k/a "Robert Erick"** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Robert Chapman, a/k/a "Robert Erick" ("Chapman") to 45 days incarceration, followed by 36 months' probation, 60 hours of community service, and $500 restitution.

### I.    Introduction

The defendant, Robert Chapman, a former journeyman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On December 16, 2021, Chapman pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 45 days incarceration, followed by 36 months' probation,  is appropriate in this case because Chapman: (1) ignored the barricades and police presence, claiming to have scaled a wall of the Capitol to gain access to the Capitol's entry; (2) entered the Capitol through the Upper West Terrace door of the Capitol Building, took pictures and filmed himself inside of the Capitol while entering Statuary Hall and the Rotunda; (3) reentered the Capitol after exiting and encouraged another rioter, Jennifer Ryan, to enter the Capitol by telling Ryan that "you just have to shove your way in there"; (4) claimed to have participated in two interviews with the press about his entry inside of the Capitol; (5) has a criminal history with multiple convictions, the most recent conviction occurring in 2019, and having at least one conviction involving a firearm; and (5) endorsed his unauthorized entry into the Capitol by boasting about his unauthorized entry on his personal Facebook page and the dating app, Bumble. Chapman has not expressed remorse for his conduct on January 6.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Chapman's participation in a riot that actually succeeded in halting the Congressional certification combined with his celebration and endorsement of the violence on that day, his lack of remorse, the potential for future violence, and

the aggravating factors above explain why a sentence of probation only is not warranted in this case.

## II.     Factual and Procedural Background

### A.          The January 6, 2021, Attack on the Capitol

On January 6, 2021, thousands of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.  Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.  Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed to the violence and destruction that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Chapman's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020, Presidential election.  By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol.  Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.  At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.  Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers.  All proceedings, including the joint session, were effectively suspended.  The proceedings resumed at approximately 8:00 p.m. after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.  (*See* Statement of Offense ¶¶ 2-5; PSR ¶¶ 9-15.)

**B.  Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds**

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.

4

The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 pm, the first breach of the

outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.





*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next

hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
All people must leave the area immediately.  This order may subject you to arrest
and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and*

*many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### C.  Injuries and Property Damage Caused by the January 6, 2021, Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.  This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred police officers.  *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety.  *See id*; *see also* Architect of the Capitol, J. Brett

Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the Capitol, resulting in losses of more than 2.7 million dollars.

### Robert Chapman's Role in the January 6, 2021 Attack on the Capitol

"I'M FUCKIN INSIDE THE CRAPITOL!!!" This was the post that Chapman made to his personal Facebook page while he paraded illegally inside of the Capitol on January 6. Chapman proudly posted about his unauthorized entry to his social media followers, while taking numerous photographs of himself, celebrating his conduct and the conduct of his fellow rioters.

Chapman traveled from his residence in Carmel, New York to Washington D.C. to attend the "Stop the Steal" rally protesting the election results on January 6, 2021. Upon learning at the rally that attendees would be walking to the U.S. Capitol, Chapman decided to join. Upon

approaching the northwest front of the Capitol, Chapman would have observed a large crowd of rioters and barricades erected to deter individuals from approaching the Capitol.   Determined to access the Capitol, Chapman entered the restricted perimeter.   Chapman boasted to at least one acquaintance that he scaled a wall to access the Capitol.    After reaching the Capitol, Chapman photographed himself.  This picture would later be used as his Facebook profile picture.



*Exhibit 5*



*Exhibit 6*

At approximately 2:45 p.m., Chapman entered the Capitol through the Upper West Terrace door and walked into the building.  Chapman walked inside of the Capitol and was captured on Closed Circuit Video ("CCV").



*Exhibit 7*



*Exhibit 8*



*Exhibit 9*

After making his entry, Chapman paraded through the Capitol, entering Statuary Hall and the Rotunda.  CCV footage capturing Chapman inside of Statutary Hall is below.



*Exhibit 10*



*Exhibit 11*

Chapman also photographed himself while inside of of Statuary Hall, later posting one photograph of himself to his Facebook page.



*Exhibit 12*

Chapman was also captured on CCV surveillance while inside of the Capitol Rotunda.



*Exhibit 13*



*Exhibit 14*

While inside of the Rotunda, Chapman photographed and recorded video as he did
previously while inside of Statuary Hall.  In CCV footage, Chapman was captured filming
Metropolitan Police Department ("MPD") officers who were attempting to clear the Rotunda of

the rioters.  The rioters, and Chapman, stood their ground as the MPD officers demanded they leave the Rotunda.



*Exhibit 15*



*Exhibit 16*

After being inside of the Capitol for approximately 30 minutes, Chapman exited the Capitol momentarily, pushing past police officers who were attempting to keep rioters from entering the building.  At his exit point, a door near the Rotunda, officers stood in the doorway attempting to keep additional rioters from entering the building.

17



*Exhibit 17*

Chapman made his way into the crowd while taking pictures and/or video of the mob standing outside of the Capitol. Chapman exited the Capitol at approximately 2:59 p.m.



*Exhibit 18*

Upon making his way into the crowd, Chapman would have heard the mob of rioters chanting and yelling phrases such as "USA!" and "This is our house." Notably, Chapman encountered rioter Jennifer Ryan who was anxiously awaiting her entry into the Capitol. Ryan

was recording herself outside of the Capitol.  *See* Exhibit A.[2]  At one point, she encountered Chapman while she was  filming.  Chapman can be heard telling Ryan how "amazing" it was inside of the Capitol, describing the artwork that he observed inside of the Rotunda.  Chapman then encouraged Ryan to enter the building by stating "You just have to shove your way in there." Ryan eventually entered the Capitol through the East Rotunda door.

Champan reentered the Capitol at approximately 3:03 p.m., approximately four minutes after he made his initial exit from the Capitol. As Chapman entered, he would have seen broken windows and would have heard the alarms audibly sounding.  Officers inside of the Capitol had deployed tear gas to keep rioters out of the Capitol. Undeterred, Chapman made his way into the building a second time.



*Exhibit 19*

Chapman continued to walk inside of the Capitol hallways for approximately fifteen minutes before exiting for the final time.

---

[2] The government has provided the Court with this video via USA*fx*.  The video is named "Exhibit A: Chapman – Facebook video of Jennifer Ryan." The pertinent portion of the video begins at the 6 minute and 30 second mark and ends at the 7:00 minute mark.

*Social Media Posts*

Upon arriving at the Capitol, Chapman began photographing himself and posting photographs of himself to his Facebook page with the profile name "robert.erick.7". While it is unknown at this time how many Facebook followers Chapman had on January 6, it is a fact that his Facebook friends did indeed see his postings and communicated with him about his entry inside of the Capitol.

In one post made on January 6, Chapman posted to his Facebook page about being inside of the Capitol.  Notably, Chapman referred to the Capitol, as the "CRAPITOL."



*Exhibit 20*

On January 7, 2021, Chapman's friend reposted the photograph of Chapman inside of Statuary Hall. In the post, Chapman engaged in a heated conversation with a commenter appearing to chastise his entrance in the Capitol. In the post, the commenter wrote: "Disgusting that he thinks that this is a joke.  Not impressed.  Not fake and trespassing on federal government property is

20

illegal and punishable."   Chapman responded to his friend, Lisa, directly. Addressing Lisa's friend's comment, Chapman wrote: "L█ J█ V█ these are your peers? colleagues? they are a bunch of little bitch trolls.  keyboard warriors who don't do a fuckin thing."  Notably, this post was made after Chapman left the Capitol.



*Exhibit 21*

Approximately two weeks later on January 13, 2021, Individual-1 contacted the Federal Bureau of Investigation ("FBI") to report that Chapman admitted to her that he entered the Capitol on January 6. Individual-1 and Chapman were acquaintances on the dating app "Bumble." Individual-1 identified Chapman as the person known to her as "Robert Chapman" of Carmel, New York.   Individual-1 exchanged text messages with Chapman.   During their text communication, Chapman stated, "I did storm the Capitol and made it all the way to Statuary

Hall." Did an interview with Robert O'Morrow of the Washington Post.  Also did online interview with Jess Bivens of the WSJ."



*Exhibit 22*

Weeks later, Chapman bragged about entering the Capitol, showing no remorse for his conduct on January 6.

*The Charges and Plea Agreement*

On April 13, 2021, Chapman was charged by Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On April 22, 2021, he was arrested in New York. On November 16, 2021, Chapman was charged in a one-count Information with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. On December 16, 2021, Chapman plead guilty to the Information. By plea agreement, Chapman agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Chapman now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Chapman faces up to six months of imprisonment and a fine of up to $5,000. Chapman must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without

authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and  smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Chapman personally engaged in violence or property destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Chapman's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants. Chapman's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Chapman's conduct is that of an individual who was undeterred by the visible signs that existed on January 6, clearly notifying him that he was unauthorized to enter the Capitol. While there was no appropriate way to unlawfully enter the Capitol on January 6, Chapman's method of entry, scaling a wall, shows that he was determined to ignore the barricades and police presence to ensure that he would accomplish his goal of entering the Capitol. Observing the mob of rioters making their way to the Capitol, Chapman photographed himself and celebrated his attendance by posting to his Facebook page. Chapman continued to make his way into the Capitol and did so upon entering an Upper West Terrace Door entrance. While inside, Chapman documented his time inside of the Rotunda and Statuary Hall. Notably, Chapman did not merely enter and exit. Instead, he exited the building only to *re-enter* a short time later. Upon exiting the building, he encouraged another rioter to enter, telling her that she needed to shove her way through the crowd to make a successful entrance, which she did. Chapman's encouragement would have come after he himself was informed by MPD officers inside of the Rotunda, that his entry inside of the Capitol was unauthorized. Chapman attentively watched as the officers asked him and other rioters to leave. Instead, Chapman left and returned, and encouraged another rioter to enter as well.

Chapman was proud of his time inside of the building and did not show any regret for making his initial entrance, as evidenced by the fact that he entered the building unlawfully a second time and his conduct in the days after January 6.

While at the Capitol, Chapman posted to social media, notifying his Facebook followers that he was inside of the Capitol. Chapman posted a number of pictures of himself inside of the Capitol and expressed pride in being able to enter the Capitol. In response to a disparaging comment made by a Facebook user regarding his unlawful entry, Chapman negatively responded by referring to naysayers as a "bunch of bitch trolls" and "keyboard warriors."

While Chapman pleaded guilty early and accepted responsibility for his conduct, he has not expressed remorse or contrition for his conduct on January 6.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

Chapman's criminal history consists of a number of criminal convictions and arrests.  The convictions include:

- 2002: Making graffiti
- 2005: Driving while intoxicated, 1st offense
- 2005: Attempted criminal possession weapon, 4th firearm weapon and violation tail lamps
- 2009: Criminal mischief: intent to damage property
- 2014: Criminal trespass 3rd
- 2017: Criminal possession of controlled substance
- 2019: Criminal possession of a controlled substance – 7th

ECF 32 ¶¶ 26-35.[3]  Chapman has arrests for possession of a controlled substance (2017) and obstruction of governmental administration and moving from a lane unsafely (2018).  ECF 32 ¶¶ 38-39.

At the time of his arrest for this offense, Chapman was employed as a journeyman. ECF 32 ¶ 56.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

---

[3] As of the filing of this memorandum, the government has not confirmed if any of the convictions are felony convictions.  The government has inquired of the U.S. Probation Office and is awaiting confirmation as to whether the aforementioned convictions are either misdemeanor or felony convictions.

democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70;  *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Chapman's words and conduct on January 6, as well as his criminal history, demonstrate the need for specific deterrence. Chapman celebrated the violence of January 6 by posting video of the chaos to his personal Facebook page.  Days after January 6, after Chapman would have had time to reflect on his actions and the actions of the larger mob, he did not express remorse for his conduct.  He, instead, praised the fact that he "stormed the Capitol" and "made it to Statuary Hall" in his communication on the Bumble app.

This Court should also consider the fact that Chapman encouraged at least one rioter to enter the Capitol after he had initially exited the building.  Instead of dissuading Jennifer Ryan, who was openly stating her desire to enter the Capitol, Chapman expressed that he enjoyed his time inside of the building.  Most concerning is the fact that Chapman told Ryan that if she wanted to enter the Capitol, she should do so by "shoving" her way inside of the Capitol.

Also significant to specific deterrence is the method of how Chapman made his way into the Capitol.  Chapman boasted to a friend that he scaled a wall to get inside of the Capitol.  This conduct reflects Chapman's desperate intentionality to enter the Capitol no matter the risk or the effort required.

Notably, Chapman has a concerning criminal history, including one conviction for a firearms related offense.  While  Chapman was not involved in assaultive conduct or destruction of property on January 6, this Court should consider Chapman's continuous criminal history and what appears to be an escalation in criminal conduct. Any sentence imposed should consider the need for specific deterrence given not only Chapman's criminal conduct on January 6, but also his criminal history.

As of the date of this filing, Chapman has not expressed remorse.  The government acknowledges that the Defendant accepted responsibility early by entering into this plea agreement.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Chapman has pleaded guilty to Count One of the Information, charging him with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can

do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in *United States v. Glen Wes Lee Croy*, 21-CR-162 (Howell, C.J.), a misdemeanor case, in which the defendant

was sentenced to fourteen days community incarceration with ninety days home confinement, and three years' probation. In *Croy*, the defendant was not involved in any violence against officers, but he entered the U.S. Capitol twice.  Chief Judge Howell found reason to distinguish this case from other misdemeanor pleas because of additional factors, including the fact that the defendant entered the U.S. Capitol Building twice, and specifically held that, "It is an aggravating circumstance in this case that this defendant made a deliberate choice to follow the mob twice in the Capitol Building." Exhibit B, Transcript of Nov. 5, 2021 Sentencing at p. 86.

Additionally, a sentence of incarceration has been imposed in cases where the defendant has a criminal history, even if the history involved mostly misdemeanor convictions.  Indeed, the government has generally sought and received jail time in criminal history cases. The government's request here is in keeping with a number of judges in this district who have imposed sentences based on a criminal history. *See United States v. David Mish*, 21-cr-112 (CJN) (government's request of 30 days incarceration imposed); *United States v. Mark Simon*, 21-cr-0067 (ABJ), (sentence of 35 days imposed); *United States v. Brian Stenz*, 21-cr-456 (BAH), (sentence of 14 days imposed, followed by 36 months' probation).

Two other defendants whose criminal history served as a determining factor at sentencing are Robert Bauer and Edward Hemenway, who were charged as co-defendants in *United States v. Robert Bauer and Edward Hemenway*, 21-cr-49 (TSC). In that case, the government requested a sentence of 30 days of incarceration and $500 in restitution. Both Bauer and Hemenway entered guilty pleas to the same count as Chapman (one count of 40 U.S.C. § 5104(e)(2)(G)) after being charged by Information with the same four charges that were charged against Chapman (18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G)).   Judge Tanya S. Chutkan

sentenced both Bauer and Hemenway to 45 days of incarceration, 60 hours of community service, and $500 in restitution.

To support its request for 30 days' incarceration of Bauer, the government pointed to the following factors: (1) although Bauer admonished other rioters not to assault law enforcement officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) Bauer remained inside the Capitol for a brief period of time – approximately 17 minutes – yet made his way into the Crypt, where police officers were being attacked; (3) Bauer admitted to his actions only two days after the riot and accepted responsibility early through a plea agreement; (4) Bauer has not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong"; and (5) Bauer has a serious criminal history. The government relied on many of the same factors regarding Hemenway, with the differences being that Hemenway did not admonish other rioters to not assault law enforcement, admitted to his actions a few days after the riot, and expressed remorse for his actions. 21-cr-49, ECF No. 33 at 2.

Bauer's criminal history involved Operating a Motor Vehicle Alcohol-Drugs in 1999, when he was 21 years old; Possession of Anhydrous Ammonia and Vandalism in 2005; Possession of Methamphetamine, Manufacturing Methamphetamine, and related charges in 2005; and Unlawful Possession of Meth Precursor in 2006. *Id.* at 11-12. Hemenway's criminal history dated back to 2004 and involved a conviction for Sexual Battery and Criminal Confinement in 2006. 21-cr-49, ECF No. 32 at 11.

Like Chapman, neither Bauer nor Hemenway was personally involved in acts of violence or destruction. Chapman, like Bauer and Hemenway, accepted responsibility early.

Notably, Chapman has a longer criminal history than Bauer or Hemenway and was inside the Capitol for a longer period of time than they were. However, Chapman contacted MPD to provide his observations from the time around the shooting of Ashli Babbitt, realizing that he was at risk of being arrested for his presence inside the Capitol. The sentences requested and imposed for Bauer and Hemenway show that the requested sentence for Chapman avoids unwarranted sentencing disparities.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of

this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing

split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022)

(imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29,

2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF XX (D.D.C.

May 6, 2022) (imposing split sentence).[7] In addition, for any defendant placed on probation, a

sentencing court may impose incarceration for a brief interval as a condition of probation under

18 U.S.C. § 3563(b)(10).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### 1. *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains

the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984),

*codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989)

(noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal

sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter

227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"),

subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from

subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

court may impose a term of continuous incarceration that exceeds two weeks[8] followed by a term

of probation.

---

[7] In *United States v. Entrekin*, 21-cr-686 (FYP), while the Court has imposed a sentence and minute entry has been docketed, the judgment has not been docketed,

[8] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10). *See* Part II *infra*.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[9] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony, and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section

---

[9] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight

imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th

ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided

sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might

be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or

probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could

be sentenced to incarceration and supervision (in the form of probation).  No sensible penal

policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and

probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded

guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the

Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed

six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty

offender may face a sentence of up to five years in probation).

**B.  A sentence of probation may include incarceration as a condition of probation,
      though logistical and practical reasons may militate against such a sentence
      during an ongoing pandemic.**

**1.  *Relevant background***

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[10]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[11]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C.

---

[10] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

[11] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

§ 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improved or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes an imprisonment as a term of probation in the defendant's case given the requested 20-day imprisonment sentence.

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Robert Chapman to 45 days incarceration, followed by 36 months' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      /s/ Brittany L. Reed
BRITTANY L. REED
LA Bar No. 31299
Assistant United States Attorney (Detailee)
U.S. Attorney's Office
650 Poydras Street, Ste. 1600
New Orleans, LA 70130
Office: 504-680-3031
Brittany.Reed2@usdoj.gov