```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
     * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 21-162
vs.                                )
                                   )
GLENN WES LEE CROY,                )  November 5, 2021
                                   )  9:24 a.m.
              Defendant.           )  Washington, D.C.
                                   )
     * * * * * * * * * * * * * * *
```

### TRANSCRIPT OF SENTENCING
### BEFORE THE HONORABLE BERYL A. HOWELL,
### UNITED STATES DISTRICT COURT CHIEF JUDGE

**APPEARANCES**:

```
FOR THE GOVERNMENT: CLAYTON HENRY O'CONNOR
                    DOJ-CRM
                    1301 New York Ave NW
                    Washington, DC 20530
                    (202) 616-3308
                    Email: clayton.Oconnor@usdoj.gov

                    JORDAN ANDREW KONIG
                    U.S. Department of Justice
                    P.O. Box 55
                    Ben Franklin Station
                    Washington, DC 20044
                    (202) 305-7917
                    Email: jordan.a.konig@usdoj.gov

FOR THE DEFENDANT:  KIRA ANNE WEST
                    NICOLE ANN CUBBAGE
                    712 H Street, Northeast
                    Washington, DC 20002
                    (202) 236-2042
                    Email: kiraannewest@gmail.com

ALSO PRESENT:       CRYSTAL LUSTIG, Pretrial Officer

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
```

```
        Proceedings reported by machine shorthand, transcript
            produced by computer-aided transcription.
```

1          **P R O C E E D I N G S**

2                    THE COURTROOM DEPUTY:  The parties in the matter

3          of United States of America versus Glenn Wes Lee Croy,

4          please come forward; Criminal Case No. 21-162.

5                    Counsel, please come forward and state your names

6          for the record.  Right here, please.

7                    MR. O'CONNOR:  This side?

8                    THE COURTROOM DEPUTY:  The lectern here.  Thank you.

9                    MR. O'CONNOR:  Good morning, Your Honor.

10         Clayton O'Connor for the United States.  And I am joined by

11         my colleague Jordan Konig.

12                   THE COURT:  Good morning.

13                   MS. WEST:  Good morning, Your Honor.

14         Kira Ann West for Mr. Glenn Wes Lee Croy.  And joining me at

15         counsel's table is my colleague Nicole Cubbage; she is a

16         member of this court.  She is in charge of all of the videos

17         that she has downloaded for me; I am not good at that.  So I

18         would ask permission of the Court for her to sit at

19         counsel's table.

20                   THE COURT:  Okay.  Are you going to be playing

21         videos during this?

22                   MS. WEST:  Not unless you ask me to.

23                   THE COURT:  Okay.  Well, I have seen them all.

24                   MS. WEST:  I am sure you have.

25                   It's good to see you, Your Honor.

1           THE COURT:  Nice to see you, Ms. West.

2           All right.  Okay.  So let me just begin with all

3    of the formalities.

4           This sentencing hearing for Mr. Glenn Wes Lee Croy

5    is being held in person; but the public access line is being

6    made available for persons to listen to the proceedings

7    remotely.

8           Anyone listening to the sentencing hearing over

9    the public teleconference line is reminded that:  Under my

10   Standing Order, 20-20, recording and rebroadcasting of court

11   proceedings, including those held by video conference is

12   strictly prohibited.  Violation of these prohibitions may

13   result in sanctions, including removal of court-issued media

14   credentials, restricted or denial of entry to future

15   hearings, or any other sanctions deemed necessary by the

16   presiding judge.

17          All right.  So let me just begin by reviewing all

18   of the materials submitted to the Court that I have reviewed

19   in connection with sentencing this morning.

20          Of course, I have reviewed the probation office's

21   presentence investigation report, docketed at ECF 41; and

22   the sentencing recommendation docketed at ECF 42.

23          I have also reviewed the following documents

24   submitted by counsel -- and videos -- in advance of the

25   hearing:  The sentencing memo from the government, submitted

1    at ECF 46; the nine videos that were listed in the joint

2    notice of filing of items incompatible with e-filing as to

3    the defendant, docketed at ECF -- the notice was docketed at

4    ECF 47; the sentencing memoranda submitted on behalf of the

5    defendant, docketed at ECF 48; plus another supplemental

6    memo submitted at ECF 51.

7            I have also looked at two additional videos

8    submitted by the defendant, and a screenshot of a text

9    conversation between the defendant and his codefendant,

10    Mr. Lindsey; and a congressional report, which is all

11    described in the defendant's notice of filing exhibits,

12    docketed at ECF 52.

13            I have also reviewed Mr. Croy's letter to the

14    Court, docketed at ECF 48-2; two letters from Mr. Croy's

15    sons, docketed at ECF 48-2, as well; and then about nine

16    letters from friends, coworkers, and supervisors, docketed

17    at ECF 48-4.

18            Does the government have all of these documents?

19            MR. O'CONNOR:  Yes, Your Honor.

20            THE COURT:  Am I missing anything from the

21    government?

22            MR. O'CONNOR:  No, Your Honor.  Thank you.

23            THE COURT:  And, Ms. West, do you have all of

24    those documents?

25            MS. WEST:  Yes, Your Honor.

1          THE COURT:  All right.  Okay.  So, Mr. Croy, why

2     don't you just stand where you are.

3          Let me just explain to you how this sentencing

4     hearing will proceed.

5          You can take your coat off, if you'd like.

6          THE DEFENDANT:  Thank you.

7          THE COURT:  The first step is to determine whether

8     the government or you, and your counsel, have any objections

9     to any of the factual or other portions of the presentence

10    investigation report that's been filed in your case.

11         The second step is to hear from the government;

12    and then I will hear from Ms. West; and then, lastly, I will

13    hear directly from you, if you wish to address the Court.

14         And then the last step will be for the Court to

15    explain the reasons for the sentence to be imposed, and then

16    I will impose sentence.  So it's three different steps at

17    this hearing.

18         Do you have any questions about what is going to

19    be happening during the next hour or so?

20         THE DEFENDANT:  No, ma'am.

21         THE COURT:  All right.  Please be seated.

22         THE DEFENDANT:  Thank you.

23         THE COURT:  All right.  Starting with the

24    presentence investigation report.  These were filed -- the

25    presentence investigation report and the sentencing

1    recommendation were filed on October 6th.  And I understand,

2    from the last page of the PSR, that the government has no

3    objections to any of the factual or other determinations set

4    out in the PSR; is that correct?

5            MR. O'CONNOR:  That's correct, Your Honor.

6            THE COURT:  All right.

7            Ms. West, have you and your client read and

8    discussed the presentence investigation report?

9            MS. WEST:  Many times, Your Honor.

10            THE COURT:  All right.  And does Mr. Croy have any

11    objection to any of the factual determinations, statements,

12    or any other items contained in the presentence

13    investigation report?

14            MS. WEST:  I sent Ms. Lustig a couple of typos

15    and -- but nothing -- only academic -- nothing else.

16            THE COURT:  So no objections?

17            MS. WEST:  No.  No objections.

18            THE COURT:  Thank you, Ms. West.

19            Mr. Croy, please stand right where you are.

20            Are you fully satisfied with your attorney in this

21    case?

22            MS. WEST:  Absolutely.

23            THE COURT:  And do you feel that you have had

24    enough time to talk to Ms. West --

25            THE DEFENDANT:  Yes.

1            THE COURT:  -- about the probation department's

2    presentence investigation report, the sentencing

3    recommendation, and all of the papers and videos that have

4    been filed in connection with your sentencing here this

5    morning?

6            THE DEFENDANT:  Yes, ma'am.

7            THE COURT:  All right.  You may be seated.

8            Okay.  Hearing no objection from either side, the

9    Court will accept the factual portions of the presentence

10   investigation report as undisputed and as my findings of

11   fact at sentencing as supplemented by review of the video

12   exhibits in the case, as well as the statement of facts

13   submitted and sworn to by the defendant in connection with

14   his plea hearing.

15           All right.  We're now at the second stage of this

16   hearing where I will hear from the government to discuss

17   application of the factors set out in Section 3553(a) to

18   supplement any of the materials in the government's

19   briefing.

20           You can step forward to the podium.

21           MR. O'CONNOR:  Thank you, Your Honor.

22           Your Honor, before I begin, may I ask:  Do you

23   prefer keeping the mask on or -- can I --

24           THE COURT:  Absolutely keep it on.

25           MR. O'CONNOR:  Thank you.

1        THE COURT:  With all of the breakthrough cases

2    happening in D.C. right now, we are keeping masks on in my

3    courtroom.  I know there are some judges who are more lax

4    about that, but not in my courtroom.

5        MR. O'CONNOR:  I think it's a good rule.  Thank you.

6        Your Honor, as you've just indicated, you have

7    seen all of the videos that the defense and the government

8    submitted as a joint exhibit.  And those videos, they

9    largely speak for themselves and show the scope of

10   Mr. Croy's criminal conduct on January 6th, as well as the

11   aggravating circumstances that the government characterized

12   in its sentencing memo.  And we'd submit and stand by the

13   reasons in the sentencing memo for our request of a

14   punishment at two months of detention, along with $500 of

15   restitution.

16       To highlight these aggravating factors, Mr. Croy

17   went into the Capitol --

18       THE COURT:  Before we get into the aggravating

19   factors, let me just ask you a little bit about, you know,

20   the situation we have here where the government -- by

21   contrast to a number of other cases where the government has

22   either recommended straight probation or probation with some

23   home detention, I think, by my count -- based on a filing in

24   another case made by the government, it's about 12 of those

25   cases.

1          The government is asking for a two-month period of

2    incarceration for Mr. Croy; and I think the government has

3    stressed that specific deterrence is necessary here.

4          So before we get into the factors -- the

5    aggravating factors, which I will shortly -- for why

6    specific deterrence is necessary here in the government's

7    view, I did want to understand some fundamentals of the

8    government's recommendation.  And the reason -- the reason I

9    want to understand these fundamentals is because normally,

10    in normal circumstances, when there is a need for a specific

11    deterrence it's -- the government usually is asking for a

12    period of supervision, a period of probation, a period of

13    supervised release to follow a period of incarceration.  And

14    this is one of those unusual recommendations by the

15    government to say, yes, there is specific deterrence needed

16    here; and yet they're only asking for a period of

17    incarceration with no period of supervision.

18          And, plainly, I can appreciate the government's

19    position that -- given what happened on January 6th,

20    specific deterrence is a particularly important focus to

21    have at the time of sentencing to ensure that any people who

22    went into the Capitol Building on January 6th, overran

23    police lines -- and this defendant went in not once, but

24    twice -- that we take steps at sentencing to protect the

25    public from defendants who may pose a threat of, advocate

1    for, or actually engage in the kind of political violence we

2    saw on January 6th.

3           So specific deterrence is something I take pretty

4    seriously.  And it is puzzling to me that the government is

5    opting only for a short period of incarceration, two

6    months -- and I say that in relative terms; for the

7    individual serving two months of incarceration, I am sure

8    it's not a short time.  But in the great scheme of things,

9    federal offenses that we see, two months is not that long --

10   but no period of supervision.

11          So is it better for specific deterrence to have a

12   period of incarceration that's short with no supervision to

13   follow; or, for specific deterrence in a case like this, is

14   it better to have the defendant supervised, monitored, to

15   ensure that there is no repeat of engaging in the kind of

16   conduct that occurred on January 6th?

17          And so I guess my question to you is:  Why are you

18   just -- why are you opting for a period of two months of

19   incarceration rather than a period of probation for a

20   specific deterrence here?  Yes.

21          MR. O'CONNOR:  Thank you, Your Honor.

22          Obviously you have hit on an important point; you

23   have articulated it before.  And I did listen to your

24   previous sentencings; and I know that there is a limitation

25   as to what you are able to do as the sentencing judge here

1    based on the crime in front of you being a Class B

2    misdemeanor.

3              THE COURT:  Well, it's interesting you should say

4    that because, you know, every sentencing judge, when they're

5    looking at a sentencing, they want to know:  What are all of

6    my options?  Right?

7              MR. O'CONNOR:  Sure.

8              THE COURT:  So in a couple of sentencings I had --

9    it seems -- I don't know, I've lived through a trial in

10   between, so maybe it was two weeks ago; maybe it was a week

11   ago.  Time becomes a blur.

12             But I actually was interested, when I was trying

13   to understand what the government's view is of my sentencing

14   options, that the government took the position in two other

15   cases in front of me -- the Griffith and the Torrens

16   cases -- that split sentences for petty offenses was

17   allowable and authorized.

18             Meaning, Mr. Croy, just -- split sentence really

19   means that you could have a period of probation and a period

20   of incarceration; that's called a split sentence, which is

21   typically barred for both felony convictions and for Class A

22   misdemeanor convictions which may be followed by supervised

23   release after a period of incarceration.

24             But for probation for petty offenses for which a

25   period of probation is allowed, and a period of up to six

1    months' imprisonment is allowed -- it's a question:  Can you

2    have a split sentence with both?

3            And the government's position is that a defendant

4    for a -- sentenced to a petty offense can be sentenced to a

5    term of both probation and a term of imprisonment under

6    18 U.S.C. Section 3561(a)(3).  So given the government's

7    position on that and what the government says is the need

8    for specific deterrence here, why isn't the government

9    recommending a split sentence in this case?

10           MR. O'CONNOR:  Thank you, Your Honor.

11           And I know my colleague, Mr. Pierce, had a much

12   more in-depth conversation on that point; and I would only

13   be able to reiterate what that same position is.

14           THE COURT:  Well, please do.

15           MR. O'CONNOR:  Without elaborating more -- I mean,

16   again, Mr. Pierce is much better equipped to answer the

17   nuances of that question.

18           My understanding is given the cases that you have

19   raised for the government to brief on that there was a

20   position that would defend that.  However, that position, as

21   the defense -- I think it was in the Griffith or the Torrens

22   case -- had pointed out, there were some concerns there as

23   well.

24           I believe you and one of the defense attorneys

25   even kind of -- you know, it's 2021, and here is a new issue

1      that still hasn't been answered; and I think the uncertainty

2      behind that makes it such that the government cares to be

3      conservative in its sentencing recommendations.

4               THE COURT:  Rather than having -- rather than

5      having me do something that will immediately go up to the

6      D.C. Circuit and have the D.C. Circuit resolve the issue

7      once and for all?

8               MR. O'CONNOR:  So as I understand it, that is the

9      position.

10              THE COURT:  Okay.  So because of the -- even

11     though the government takes this position, the government is

12     not making a recommendation for a split sentence in petty

13     offenses in this case or in any other January 6th case; is

14     that right?

15              MR. O'CONNOR:  So I'd have to get back to you on

16     the answer regarding the policy at large for the Capitol

17     riots cases as an entirety.  I am not in a position to speak

18     on the government's complete approach for all of those

19     cases.  If it's important, I can certainly, you know,

20     arrange to get the Court an answer for that.

21              THE COURT:  Well, Mr. Pierce did answer that and

22     said no; I mean, that they're not recommending it in any

23     other January 6th case.  And so that -- and this all stems

24     from the fact that the plea is to a Class B misdemeanor.

25              If Mr. Croy was charged with Class A misdemeanors,

1    too, and had he been given a plea offer and a conviction for

2    a Class A misdemeanor, we wouldn't be having this

3    discussion.  It would be clear that the Court would have the

4    full panoply of sentencing options of a period of

5    incarceration if necessary for specific deterrence, followed

6    by a period of probation which is, frankly, you know, pretty

7    important for a specific deterrence to ensure that the

8    defendant stays on a law-abiding path over a period of time,

9    even post-incarceration, particularly when the period of

10   incarceration recommended even by the government is two

11   months' short; wouldn't you say?

12              MR. O'CONNOR:  Understood, Your Honor.

13              I mean, again, with the same caveats that you

14   articulated earlier.

15              THE COURT:  Right.  Okay.  So let me explore this

16   a little bit more because if you look at the special

17   conditions -- discretionary conditions I think it's called,

18   in the statute for probation, there is authorization for

19   periods of probation for either intermittent confinement or

20   confinement at residential reentry centers, which would

21   allow for some period of confinement and very close

22   supervision and, at the same time, a period of supervision

23   on probation.  And the government doesn't seem to be looking

24   at those options either for allowing longer periods of

25   supervision for something as important for specific

1      deterrence and to stop people who actually engaged in the

2      crowds' behavior on January 6th not to do that again.

3                  We don't want a repeat performance of that --

4                  MR. O'CONNOR:  Yes, Your Honor.

5                  THE COURT:  -- so supervision for a longer period

6      of time is helpful to avoid that.  So why isn't the

7      government being more creative even in using some of the

8      discretionary special conditions of probation?

9                  MR. O'CONNOR:  And please correct me if I'm

10     misunderstanding the Court's question here -- or premise.

11                 But I do believe that Mr. Pierce had articulated

12     some of that; that that certainly would have satisfied the

13     ability to do -- the intermittent incarceration would have

14     satisfied the ability to both have incarceration and

15     probation and, as the exchange elaborated, that due to the

16     fact of the ongoing pandemic and Bureau of Prisons are

17     reluctant to have people coming in and out of the prisons,

18     that -- for those pragmatic concerns, that that wasn't an

19     option that -- you know, I think the Court would -- you are

20     suggesting what I would agree would be the solution, but

21     it's just not available because of those concerns.

22                 THE COURT:  Yes.  Well, also, intermittent

23     confinement is not available everywhere.  And I have

24     checked; it's not available in Colorado.

25                 MR. O'CONNOR:  Sure.

1           THE COURT:  All right.  So it's just because of

2    the COVID pandemic situation that the government isn't using

3    some of the discretionary special conditions of probation --

4           MR. O'CONNOR:  As I understand --

5           THE COURT:  -- to allow for some period of

6    confinement and a longer period of supervision on probation?

7           MR. O'CONNOR:  And, again, I have had some

8    conversations with the supervisors who are crafting, you

9    know, the larger policy-strategy approaches for all of the

10   cases; that is a topic that we have discussed.

11          Again, I would want to bring in somebody else from

12   the office if you wanted a more comprehensive response as to

13   the government's approach --

14          THE COURT:  Well, who is with you?

15          MR. O'CONNOR:  I'm sorry?

16          THE COURT:  The person with you is not one of

17   those, Mr. Konig.

18          MR. O'CONNOR:  Your Honor, my colleague, Jordan

19   Konig, is taking over the codefendant case; he's entered a

20   notice of appearance for that.

21          THE COURT:  I see.  Okay.

22          MR. O'CONNOR:  It's similarly situated.

23          THE COURT:  I know I have seen you on the

24   screen -- excuse me for interrupting.

25          I know I have seen you on the screen, Mr. Konig;

1     but people are always -- always a little bit of a different

2     view in person.  Thank you.

3               MR. KONIG:  Thank you.

4               MR. O'CONNOR:  I will just say, Your Honor, I

5     believe that is correct.

6               THE COURT:  Okay.  So let me -- I mean, what was

7     interesting is -- when I go back to the plea hearing in this

8     case, and Ms. West made -- she made a comment in her brief

9     about how it was the most difficult plea hearing she had

10    been in; so it made me want to go back and review that plea

11    hearing.  It's like, oh.  It's not -- never my intent to

12    make Ms. West's life difficult.

13              And so I actually went back to that plea hearing

14    to see why would that be so difficult.  And I noticed that,

15    when I went back, at the plea hearing on September 3, I

16    actually asked you to confirm that if the Court accepted the

17    plea to a petty offense there are only two options the Court

18    can do, probation or a term of imprisonment with no

19    supervision to follow; and you responded that you were fully

20    aware of that consequence.

21              And so actually at the plea I confirmed with the

22    defendant that the penalties that could result from his

23    guilty plea, since it was a petty offense, is that if there

24    is no prison term imposed he could be subject to probation

25    for a period of up to five years; and there is no supervised

1  release term that can apply.  And if he's sentenced to

2  imprisonment, he would then be free from any supervision

3  from this Court on this charge; and he said he understood

4  the statutory penalties that applied.  So that's

5  September 3.

6        And then fast forward to October 21 in the

7  Griffith case where the Court -- where the government's

8  position is that the sentencing Court may impose the split

9  sentence.

10        So did the government just have a change of

11  position?  Or did it study the matter more and decide,

12  between September 3 and October 21, that oh -- whoops; we

13  think, in our interpretation of 3561(a)(3), you actually can

14  have a split sentence for petty offenses?  Is that what

15  happened?

16        MR. O'CONNOR:  So, Your Honor, I have not sat in

17  on all of the decision-making meetings about that position,

18  so I am really not equipped to give a comprehensive answer

19  on that.

20        I have seen some of the litigation in briefing as

21  a result of the question that you posed to the government

22  and leading up to the Griffith case; I don't know the answer

23  to your question.  I could suppose that, yes, the government

24  did study it more, in line with the order, and came up with

25  that position.

1          I apologize if I misspoke on September 3.  I

2     think, to those regards, that was my understanding at the

3     time.

4          THE COURT:  Well, no need for apology.

5          As the briefing we have seen in connection with

6     the Griffith and Torrens sentencing reveals, this is an

7     issue that's unresolved with good reasons and case law on

8     both sides.

9          But I think the government's hesitancy in urging

10    any of the judges on this court to adopt a split sentence on

11    a petty offense really just confirms that it's an open

12    question with such good arguments on the other side.  And I

13    am not going to resolve that issue here; perhaps one of my

14    colleagues will at some point, but not for me right now.

15         Let me turn to -- but you understand my concern

16    here for specific deterrence.  And let me just say, I do

17    agree with you that there is a need for specific deterrence.

18    And when I -- and in most cases when there is a need for

19    specific deterrence, we look for longer periods of

20    supervision to make sure a law-abiding path is complied

21    with.  Am I right on that?

22         MR. O'CONNOR:  Yes, Your Honor.

23         THE COURT:  Yes.  Okay.  Let me just turn to a

24    factual issue because Ms. West has raised concerns about the

25    government's recommended prison term creating unwarranted

1      sentencing disparity among similarly-situated defendants

2      charged with similar conduct.

3             Sort of related to that issue is this one mystery

4      in this case.  And that mystery -- I will call it the

5      mystery missing woman because the government says in its

6      memo that Mr. Croy, his codefendant -- and then I quote:

7      And a female companion all went to the political rally at

8      the Ellipse and spent the entire day together, going from

9      the rally to the steps of the Capitol, and twice into the

10     Capitol.

11            The presentence investigation report, the signed

12     statement of offense also note the same thing; that

13     Mr. Croy, Mr. Lindsey, quote:  Were also accompanied by an

14     adult female who went inside the U.S. Capitol with them.

15     That's from the PSR, paragraph 18; statement of facts in

16     connection with the underlying plea, paragraph 9.

17            Mr. Croy, Mr. Lindsey, have both been charged.

18     But if their female companion spent the entire day with them

19     and was right by their side, what happened to her?

20            MR. O'CONNOR:  Certainly.

21            THE COURT:  Isn't that -- I mean, is there some --

22     Ms. West hasn't made this argument necessarily.  But should

23     it be a concern that a person engaging in exactly the same

24     conduct amongst the defendant and his codefendant is not

25     charged at all?

1          MR. O'CONNOR:  Yes, Your Honor.  And I agreed with

2    you on that.

3          At the time Mr. Croy and Mr. Lindsey were charged,

4    the government did not know who this person was to make an

5    identification such to continue building a case.

6          I believe -- I have not confirmed -- I do know

7    through the course of working on this case that the FBI has

8    made efforts at identifying who that person is to -- and

9    while I am uncertain where the development of that case is,

10   I do know that it has continued to be looked at and

11   investigated, including through this case.

12          THE COURT:  I see.

13          MR. O'CONNOR:  So I agree with you that it would

14   be odd and there would be a disparity if the government knew

15   of an individual who entered the Capitol and just decided to

16   turn the other way and not bother; and that is not what's

17   happening.

18          However, as you well know, we can only move

19   forward on investigations and charging decisions with people

20   that we have identified to ensure that we have the right

21   person that we're charging with a criminal offense; and I

22   believe that aspect of the investigation has been continuing

23   to develop.

24          THE COURT:  Okay.  All right.

25          Okay.  So now let's -- you know, one of the things

1    that -- one of the points that the defendant's sentencing

2    memo makes, and Ms. West says in her brief -- her reply

3    brief at page 6 -- that the crowd attacking the Capitol on

4    January 6th was not -- and I quote:  One cohesive collection

5    of Trump supporters on some collaborative mission to overrun

6    officers in the Capitol; but the group was, in fact, as

7    diverse as the people in this nation with many different

8    reasons for being there that day.

9            So putting aside the accuracy of her description

10   of the crowd, with so many of them wearing MAGA hats and

11   Mr. Croy himself wearing a Trump sweatshirt, I think

12   Ms. West's point is that the punishment should fit the crime.

13           And I don't think the government has any

14   disagreement with that; is that right?

15           MR. O'CONNOR:  Agreed.

16           THE COURT:  Okay.  And so then the government goes

17   on and actually explains that:  Those who trespassed but

18   engaged in aggravating factors merit serious consideration

19   of institutional incarceration, while those who trespassed

20   but engaged in less serious aggravating factors deserve a

21   sentence more in line with minor incarceration or home

22   confinement.  And the government recommends that this

23   defendant falls in the category of having aggravating

24   factors warranting prison time of 60 days.  So this is the

25   point where I want to go into what those aggravating factors

1    are for this defendant.

2              And as I look at the facts here, this is a

3    defendant who was inside the Capitol Building twice for a

4    total of around 30 minutes; the first time about 17 minutes,

5    the second time for about 10 minutes.  And then he was

6    standing around the Capitol grounds for some period before

7    he went into the Capitol the first time and then, in between

8    his two trips, he was hanging around 40 to 45 minutes by the

9    government's estimation.

10             MR. O'CONNOR:  Accurate.

11             THE COURT:  But he didn't engage in preplanning?

12             MR. O'CONNOR:  Correct.

13             THE COURT:  And he brought no dangerous weapons

14   with him or other defensive gear for preparation for any

15   kind of violence; he didn't enter any of the private offices

16   or rooms inside the Capitol Building; and he certainly

17   didn't get into the Senate Chamber or the House Chamber?

18             MR. O'CONNOR:  Correct.

19             THE COURT:  He didn't steal anything when he was

20   inside the Capitol Building?

21             MR. O'CONNOR:  Correct.

22             THE COURT:  He didn't physically attack any police

23   officer or any other person; he didn't personally damage any

24   property inside the Capitol.

25             And according to the government, he cooperated

1      with law enforcement when he was arrested and voluntarily

2      gave law enforcement asked-for details concerning his

3      conduct; is that right?

4                  MR. O'CONNOR:  Eventually.

5                  THE COURT:  Eventually.

6                  MR. O'CONNOR:  After the plea agreement.

7                  THE COURT:  All right.  And he didn't post -- so

8      that didn't happen at the time of his arrest?

9                  MR. O'CONNOR:  Correct.

10                 THE COURT:  So it wasn't as prompt as that; it was

11     only after his plea agreement?

12                 MR. O'CONNOR:  Correct.

13                 THE COURT:  He didn't post inflammatory language

14     publicly --

15                 MR. O'CONNOR:  Publicly.

16                 THE COURT:  -- on social media that would have

17     encouraged or incited more political violence, right?

18                 MR. O'CONNOR:  Correct.

19                 THE COURT:  And he did promptly agree to enter a

20     plea agreement after the offer was extended?

21                 MR. O'CONNOR:  Agreed.  Agreed.

22                 THE COURT:  And would you agree that he has

23     expressed remorse for his criminal conduct?

24                 MR. O'CONNOR:  Yes, Your Honor.

25                 Again, eventually.

1          THE COURT:  Eventually.  Well, in his fairly

2     lengthy letter, he did --

3          MR. O'CONNOR:  Absolutely.

4          THE COURT:  -- I would characterize it as that.

5          MR. O'CONNOR:  Just to say in the immediate days

6     following the riot he expressed sentiments to friends that

7     showed that he was quite proud of what he did, and adamant

8     about it.

9          THE COURT:  Right.

10         MR. O'CONNOR:  And to your point, eventually, yes,

11    through this end of the proceedings I believe he has fully

12    expressed remorse for his conduct.

13         THE COURT:  Right.  And I mean, I think, as

14    sentencing judges, you know, we do hope that being shown the

15    error of a defendant's ways they learn from it; and so

16    remorse shown over the course of being involved in criminal

17    proceedings and appreciating the gravity --

18         MR. O'CONNOR:  Agreed.

19         THE COURT:  -- of the circumstances of the offense

20    conduct, it's hard to hold against -- for me at least -- to

21    hold against somebody -- prior to the education that comes

22    with being a defendant in a federal criminal case --

23    statements that they make early on --

24         MR. O'CONNOR:  Understood.

25         THE COURT:  -- as opposed to once they get better

1    educated.

2             MR. O'CONNOR:  Sometimes it takes a while to set

3    in.

4             THE COURT:  Exactly.

5             Okay.  So the government has identified what it

6    calls a number of critical factors to distinguish among

7    those charged with criminal conduct warranting prison time

8    with aggravating factors versus those that don't.  And so I

9    want to turn to what the government has listed in its papers

10   the five aggravating factors it has associated with this

11   defendant's criminal conduct that the government says

12   distinguishes his criminal conduct from other defendants for

13   whom the government has recommended either straight

14   probation or probation with home detention and, in the

15   government's view, believes warrants jail time in this case.

16            And let me just say at the outset, this is not an

17   easy task.  I mean, for petty offenses that are not subject

18   to the guidelines --

19            MR. O'CONNOR:  Sure.

20            THE COURT:  -- but courts must still comply with

21   the Section 3553(a)(6) factor of avoiding unwarranted

22   sentencing disparities, we're left to do this in different

23   ways without the guidance from the sentencing guidelines.

24            MR. O'CONNOR:  Understood.  And --

25            THE COURT:  If you have sentencing guidelines, you

1    have the entire sentencing commission apparatus collecting

2    data from all across the country for decades to be able to

3    tell judges:  This is the median and average sentences; this

4    is what is normal; this is how you can avoid unwarranted

5    sentencing disparities.

6           But the government's choice to allow pleas to this

7    petty offense puts us outside the guidelines and, therefore,

8    we have to find alternative mechanisms to address the

9    3553(a)(6) factor of avoiding unwarranted sentencing

10   disparities.  So no easy task made more difficult because we

11   don't have the sentencing commission data collection effort

12   that's been going on two (sic) years.

13          MR. O'CONNOR:  To the point I believe you have

14   recognized, defense counsel has recognized, and the

15   government has recognized that this is a novel event in our

16   nation's history, such that there is not a lot of history to

17   fall back on or data to collect about the intricacies

18   involved with this criminal event that was both individual

19   and collective in its application.

20          THE COURT:  Right.

21          MR. O'CONNOR:  Understood --

22          THE COURT:  So your point of that is, even if this

23   was a Class A misdemeanor subject to data collection by the

24   sentencing commission, this was such a unique incident that

25   even data collected by the sentencing commission might not

1    be helpful?

2              MR. O'CONNOR:  Without going that far, more to

3    empathize, because the government does struggle with making

4    efforts to have recommendations that don't show disparity;

5    that there is some empathy with the task you have described

6    as being a very difficult one; also understanding that the

7    collection of individuals in the Capitol that day all acted

8    very differently.

9              So while we look at a number of different factors

10   and we highlight, from the government's perspective, what it

11   finds aggravating and makes efforts to make recommendations

12   consistent -- understood, it is a hard task.

13             THE COURT:  It is a hard task.

14             And so I do appreciate that the government is

15   making transparent the factors that it's looking at; it's

16   enormously helpful, as I think through what I believe are

17   factors that pertain to individual defendants coming before

18   me.

19             MR. O'CONNOR:  On that effort, could I provide one

20   benchmark, if I may?  And I wanted to address it because

21   defense counsel had addressed it in the reply and referenced

22   it in its initial submission, and that's the parallel to the

23   Robert Reeder case.

24             And understanding -- and Ms. West, defense

25   counsel, and I had had several conversations leading up to

1    the sentencing about --

2              THE COURT:  Can you just pull that microphone up?

3              MR. O'CONNOR:  I'm so sorry, Your Honor.

4              Is that better?

5              THE COURT:  I think -- I don't know.

6    Maybe it's -- I think that's much better.

7              Is that better for you, too, Ms. West?

8              MS. WEST:  Yes.  I was having a hard time --

9              THE COURT:  I was, too.

10             MR. O'CONNOR:  Thank you so much.

11             Understanding Mr. Reeder's case is a little

12   difficult to assess -- in looking through the case history,

13   the government had submitted an initial sentencing

14   recommendation -- this was in August.  And during that time,

15   the government knew that Mr. Reeder had entered the Capitol

16   twice, had spent approximately a half hour in the Capitol,

17   and, on top of that, had been in and around the Capitol for

18   about an hour; and in that initial recommendation had asked

19   for a sentence of two months' confinement.

20             Subsequent to that, as I understand it, the

21   government learned of more aggravating evidence regarding

22   this specific defendant, leaving it ultimately in a notice

23   to the Court -- I think it came out -- I can look --

24   September to October, where it eventually asked for -- based

25   on that aggravating evidence, an additional six months of --

1    rather, not an "additional," it asked ultimately for six

2    months of confinement.

3            And when talking about this with defense counsel,

4    I said that we were drawing a parallel to the initial

5    recommendation.  At no point has the government tried to

6    associate Mr. Croy with directly causing or committing any

7    violence.  Insofar as it was referenced, we wanted to make

8    sure that the Court is aware that the government is not

9    alleging Mr. Croy should be analogized to people that did

10   commit violence.

11           THE COURT:  And Mr. Reeder did commit some

12   violence?

13           MR. O'CONNOR:  And, again, I don't know the

14   specific facts.  I understand the aggravating --

15           THE COURT:  It's not my case either, so I don't

16   know the facts.

17           MR. O'CONNOR:  -- that the aggravating evidence

18   that the government learned between its initial

19   recommendation and its subsequent recommendation was along

20   those lines.

21           However, when drawing an analogy to -- and, again,

22   in an effort to be consistent among similarly treated --

23   similarly-situated defendants, in that case the government

24   had initially requested a two-month period of confinement

25   based on the facts that he had entered the Capitol twice;

1    had spent about a half hour in the Capitol; spent about an

2    hour in and around the Capitol altogether.  Based on those

3    facts, I believe that Mr. Croy's situation is fairly

4    comparable; and that was a large part of what led the

5    government to its request now.  It's focusing on those

6    aggravating factors and being consistent with what it was

7    requesting amongst different defendants.

8              THE COURT:  Okay.  And, in fact, you are only

9    asking for one month incarceration here?

10             MR. O'CONNOR:  Two months.

11             THE COURT:  You are asking for two months.  Okay.

12             There are a lot of these cases.

13             Okay.  So let's just go through the five

14   aggravating factors here.

15             So the government's memo says that the first

16   aggravating factor is the defendant's decision to enter the

17   Capitol Building for the first time after witnessing law

18   enforcement attempt to keep rioters at bay for over an hour.

19   Is that the first aggravating factor?

20             MR. O'CONNOR:  Agreed.  And along the lines of

21   that aggravating factor, where he entered was through the

22   Senate wing door within the first five minutes of it having

23   being breached at that location.  That puts him in the

24   Capitol at a very early point of the breach; suggesting, you

25   know, he was close, if not at the very front; you know,

1    within five minutes of getting to the Capitol.  Just

2    associating how he came to be there would suggest that he

3    was close.

4            I know during the plea colloquy he spoke at length

5    about having seen police officers making efforts not

6    directly at him but towards other rioters about keeping them

7    at bay.  Having witnessed that and, then, being in the

8    Capitol within five minutes of it being breached, that's an

9    aggravating factor.

10           THE COURT:  And the Senate wing doors were opened,

11   from my recollection of the videos, because rioters broke

12   the windows on either side and then got in and opened it?

13           MR. O'CONNOR:  Largely, yes.  And there was --

14           THE COURT:  One person actually kicked down the

15   door --

16           MR. O'CONNOR:  Window.  As I have seen it, after

17   that window was kicked in, rioters started flooding in; some

18   rioters then broke open the door from the inside.

19           THE COURT:  By kicking it?

20           MR. O'CONNOR:  Correct.

21           THE COURT:  There was one guy really violently

22   kicking it --

23           MR. O'CONNOR:  Correct.  Correct.

24           THE COURT:  -- and that's what opened it up.

25           MR. O'CONNOR:  And then eventually the other

1    window was --

2              THE COURT:  Also broken.

3              MR. O'CONNOR:  -- also broken.

4              THE COURT:  So people were streaming in from both

5    the broken windows and, then, also through the kicked-down

6    door.

7              MR. O'CONNOR:  And I don't recall if the second

8    window had been broken by the time Mr. Croy came in, but you

9    have people flooding in --

10             THE COURT:  It was, from when -- I think it was,

11   from looking at the video.

12             MR. O'CONNOR:  I would say the scene really draws

13   an image of, you know, someone coming in through the door,

14   while people are streaming in through the windows -- to say

15   that there was no one there to say you couldn't come in is a

16   bit of a distraction; that's not how people enter most

17   buildings, much less the Capitol.  And so to come in at that

18   time, it's aggravating --

19             THE COURT:  But let me just -- I just want to

20   focus on this -- the first aggravating factor is witnessing

21   law enforcement attempt to keep rioters at bay for over an

22   hour.

23             I mean, I think that there are defendants for whom

24   the government has recommended either straight probation or

25   probation with home detention who are both inside and

1    outside the Capitol with views of law enforcement trying to

2    keep --

3                    MR. O'CONNOR:  Sure.

4                    THE COURT:  -- the crowd out.

5                    MR. O'CONNOR:  Sure.

6                    THE COURT:  So to find this to be an aggravating

7    factor standing alone strikes me as -- doesn't really

8    distinguish this defendant from others.

9                    MR. O'CONNOR:  And, Your Honor, fair point.

10                   I'd only offer -- you know, in line with our

11   earlier conversation, every individual that was involved in

12   the riot is hard to assess; so it's not one factor alone

13   that pushes an individual into one camp or another.

14                   Obviously if somebody committed violence, they

15   would be charged with that; that would be a clear

16   distinction --

17                   THE COURT:  Right.

18                   MR. O'CONNOR:  -- and they would be facing a much

19   different range of criminal --

20                   THE COURT:  Right.

21                   MR. O'CONNOR:  -- liability.  However, at this

22   point, it's a -- it is a collection of various factors that

23   we're looking to associate.

24                   And I do recall -- I think you had mentioned at

25   some point during a sentencing hearing, it's a very human

1    endeavor.  I mean, we are not machines, we don't calculate

2    this out; and the weighing factor, to your point, is

3    difficult --

4              THE COURT:  Right.

5              MR. O'CONNOR:  -- but it's not one factor alone.

6              THE COURT:  Okay.  But I -- as I am parsing out

7    factors -- and I have a number of these cases, so I want to

8    make sure not just that I am at least internally consistent

9    with how I'm looking at factors --

10             MR. O'CONNOR:  Right.

11             THE COURT:  -- but also not -- when I'm evaluating

12   the government's recommendation, which every sentencing

13   judge takes pretty seriously, as it does any defense

14   recommendation and the reasons for the disparity, as I have

15   here between the government's recommendation of two months'

16   incarceration and the defendant's recommendation of straight

17   probation, you know; so figuring out the reasons behind

18   it -- because what I have to do is fashion a reasonable

19   sentence.

20             MR. O'CONNOR:  Understood.

21             THE COURT:  Okay.  And so the second factor is

22   defendant's support of violent, aggressive, and antagonistic

23   actions against law enforcement through his presence in a

24   mob that overwhelmed law enforcement officers and forced

25   them to retreat further into the Capitol and, also, joining

1      in the chant of, "Whose house?" "Our house." -- while inside

2      the Capitol.

3              So, by saying this, you are not saying that this

4      defendant actually himself engaged in violent behavior, but

5      that he was in parts of the mob that, at particular times

6      and in particular parts of the Capitol, actually overran

7      police lines.

8              MR. O'CONNOR:  Yes, and I think you can see that.

9              I mean, again, it links to when the defendant

10     entered the Capitol at a very early stage.  And you see the

11     video after he enters through the Senate wing doors, he goes

12     into the crypt specifically.  And there are two videos that

13     I think are really illustrative; one -- I think it's

14     Exhibit 3 is the CCB (sic) where you see the rioters just --

15     the word I use is "swell."

16             As they continue to pack in, there is a line of

17     law enforcement officers who are trying to keep people from

18     further entering the Capitol.  And the CCV (sic) shows that

19     that size of the crowd -- each by one individual, one

20     individual, one individual -- and Mr. Croy was one of those

21     one individuals who caused the room to swell to the point --

22     and I have watched some video where they weren't nec- --

23     they weren't assaulting any officers; they were certainly

24     aggressive, and they're walking and posturing towards the

25     officers that eventually forced the officers to retreat.

1    You also see this through Mr. Croy's cell video from the

2    crypt; I think it's Exhibit 2.  And in there you get his

3    account pretty firsthand because it's his cell phone video

4    of what he's seeing and what he's observing.

5              And I submit what it shows is that he got within a

6    person -- if not at the very front of the line, maybe one

7    person back from a law enforcement officer who was part of

8    that line trying to keep rioters at bay.  What strikes me is

9    not necessarily just the proximity or the numbers of the

10   crowd swelling around him but, when you hear the audio, you

11   hear the antagonism from the riot that he was a part of --

12   the mob that he was a part of; their chants of "USA," as if

13   it's the rioters who are representing our country.  There

14   are chants of, "Whose house?" "Our house" -- to, you know,

15   presumably justify their presence there.

16             What really struck me was hearing the chant or the

17   jeer:  You're on the wrong side.  Such to say that the

18   crowd, when facing off with law enforcement, is drawing a

19   distinction and making law enforcement officers the

20   opposition to them.  "You're on the wrong side."  There is a

21   side here; and they're putting law enforcement officers on

22   the other side of it.

23             Even without directly engaging in violence, being

24   a number in that mob is aggravating because it was the size

25   of the mob where -- you know, in some conversations about

1      this -- it is a difficult event because it is one of those

2      instances where the sum is certainly greater than -- the

3      whole is certainly greater than the sum of the parts.  While

4      Mr. Croy may have just been a person there, having so many

5      people just being there certainly prevented law enforcement

6      from containing the situation.  And, Your Honor, in that

7      antagonistic environment, that's aggravating.

8              THE COURT:  So there are -- from the videos --

9      three different areas within the Capitol Building where

10     Mr. Croy was a member of this mob that was so big it overran

11     police lines in the crypt, in the hallway by the House wing

12     door, and then the second time he went into the building in

13     the Rotunda.

14             MR. O'CONNOR:  Agreed.  And just to say --

15             THE COURT:  Is that the government's view of what

16     the video evidence shows?

17             MR. O'CONNOR:  If I can elaborate a little bit;

18     largely, yes.

19             I would submit, when you see the video from the

20     hallway by the House wing door, Mr. Croy initially is

21     certainly part of a crowd that is marching for (sic) law

22     enforcement officers while you see law enforcement officers

23     retreat down the hallway.

24             THE COURT:  You see that clearly.

25             MR. O'CONNOR:  Clearly.  To be fair, two minutes

1    later you see a crowd of rioters going back the other way

2    with law enforcement behind them seeming to have control of

3    that hallway; and you see Mr. Croy, in line with the crowd,

4    also walking back.  But to your point, it clearly does show

5    there was a time when this riot -- when this mob was pushing

6    back the line of officers, yes.

7                THE COURT:  All right.  Okay.  So as I -- I want

8    to make sure.  As I understand the government's second

9    aggravating factor is not just merely being a member of the

10   crowd because lots of the defendants for whom the government

11   has -- if not all, has recommended already straight

12   probation, or probation with home detention, had been part

13   of the crowd inside the Capitol; it's this defendant's

14   participation at times and in locations where the crowd

15   overran police lines?

16               MR. O'CONNOR:  Yes, Your Honor.

17               THE COURT:  Okay.  Then, third, the government

18   cites the defendant's disregard for the -- and I am quoting

19   you:  The severity of his actions when he traipse through

20   the Capitol as if it was an amusement park, including taking

21   fun photos and videos of other rioters dressing statues, and

22   posing for his own photograph by a statue that he would

23   later send to friends.

24               So, as an aggravating factor, I wanted to know why

25   is this so aggravating?  I mean, I think that there are a

1    number of other defendants for whom the government has

2    recommended straight probation or probation with home

3    detention who also took photos while they were touring the

4    Capitol, with the alarms blaring and the police trying to

5    get them out.

6            MR. O'CONNOR:  A real juxtaposition there, to be

7    acting in that manner; and only to say, correct, Your Honor,

8    there were many people who took photos.  There were many

9    people who seemed to be enjoying themselves who completely

10   disregarded the severity of what was happening, such to say

11   as it is one of the factors in fashioning the sentence.

12           THE COURT:  Well, let me just say that my focus

13   right now is not on whether it was offensive, whether it was

14   sophomoric behavior; my focus is on disparity.

15           So other defendants for whom the government has

16   recommended straight probation or probation with home

17   detention have also taken photos, so how is Mr. Croy's

18   participation in that denigrating behavior to the Capitol,

19   our democracy -- why does it make it more aggravating here

20   for him to warrant two months in jail?

21           MR. O'CONNOR:  To those similarly-situated

22   defendants who also engaged in that same kind of sophomoric

23   behavior, it's not distinguishable; it is one of the many

24   factors of what Mr. Croy did that day.

25           THE COURT:  Okay.  So -- all right.  So I will

1    tell you that it somewhat troubles me to say that -- I mean,

2    that him taking pictures of Winston Churchill and Václav

3    Havel dressed up in Trump paraphernalia is such an

4    aggravating factor it deserves jail time.  Despite what one

5    might think of that conduct, that didn't make his -- anyway,

6    and so I --

7              MR. O'CONNOR:  Your Honor --

8              THE COURT:  -- it's hard for me to see that as an

9    aggravating factor warranting jail time.

10              MR. O'CONNOR:  Understood.

11              I think more the point of what that sophomoric

12    behavior illustrates is really the disregard to the severity

13    of what happened because, as Mr. Croy and his colleagues --

14    or co-rioters -- were engaging in that behavior, it came at

15    the time where the riot had successfully -- and thankfully

16    only temporarily -- but had successfully delayed the

17    certification of the presidential election.

18              And I think it is worth noting that the rioters,

19    when they went into the Capitol, had a severe consequence.

20    What they achieved is significant.  And the conduct they

21    engaged in at the time was completely unfitting.  To that, I

22    think it is a factor of their intent towards entering the

23    Capitol that they disregarded the severity of what was going

24    on.  I think that is notable.

25              Again, it doesn't stand alone by itself, is not

1    the only factor involved, but is worth commenting on as part

2    of the nature and circumstances of this offense.

3            THE COURT:  Yes.  Well, I mean, let me just say

4    that if the government was viewing this as an aggravating

5    factor warranting jail time, any participant in that mob who

6    took pictures and acted like it was a big party you'd be

7    asking for two months' jail time for thousands of people;

8    and you are not.

9            MR. O'CONNOR:  You are correct, Your Honor.

10            THE COURT:  Okay.  So then the fourth aggravating

11    factor is that the defendant wrongfully entered the Capitol

12    Building a second time.

13            And I just wanted to ask you, point blank, is

14    it -- is the defendant's entering the Capitol a second time,

15    after everything he had seen, both while he was inside the

16    Capitol, while he was hanging around for 45 minutes outside

17    the Capitol before he entered the second time, including

18    seeing somebody come out of the Capitol with a bloody

19    T-shirt -- is it that entering -- reentering, a second time,

20    the Capitol Building in that context the dispositive

21    aggravating factor here for the government to ask for jail

22    time?

23            MR. O'CONNOR:  In addition to the initial time and

24    manner he entered, yes.

25            THE COURT:  Okay.  Then the government cites, as

1    an aggravating factor, the fifth and final aggravating

2    factor warranting jail time, that he bragged about breaching

3    the Capitol and defending his actions and the actions of

4    co-rioters to his friends.  And I think, in that regard, the

5    government points to the defendant sending a private message

6    to a friend while outside the Capitol Building stating that,

7    "We stormed the Capitol"; that's a quote.

8            And then, in response to the friend's question,

9    Did congressmen bail?  The defendant responded, in part,

10   "absolutely"; and that was on January 7th, I think.  No,

11   that was outside the Capitol Building, so that was actually

12   on January 6th.

13           And then, after the Capitol attack, on January 8th

14   Mr. Croy told his friends, also in a private Facebook post,

15   that it "was a legit and mostly peaceful protest, unlike the

16   burning buildings we see during the summer and are told is

17   mostly peaceful."  So these were not public posts.

18           MR. O'CONNOR:  They were not.

19           THE COURT:  They were clearly defending and

20   minimizing the seriousness of the consequences of the

21   conduct on January 6th.

22           MR. O'CONNOR:  I would say it displayed his intent

23   and his pride for that action.

24           THE COURT:  And his pride.

25           But, as an aggravating factor warranting a prison

1    term as opposed to straight probation or probation with

2    detention, I look at, for example, Morgan-Lloyd and Jessica

3    Bustle, both of whom used almost exactly the same phrase,

4    "We stormed the Capitol."  And Bustle went on to say, "We

5    need a revolution."  Morgan-Lloyd went on to say she was so

6    glad she was there; she can now spread the truth about what

7    happened and open the eyes of some of their friends.

8            So they are much more, in some ways -- compared to

9    what Mr. Croy said -- you know, much more proselytizers than

10   defenders of his own conduct.  So how -- and for both

11   Morgan-Lloyd and Jessica Bustle, who I just pulled off one

12   of the government filings to me in another case as

13   comparators -- how does Mr. Croy's messages -- both on

14   January 6th and then the few days afterwards -- amount to an

15   aggravating factor?

16           MR. O'CONNOR:  Again, Your Honor, similar to his

17   manner -- the, again, sophomoric traipsing through the

18   hallways -- it is a part of Mr. Croy's criminal conduct that

19   day.  It is part of the nature and circumstances of the

20   offense that the Court should be aware of when fashioning a

21   sentence; it is a factor.  Also understanding, as you've

22   just discussed, this one is not the dispositive factor.

23           THE COURT:  Okay.

24           MR. O'CONNOR:  That one, again, is much more the

25   entering the second time, the amount of time he was in the

1    Capitol collectively; the amount of time he was in and

2    around the Capitol, as well as having entered very early in

3    the riot; those are certainly much more of the dispositive

4    factors.

5            I would say that these are more atmospheric as to

6    demonstrating his intent; his joining the crowd; his pride

7    about everything that took part that day that did -- again,

8    while he was not directly engaged in the violence, did

9    include violence.

10           THE COURT:  Okay.  Well, thank you.

11           Mr. O'Connor, is there anything else you want to

12   add?  It's been a helpful discussion.

13           MR. O'CONNOR:  Thank you so much.

14           I did just want to mention one thing, and I spoke

15   with defense counsel about this briefly.

16           In the reply the defense had referenced that there

17   was a discovery concern that the government didn't provide

18   something to defense.  I did just want to correct it, for

19   the record.

20           I did respond to Ms. West's discovery --

21           THE COURT:  Could you remind me?  What was it?

22           I remember seeing something about that, but --

23           MR. O'CONNOR:  There is a line in there where we

24   talked about a witness who had observed Mr. Croy had deleted

25   things from his Facebook account.

1              THE COURT:  Oh, yes.  But -- and that's why

2     Ms. West submitted the screenshot showing Facebook had

3     blocked -- blocked Mr. Croy's --

4              MR. O'CONNOR:  I believe so.  Right.

5              And Ms. West had asked me for records about

6     that -- that person, and identifying information about that

7     person; and I provided her with the records.  They had been

8     previously provided; but I did respond to that email before

9     the filing of the reply to say, Here are the records we

10    have.  She acknowledged it in a very nice way.  I thought

11    that was the end of -- more or less we had satisfied the

12    concern that she had.

13             Just insofar as it's in the reply, I did want to

14    correct the record to say that we did -- I did respond to

15    that discovery request; and I believe she will say the same.

16             THE COURT:  Okay.  Well, while you are on that

17    point, it was a bit of a puzzle to me -- and I was going to

18    ask Ms. West about it, but maybe I will just ask you.

19             There was a letter submitted by one of Mr. Croy's

20    friends who said -- a Mr. Kezer -- who said defendant, and I

21    quote, Can be seen in multiple videos telling people not to

22    break anything; and that video evidence shows that he was

23    telling people not to perform illegal actions but to have

24    their voices heard peacefully.  That's docketed at ECF 40-4.

25             I haven't seen videos that say anything like that.

1    Do those videos exist, or are they in connection with this

2    case?

3              MR. O'CONNOR:  Not that I have seen or collected.

4              I mean, as you well know, there is plenty, plenty,

5    plenty video out there.  I have not seen videos along the

6    lines of what this witness is discussing.

7              THE COURT:  Okay.  So -- okay.  Because I was just

8    puzzled by that statement in that letter.  But maybe

9    Ms. West will be able to explain what this Mr. Kezer was

10   talking about or whether Mr. Kezer was dreaming it or

11   getting people confused.

12             MR. O'CONNOR:  Certainly.

13             THE COURT:  Okay.  Anything further?

14             MR. O'CONNOR:  No, Your Honor.  Thank you.

15             THE COURT:  All right.  Ms. West.

16             So maybe I will just start with Mr. Kezer's

17   letter.  Am I missing -- I tried to be prepared so, when I

18   saw that letter, I wanted to make sure I hadn't missed any

19   videos.

20             MS. WEST:  Your Honor, no, you haven't.

21             As Mr. O'Connor said, there are gazillions of

22   videos.  These are reports of what Mr. Croy has said -- has

23   told friends that happened.  We're still finding videos.

24             We're hopeful that we'll find a video when

25   Mr. Croy was helped after he was pepper sprayed.  A police

1     officer -- I am sure was wearing a body-worn camera -- came

2     over to assist Mr. Croy; I haven't seen that video.

3           When the woman police officer in the video -- when

4     Mr. -- you mentioned it.  When Mr. Croy leaves the video for

5     a little bit, he is actually in a bathroom.  He comes out of

6     the bathroom.  He has a really nice discussion with those

7     police officers; we haven't seen any body-worn camera on

8     that.  I am sure it exists.

9           THE COURT:  Well, I am not so sure about that

10    because -- based on what I have learned through the course

11    of these cases, if it's a Metropolitan Police Department

12    police officer, they're required to wear body-worn cameras

13    if there is footage.

14          MS. WEST:  Yes.

15          THE COURT:  But if it's a Capitol police officer

16    they don't wear cameras.  And so if he had an interaction --

17    it depends on -- I think they all look like police officers.

18    But if it was a Capitol police officer, it is highly likely

19    there is no body-worn camera footage.

20          MS. WEST:  Which is unfortunate.

21          But in that vein, in this Class B misdemeanor --

22    and I should say, Mr. O'Connor is a true southern gentlemen;

23    he has been a pleasure to work with.  I have asked him for

24    video after video.  He, I know, has spent days looking for

25    things I have asked for, to identify people; every time, he

1    did it.

2            It's just that more keeps coming up.  After

3    Mr. Croy's re-arraignment, we had more videos.  And as I

4    have mentioned in my brief, I think now I am up to 11

5    discovery dumps since he pled guilty; that never happens in

6    a case, as this Court knows, in cases that I generally

7    handle that are ten years to life.  You don't get discovery

8    after the person pleads guilty.

9            And to Mr. O'Connor's credit, he was really,

10   really trying hard to find something to make Mr. Croy look

11   more aggravating for this Court so that he could, in fact,

12   say two months' incarceration is what he should have but

13   there just wasn't, thankfully.  So --

14           THE COURT:  Well, it is -- in a case of this

15   magnitude, with so many people involved at the Capitol, and

16   the government diligently trying to do its job of making the

17   punishment fit the crime -- I think they also don't want to

18   make a mistake and misevaluate somebody as falling in a

19   lesser category of aggravating circumstances, and then find

20   out that that person engaged in more aggravating conduct

21   than they were initially aware of.  And it has happened

22   before me and, I think, in front of other judges where pleas

23   have been postponed because new evidence has surfaced that

24   the government has to evaluate, plus defense counsel; so

25   it's the nature of this particular incident.

1          MS. WEST:  I agree with the Court.  And

2     Mr. O'Connor and I both agreed that we wanted to bring you

3     every fact we possibly could that was pertinent to the case.

4          With regard to what Mr. O'Connor said about what I

5     said in my response about the missing discovery, he did give

6     me that; but he didn't identify who that person was that

7     said Mr. Croy had deleted these things so that we could

8     investigate that.  But it became a nonissue because we found

9     a Facebook post where he clearly said that he was banned by

10    Facebook.  He didn't -- that wasn't something he did; so

11    that became actually a moot point.

12         THE COURT:  Well, let me ask you about a video,

13    joint -- the video footage that was Joint Exhibit 2, which is --

14         MS. WEST:  Mr. Croy's cell phone in the crypt.

15         THE COURT:  Yes.  And you can hear the crowd

16    shouting, "Whose house?" "Our house." -- and the rioters

17    shouting:  "You are on the wrong team."  And a lot of that

18    is the voices that are clearly other people in the crowd in

19    some ways.

20         But early in that video you can hear a voice very

21    clearly.  So it was either Mr. Croy holding the phone, or

22    somebody very close to him; and the voice says, "Where you

23    motherfuckers hiding!"  "Get out of the basement with

24    Biden!"  Is that Mr. Croy speaking?

25         MS. WEST:  I certainly hope not, Your Honor.  I

1    didn't ask Mr. Croy.  I can ask Mr. Croy.

2            We discussed -- Ms. Cubbage, she is the video

3    expert.  We discussed having a voice exemplar done of

4    Mr. Croy so that we could identify who said what and --

5    because I didn't want to rely on Mr. Croy's memory because

6    it was so chaotic.  And we decided -- I felt like it wasn't

7    worth -- which you are not going to like; but I felt like:

8    This is a Class B misdemeanor; I am court appointed; my

9    voucher is already over the limit; I have Ms. Cubbage to pay

10   from the government.  So I just was really, actually,

11   running out of time; I was looking at so much video.

12           So I feel like -- there was one thing I did ask

13   Mr. Croy, if it was -- that we just talked about that I did

14   ask him --

15           THE COURT:  Well, let me just say, whether

16   Mr. Croy said it -- it's so clear, it's so close to him, it

17   would be hard to imagine how he didn't hear it to know what

18   people around were doing; and they were looking for

19   congressmen.  So it was a good thing all of the Congress

20   people were evacuated.

21           MS. WEST:  Right.  So -- and I think --

22           THE COURT:  And I think that that's -- whether he

23   said it or not, you are right; I can imagine why you would

24   hope he didn't say that.  But it does give a pretty clear

25   indication of what people right around him, very close to

1    him -- because it's a clear statement on the video --

2              MS. WEST:  It's scary.

3              THE COURT:  -- are thinking.

4              MS. WEST:  It's scary, quite frankly.  Very scary.

5              And there were a lot of things people said that --

6    just from sitting and talking with Mr. Croy that I could

7    tell wasn't him, things that were very offensive; so I think

8    that I am going to get to that.  There were a couple that

9    Mr. O'Connor mentioned.

10             I do want to talk about a couple of things that

11   the Court brought up, the factual mystery of a woman.  That

12   goes along with the Court saying -- and the government

13   saying that Mr. Croy didn't immediately cooperate with the

14   police; that's not true.

15             Mr. Croy went to the police station, as I

16   described in my brief; he did everything we said.  The fact

17   that he didn't give them a statement that day doesn't mean

18   he wasn't cooperative.

19             He did cooperate immediately as soon as he had

20   legal representation.  And I should tell the Court that the

21   codefendant in this case did give an oral statement, a

22   recorded oral statement.  And what he says has coalesced

23   with what Mr. Croy has told me, so I wanted the Court to be

24   aware of that.

25             As far as the mystery woman, to me, that's

1      cooperation that Mr. Croy should get credit for in this

2      case.  He didn't have to talk about that.  The plea

3      agreement -- as the Court says, there is not guidance like

4      we have in the guidelines, like the safety valve; here's the

5      five things you have to do.

6              Well, in the plea agreement, all of these

7      defendants have agreed to sit down and talk to the

8      government about what happened on January 6th.  So Mr. Croy

9      went beyond what he -- describing what he did.  He described

10     for the FBI other things; and I think that is super

11     important.  And Mr. O'Connor just said they didn't know who

12     she was at that time.  What he failed to mention is that

13     Mr. Croy, in his interview, was able to help the FBI.  And

14     not only that, Mr. Croy had a receipt for the hotel that

15     they stayed in, which is going to have -- make the

16     government's job easier at trial with the codefendant.  So,

17     to me, when criminal defendants go beyond what they have to

18     do, they should be given credit for that; and that's

19     important.

20             I agree with the Court that this is not an easy

21     task.  And Mr. O'Connor said that it's quote-unquote a novel

22     event, which is true; but the law is not novel.

23             My understanding -- as the people have been

24     prosecuted in D.C. for protests for a long time, and I know

25     how important it is for this Court to treat everybody

1    equally.  And what -- why I wanted the Court to look at this

2    case through the prism of COVID-19 and the protests that we

3    experienced last summer is that really -- people were on

4    edge; everybody was.

5            And a person like Mr. Croy -- at that time he was

6    unemployed; he has two kids to feed and clothe.  Mr. Croy is

7    unique to other defendants because of what happened in

8    Portland, which is where his dying mother was; he couldn't

9    get to her; he was worried about her.  And she died last

10   year and he was able to take care of that thankfully, even

11   though he was on release in this case.

12           But for a period of months, Mr. Croy -- unlike

13   other people whose parents perhaps were not in Portland --

14   watched that happen.  And I have to say I watched it happen,

15   and I watched January 6th happen; and I was just stunned.

16           I just -- I don't know how to say that it was very

17   hard for Mr. Croy to watch that.  And he did -- what he did

18   was wrong; he has told this Court that.  But he felt like he

19   needed to express himself in a way that turned out,

20   unfortunately, not to be good.

21           So what I'm trying to say is that Mr. Croy is a

22   good person who made a very bad decision -- not just based

23   on fake news that Donald Trump spewed, but also based on

24   what was happening to him personally; what he had watched

25   for months.  So he, as a person, was perhaps more ripe for

1    his behavior than others is all I am saying.

2              THE COURT:  Well, I don't really want to get into

3    the whole comparison.  I know you have brought it up in your

4    papers.  Mr. Croy brought it up in his letter; you know,

5    about watching the Black Lives Matter and the protests after

6    George Floyd's murder that happened across the country.

7    There were protests in D.C.  I think many protesters who

8    were arrested were processed in Superior Court, not this

9    Court.

10             To the extent that there were protesters who

11   participated in some of those incidents who were brought up

12   on felony charges and brought to this court -- I had one; a

13   guy who walked -- broke a window in a bank, walked through

14   the bank, took nothing -- took nothing -- 16 months.

15             MS. WEST:  Wow.

16             THE COURT:  I gave him 16 months; below what the

17   government was asking for.  So for people to say that they

18   thought people who participated in protests during the

19   summer of 2020 got no punishment, that's not my experience

20   in my court.

21             MS. WEST:  No, it's not.

22             THE COURT:  It is not.

23             If he wants to be treated like some of those

24   protesters, he wants -- he was given a maximum of a petty

25   offense charge, not a felony charge.

```
 1                MS. WEST:  I agree.  I agree.

 2                THE COURT:  And that guy walked into a bank, took

 3    nothing, at night.  There was nobody there.  He wasn't

 4    obstructing a constitutionally-mandated process --

 5                MS. WEST:  I understand.  I understand.

 6                THE COURT:  -- charged with a felony.

 7                MS. WEST:  I understand the Court's frustration.

 8    I just wanted --

 9                THE COURT:  So I hear the comparisons to the

10    treatment of people arrested in connection with the riots

11    during the summer of 2020, my experience is felony

12    prosecutions in this Court, and lots of jail time;

13    certainly --

14                MS. WEST:  I think --

15                THE COURT:  -- beyond the six months max for the

16    petty offense charge.

17                MS. WEST:  And I think Judge Lamberth mentioned

18    that in one of his sentencings; that he had watched the

19    testimony of Judge Garland, and how he was going to treat

20    all of these people equally.

21                I just wanted to point out that Portland had a

22    real place in Mr. Croy's heart, and it was really, really,

23    hard for him at that time is what I wanted the Court to take

24    from that.

25                THE COURT:  Well, I read his letter.  I read your
```

1    briefing, Ms. West.  And I -- you know that old motto that

2    moms tell their kids:  Two wrongs don't make a right.

3              MS. WEST:  Yes.

4              THE COURT:  So if he's offended by what he saw in

5    terms of some of the protests in the summer of 2020 because

6    of the violence and criminal conduct that occurred with

7    looting businesses, burning buildings -- which is what he

8    describes in his letter -- you know, okay, well, why should

9    he go and repeat that behavior if he thought it was so

10   wrong?

11             MS. WEST:  As I said --

12             THE COURT:  That argument -- that comparison makes

13   little sense to me, so I wasn't even going to talk about it,

14   because it makes so little sense to me, until you brought it

15   up.  And I know your papers are replete with it, as is his

16   letter; but two wrongs don't make a right, it's as simple as

17   that.

18             My experience with prosecutions in the summer of

19   2020 -- I only speak from my experience -- is that -- is

20   that people were brought to me facing felony charges.

21             MS. WEST:  I understand, Your Honor.

22             THE COURT:  And not that many cases I think, as

23   most of them were processed in superior court.

24             Anyway -- so I don't know that there is much more

25   to be said.  I do think that the goal of a lot of the

1    protests in 2020 were to hold police accountable and

2    politicians accountable for police brutality and murder, in

3    George Floyd's case; and it was to improve our political

4    system.

5           What happened on January 6th is in a totally

6    different category.

7           MS. WEST:  I agree.  I agree.

8           THE COURT:  That protest was to stop the

9    government from functioning at all, to stop our democratic

10   process -- and it worked, at least for a period of time.

11   They are not comparable.

12          So -- but let's go back to this case.

13          MS. WEST:  There are two videos, Your Honor, that

14   you mentioned.

15          The first one, Exhibit No. 3, you talked about the

16   two windows that were broken, and that he went into the

17   doors when he first entered the Capitol.  I watched that

18   video multiple times.  There were at least 400 -- I think I

19   put 700 in my brief; and then I went back and said I better

20   start counting.  There were at least 400 people ahead of

21   him.

22          According to Mr. Croy, he did not understand or

23   see the violence until weeks later of what really happened

24   at the Capitol; and even today we're seeing more things

25   about the violence.  And there is a --

1          THE COURT:  Well, I think he did say that, even

2     before he went into the Capitol, he saw officers shooting

3     pepper balls and throwing smoke and gas grenades at rioters

4     climbing up the rails to the steps of the Capitol and into

5     the crowd.  But, I mean, it's just --

6          MS. WEST:  He knew he shouldn't go in, and he went

7     in any way.

8          THE COURT:  Exactly.

9          MS. WEST:  That's right.  That's absolutely right.

10          But you asked -- there was a chant -- I did ask

11     Mr. Croy -- because I have a note:  "You're on the wrong

12     side."  I asked Mr. Croy if that was him because that was

13     that police video when he was so close to the police; he

14     said that wasn't him.  That's when we had the discussion of

15     whether we should have a voice exemplar; and we -- I just,

16     basically, ran out of time.

17          The other video that you talked about is where

18     he's pushed into the Capitol --

19          THE COURT:  Well, in his defense -- Defense

20     Exhibit 1, in that video, I think he is saying -- he does

21     yell to the police:  You took an oath to the Constitution,

22     not a fucking -- I think he says -- pirate.  "Why you coming

23     over here to my house?"  "Protect your precious fucking

24     building?"  And he calls them oath breakers.  That is the

25     defendant speaking at that point, right?

1          MS. WEST:  It is, because I did ask him about that.

2          THE COURT:  So he is part of a crowd that's

3    taunting the police; and this is at 1:57 to 2:02.  It's just

4    a few minutes before the police were overrun and members of

5    Congress and the Vice President had to be evacuated.  Right?

6          MS. WEST:  Correct.

7          I did want to -- I know the Court knows the Reeder

8    case.  He has shown a lack of remorse, which I think this

9    Court has just mentioned, how important that is.  He had a

10   lack of remorse even after he pled guilty, which I think is

11   a different situation; and he publicly live-streamed the

12   information is what I am told.

13         I think that, finally -- I agree with the Court

14   that, as far as specific deterrence, a period of probation

15   is, in fact -- it's not supervised release as we know it,

16   but it does provide for supervision to make sure that

17   nothing happens like this again, which I think -- which

18   probation, I think, practically, is better for these

19   lower-level defendants than a period of incarceration

20   because they can be supervised.  And as the Court fashions a

21   sentence, I believe I mentioned he would -- I am not sure he

22   would be willing to wear an ankle monitor if the Court

23   wanted that kind of supervision.

24         You started this hearing by saying -- mentioning

25   the footnote that I wrote, and that your goal is not to make

1      my job harder.  I can't tell this Court what a privilege and

2      gift it is to practice law in this courthouse and in front

3      of you.  I have learned -- I am such a better lawyer than I

4      was before I came here.

5           But the irony is -- I told Mr. Croy before his

6      plea what was going to happen.  I said, Mr. Croy, you don't

7      realize how fortunate you are to have Judge Howell.  And

8      that plea hearing was so hard for me because I had never

9      heard the level of emotion and angst in your voice in a

10     case; and I have had several cases in front of you.  And so

11     I believe -- even though this is such a unique circumstance

12     and unique case -- that this Court will treat Mr. Croy like

13     other similarly-situated defendants and give him a sentence

14     of probation, which would allow him to work and take care of

15     his children which is a very serious issue in this case.

16          THE COURT:  And you have mentioned that also.  But

17     I also am looking at a defendant who picked up -- when he's

18     unemployed, and travels to Washington, D.C.; pays for a

19     hotel.  He's got -- I mean, it's -- you know, if you are

20     really concerned about your son with diabetes and, you know,

21     supporting your family, what are you doing picking up and

22     traveling across country?

23          MS. WEST:  Well, I think that that's a good

24     question.  But at the time Mr. Croy believed what millions

25     of other Americans believed that Donald Trump told them;

1   that the "stop the steal" was real.  Mr. Croy doesn't

2   believe that now, but he did then.  And I think, as

3   Americans, that's what we want our citizens to do, is to

4   address wrongdoing by anyone, but to do it legally.

5          And Mr. Croy came here to peacefully protest.  He

6   didn't know he was going to go into the Capitol.  And you

7   mentioned that -- about whether or not that paragraph in my

8   brief was factual; I represent nine people in these cases,

9   and some guy came here just to pray -- just to pray for our

10  country.  There were moms that came to hear some women's

11  group talk.  I mean, there were all -- Mr. Croy is an

12  American Indian; there are all different races and types.

13         I agree with the Court.  Most of those people were

14  Trump supporters; most of those people.  But I have seen

15  hundreds of hours of videos.  There are women pushing baby

16  carriages; there are people listening to Elton John.  I

17  mean, it started out peacefully and didn't go south until

18  Mr. Trump told everybody to go over to the Capitol.

19         And what I told Judge Hogan in another case -- I

20  represent a native Texan.  As soon as he realized that

21  Donald Trump told him to go to the Capitol but didn't go to

22  the Capitol with him, he was off the list, Donald Trump,

23  because he didn't do what he said he was going to do.

24         And Mr. Croy has had a similar revelation.  At the

25  time he went to D.C., January 6th, he believed what he was

1    doing as an American was right.  He made a bad decision to

2    go into the Capitol; then he did it again, that's wrong.

3    Now he knows that he was misled but his President, like

4    many, many, many millions of others.

5              THE COURT:  Well, let's talk about the second time

6    he went into the Capitol, because that's one of the

7    dispositive aggravating factors in the government's view,

8    and one that I find to be a very aggravating factor in this

9    case.

10             And you are sensitive to that, Ms. West; and you,

11   sort of, make the arguments about that focused in your brief

12   and state that he did not voluntarily enter the Capitol

13   Building a second time.  And you say that he was pushed in

14   by the crowd; it was a surge that carried him into the

15   building and the crowd pushed him through.  So you make it

16   seem like he is just -- floats among the ocean, going with

17   the tide.

18             MS. WEST:  I don't think it was quite that way.

19             THE COURT:  Well, you didn't say that, but that's

20   my --

21             MS. WEST:  Yes.

22             THE COURT:  So I actually looked at videos 7 and 8

23   of the moment he goes in the second time around.  And I have

24   to say it doesn't look to me like he is simply pushed in by

25   the crowd.

1          So I wanted to share with you what I saw; you can

2     tell me where I am wrong.  But video 7, from his phone, does

3     show a mass of people outside of the Rotunda door.  And what

4     is striking to me is that there is a steady stream of people

5     exiting through the doors trying to push through the crowd

6     to get out; steady stream of them.  And you can hear a voice

7     in the background saying something about how the police are

8     trying to push them out.  There are alarms blaring.

9          And instead of Mr. Croy joining the stream trying

10     successfully to get out through the crowd out of the Rotunda

11     doors, he isn't moving.  He is still facing forward, pushing

12     towards the doors.  And, in fact, there are other rioters

13     who are yelling:  Get back in there, push forward.  And he

14     appears to be one of those people following the directions

15     to push forward and get back in there, rather than following

16     a number of people who are trying successfully -- as I said,

17     a steady stream of people leaving the building.

18          And then -- that's on the outside of the Rotunda

19     doors.  And inside the Rotunda door the CCTV footage shows

20     him, sort of, standing -- sort of looking at his phone;

21     standing around with his phone.  And then a crowd of

22     rioters -- and there is a police line trying to keep people

23     from going inside of the Rotunda.  And then you see him just

24     standing there.  No gassing, no chemical spray at him at

25     that point; he is just standing there.

1          So then he made his way in, rather than leave with

2     the exiting crowd.  And then the police -- then the police

3     line is broken with him, with the crowd, being pushed into

4     the Rotunda.  This is not somebody who seems that he just

5     happened to be standing at the wrong place at the wrong

6     time, and that's how he ended up inside the building a

7     second time.

8          MS. WEST:  And I asked Mr. Croy exactly what you

9     just described, and here is what I was told -- and here is

10     what I saw.  You are correct, somebody said:  Push forward,

11     and get back in there.  And I asked Mr. Croy if that was he;

12     and he said no, that wasn't; that was people behind him.

13          And he said, you know, it's like being at a

14     concert.  I said, What do you mean?  He said, you know,

15     people are going one way, people are going another way; the

16     people behind me were pushing me.  And I said, Well, why

17     couldn't you turn around?  And he said that there was a

18     police officer or someone that said turn around, and he

19     physically was pushed so close to the other people that he

20     could not even do that.  And people -- he said it was like a

21     group of 20 or 30 people had -- he didn't see it, but he

22     felt from behind him being pushed, being pushed, being

23     pushed, even though you could see people on the left-hand

24     side of that video coming out of the building and out into

25     the outside.  So that's how he described that to me.

1          And then, when I watched video No. 8, somebody

2     said -- as the Court said, at 21 -- he said -- somebody

3     says:  Push forward.  I said, Well, Mr. Croy, was that you?

4     He said no; that's these people behind me pushing me in.

5          He said as soon as he got in he was -- believes

6     the police -- he was pepper sprayed, took his glasses off --

7     he can't see without his glasses.  Even if he had glasses,

8     if you have been pepper sprayed you can't see.  He said a

9     police officer actually helped him and asked him if he

10    needed assistance.  And you can see, as you watch the video,

11    that he is, kind of, in a daze.  He really doesn't know what

12    to do.

13         But there is a whole line of police officers

14    trying to get everybody out.  I think one of them says:  Get

15    on the ground.  And Mr. Croy completely complies, once

16    again, with everything the police officer said to him.  And

17    he then got out after he was able to clear his eyes with

18    water.  So that's why, Your Honor --

19         THE COURT:  Yes.  But complying that time was

20    after he was told the first time around by a police officer:

21    Leave, exit.  So he left, only to come back in.

22         MS. WEST:  Yeah.  And that's why -- I had the same

23    questions that Your Honor does; and that's how Mr. Croy

24    described that to me.

25         THE COURT:  All right.

1        MS. WEST:  I think that's all I have, Your Honor.

2   Thank you.

3        THE COURT:  Okay.  Thank you.

4        MS. WEST:  Mr. Croy, this is your opportunity to

5   speak to me directly if you wish.

6        THE DEFENDANT:  Yes, ma'am.

7        I just want to start by saying that I am sorry.

8        I have seen a lot of things since that day, you

9   know.  As the prosecutor said, you know, I did say some

10  things directly after the incident; but I never witnessed

11  no -- no major violence; a lot of pushing; a lot of shoving.

12  And, you know, since then I have seen video footage; and I

13  don't condone violence or aggression.

14        You know, I am not against police officers.  I am

15  not against the government.  I am not against -- I am not

16  against anything.  I love America.  I love my children.  And

17  I respect law enforcement.

18        When I was at the bottom there, and you said that

19  I was a little bit yelling at the police, you know:  You are

20  not a tyrant, or whatever; I had just seen them punch a guy.

21  And I had no context for it, I don't know what happened, you

22  know.  But I saw him punching him, not trying to detain him.

23  So I was -- I tried to record it; I missed it.  And then,

24  you know, you see me yelling at the police officers.  It was

25  me being aggressive with the police officers.  It was me

1    saying, you know, Why are you hitting that guy?  Why aren't

2    you up there protecting that building?

3            And then, after they left, I turned around, and it

4    was completely open all the way up to the Capitol.  This

5    large group of police officers had moved off into the

6    crowd -- not up towards the Capitol, into the crowd; so I

7    had no idea where they were going off to.

8            Foolishly, I walked into that building, Your

9    Honor.  I followed along with everybody else.  I saw

10   everybody going up.  I didn't see police at the top no more.

11   I knew there was police officers who were aggressive behind

12   me now, so I followed the crowd.  I tried to stay with them,

13   and I shouldn't have.  I definitely should have just left at

14   that point.  But all day we were, you know, under this

15   impression that the election had been stolen; that, you

16   know, we were there to make our vote count and, you know,

17   make sure that our voices were heard, you know.  And so I

18   was caught up in the group.  That's how it was, I was caught

19   up with them.

20           I went inside that building.  I never got

21   aggressive with the police even inside the building, even in

22   the crypt.  I wasn't -- I wasn't yelling at people.  I

23   wasn't in the front of the line trying to push police

24   officers, never.

25           And then, when they got pushed back again, I

1    followed the crowd.  I saw a bathroom at the end of the

2    hallway.  I went in to use the restroom, washed my hands,

3    respectfully.  I didn't touch anything in there.  I didn't

4    make a mess, nothing.  And when I came out my first

5    question, when I saw a police officer standing there was,

6    Are you guys okay?  Immediately, you know.  And they asked

7    me if I was okay, and I responded yes.

8           So then they pointed me on the way.  I walked out.

9    I took some pictures.  And when I exited that building, I

10   had no intentions ever of going back in there.  And then it

11   was 40 minutes, as you said, that I was milling around

12   outside, just kind of singing; you know, standing around

13   talking with people.  And then the guy came out with the

14   bloody shirt and said that a woman had been shot inside.

15          Like I said, I never saw no violence that day with

16   the group that I was with.  I have since seen that HBO

17   documentary.  I know that there was violence there now.  But

18   I hadn't seen any; and I hadn't seen anybody with weapons or

19   anything like that.  The only people I saw with weapons were

20   police officers.  So to hear somebody was shot, I couldn't

21   believe it; I had no idea what was going on.

22          You know, I had already seen -- for the most part,

23   the police officers all day that day were very -- very

24   nice -- you know, congenial, respectful.  I was respectful

25   to them; they were respectful to me.  The only ones I saw

1    were the ones at the beginning.  And, like I said, I have no

2    context for why that happened.  I have no understanding of

3    why that happened; I just saw that it had happened.

4           And so when I heard that a lady had been shot --

5    you know, I had been watching all of those YouTube videos

6    all summer on.  And foolishly, again, I thought maybe if I

7    documented stuff on my phone that you would get the real

8    context of what was going on because, you know, I was

9    watching all of those riots in Portland and, also, because

10   my mom lives in Oregon.  I wasn't seeing any of that on the

11   news.  So I knew that it was important for people to be out

12   there and actually documenting what was going on.  It was

13   important in George Floyd; it was important in BLM, you

14   know, protests all across the country for people to actually

15   be out there documenting who weren't journalists or

16   anything.

17          So I almost felt like I was trying to do that all

18   day that day, trying to document.  But then when I was

19   pushed inside of that building, I was trying to document

20   that whole thing because we were up there; I was trying to

21   find out about the girl that was shot.  People were yelling,

22   you know.  I tried to record a little bit.

23          And then once I started to feel like I was being

24   pushed, I immediately put my phone away, you know, because I

25   didn't want my phone broken.  By that time, you know, I had

1    a flag in one hand, I had a phone in the other.  Like

2    Ms. West said, at a concert, when you are in a crush

3    situation like that -- I go to a lot of heavy metal

4    concerts, so it's always like crushing.  You always get your

5    hands up in front of you and protect your chest; that way

6    you don't get crushed.  If you do, then you have got some

7    kind of barrier there to keep you from getting knocked down

8    or light-headed.  So that's how I was.

9         I was pressed up against the front by the police,

10   and they were asking me to go back.  I was explaining to

11   them I can't go back, I can't; you know, I am trying, I

12   can't go back.

13        Then, when they released us, they told me to get

14   on the ground and, at the same time, I was maced; at the

15   same time it seemed like.  I mean, my memory is -- you know,

16   obviously it's been ten months; but that's how I remember

17   it.  I remember being pushed in there, stuck, face-to-face

18   with the police, and them telling me to go back.  I was

19   saying, I can't; I am trying.

20        And then you could hear people yelling behind me:

21   We're being crushed.  They maced me and released us at the

22   same time.  They were, like, get on the ground.  I told

23   them -- immediately, I put my hands in the air -- you know,

24   from my chest up to the air; I said, I can't, I am maced; I

25   can't see.  They said:  Go this way.  So I wandered off that

1    way.  I didn't have my glasses on because I had taken them

2    off.

3              As soon as we were released, I took my glasses

4    off, put those in my hoodie.  I went off to the left to a

5    door that they directed me to go to.  I went out; there was

6    a police officer standing there, and there was a spiral

7    staircase going down.  And I told them -- he was, like, get

8    down the stairs right now.  I was, like, I am maced; I can't

9    see very good.  He offered to help me right away.  You know,

10   I was like, really?  He was like, yeah, I don't want you to

11   get hurt; I was, like, I appreciate it.

12             And then, after I exited the building -- again, I

13   met with other police officers that day, very cordial; gave

14   me water.  I had no bad interactions that day to base how

15   bad it was until afterwards.

16             Like I said, the only -- the only group was the

17   first group, you know; and I have no context for it.  I

18   don't know if it was warranted for them to be punching some

19   guy like that; but every other interaction with police that

20   day was good.

21             I didn't see anybody physically assaulting police

22   officers in front of me, you know.  And if they were, then I

23   was trying to document that, too.  I wasn't just documenting

24   police being on bad behavior; I felt like I needed to

25   document all bad behavior.  But I wasn't very good at it

1    because I was always afraid of getting my phone broke, or --

2    so I would record what I could, and I would put it away.

3           As soon as we heard that there was a curfew, we

4    left immediately, as soon as -- you know, we got out before

5    the curfew.  I never wanted to break the law that day.

6           I had no idea I was going to the Capitol that day.

7    I thought we were going there for a rally.  And then, when

8    Mr. Trump said that -- walk down the street and go to the

9    Capitol, that's what I did.  I never saw no signs, no

10   barricades.

11          When I walked up, I walked right up to that spot

12   where you see me at where the first police officers

13   encounter us; walked right through a crowd with tons of

14   people.  I never saw -- I saw the barricade right there with

15   the stairs; but I never saw any signs or anything like that,

16   you know.  Then, when I got to the top of the stairs, the

17   doors were open and there was a ramp going up to the doors.

18   We kind of followed along.

19          The whole time -- like I said in my letter, Your

20   Honor, I was kind of like a lemming.  You know, I just kind

21   of followed the crowd.  I regret every -- every moment of

22   being inside of that building now, in hindsight, you know.

23          I -- my children are the most important thing to

24   me, you know; and me being away for two months, I mean,

25   incarcerated -- it not only messes with my job; I lose my

1    apartment; my kids have to be placed elsewhere, you know,

2    with other people, and it disrupts all of their lives.

3            I am willing to accept all of the punishment for

4    myself -- for my actions.  I have no problem being held

5    accountable for making a mistake.  I promise I will learn

6    from my mistake.  I will never do anything like that ever

7    again.

8            You know that I have previous criminal records.

9    Every mistake I have made I have learned from it, you know.

10   I don't go out and repeat the same mistakes.

11           Like I tell my children, I take those mistakes and

12   I use them as a lesson.  And as long as you are not doing

13   the same mistake over and over again, it's not -- it's not a

14   mistake, it's a lesson.  And I have learned my lesson from

15   this, Your Honor.

16           And I sincerely apologize to you --

17           THE COURT:  And what is the lesson you have

18   learned, Mr. Croy, because what was -- what I remember from

19   your plea hearing and what -- you essentially are saying the

20   same thing here today --

21           THE DEFENDANT:  Right.

22           THE COURT:  -- which is you didn't know there was

23   anything wrong with being on the Capitol grounds, going up

24   the Capitol steps, going through the open doors of the

25   Capitol; you were just following the crowd, you didn't know

1      that there was anything wrong.

2                  It was irksome to hear that --

3                  THE DEFENDANT:  Yes.

4                  THE COURT:  -- at your plea hearing, as it is

5      today, when, at the same time, you saw police shooting

6      pepper bombs, and other kinds of smoke grenades, and using

7      chemical tools that they have to do crowd control, trying to

8      keep people out of the Capitol.  You saw police lines in the

9      Capitol.

10                 It's minimizing your -- minimizing your conduct

11     that I heard in what you were saying to me at the plea

12     hearing, and I hear again today.

13                 So tell me, Mr. Croy, what have you learned from

14     this experience?

15                 THE DEFENDANT:  I should have never went up the

16     stairs.  I should have never, ever -- as soon as I saw that

17     there was a commotion like that, I should have dispersed; I

18     should have left.

19                 I didn't hear anybody say that; but, you know,

20     again, I was caught up.  I was caught up at the time.  You

21     know, I had been following all kinds of different stories

22     and heard all kinds of different things, even that day.

23                 And, since then, I've learned that a lot of that

24     is not true, Your Honor.  You know, I was caught up.  I was

25     not in a good emotional place at the time.  I was erratic.

1    I was erratic and frustrated; and I am not -- I am not in

2    that place no more.  You know, I have since returned to

3    work.  I have since seen evidence, you know.  I have since

4    seen context of stuff that I had just gotten snippets of,

5    you know.

6           Now you get the full context and you realize that

7    a lot of that wasn't even true.  You know, I should have

8    never been there in the first -- I mean, to go there for a

9    protest or for a rally, acceptable.  But, you know, I had no

10   business walking down there to the Capitol, you know, and

11   going inside of the Capitol, you know.

12          I mean, I was told to go -- I don't know how

13   protests work.  But I figure, you know, we move to a

14   different spot and we stand around with our signs and wave

15   our flags and make our voices heard.  I had no idea what was

16   going on.

17          THE COURT:  Well, let me ask you, Mr. Croy, also

18   because you have submitted letters from your friends; and

19   they make a bunch of statements, you know, that you have

20   never been disrespectful to any authority figure; you always

21   have a level head and -- that's Mr. Kezer.

22          Mr. Donnelly says you use good judgment, a very

23   reasonable person.  And he believes this incident has been

24   blown out of proportion -- that's Mr. Donnelly.

25          Mr. Lindsey Walter says you are respectful.

1      Again, described multiple times as a very respectful person.

2              Mr. Theisen says that, too.

3              So, on January 6th, were you behaving in a

4      respectful way as an upstanding citizen should?

5              THE DEFENDANT:  I was not, Your Honor.

6              You know, like I said, it was a whole summer of

7      COVID; it was a whole summer of fear.  It was a whole summer

8      of, you know, not working, collecting unemployment and

9      stimulus checks occasionally.  You know, I was frustrated.

10     I felt so frustrated.  And then, you know, to go there --

11     like I said, when I got there, it was all camaraderie and,

12     you know, citizens banding together.  You know, it was,

13     like, happiness, you know.  And to be around people -- you

14     know, I haven't been around people except for children for

15     months and months.  So to be there with everybody and just

16     feel like a unity, I just got caught up.

17             And then later on -- you know, I just kept

18     following along.  You know, I had no idea -- normally, I am

19     a very reasonable respectful person, Your Honor.  At that

20     time I lost -- I lost my way.  I made a mistake.  I made a

21     huge mistake.

22             THE COURT:  Well, one of your friends says -- and

23     I ask you about this because is this the new you you're

24     living in?  That -- one of your friends says that your

25     conduct on January 6th is being blown out of proportion.

1          Do you think that it is unfair for you to be held

2     accountable for what happened on January 6th?

3          THE DEFENDANT:  Absolutely not.  Absolutely not,

4     Your Honor.

5          THE COURT:  Do you think what is happening here

6     today is blown out of proportion?

7          THE DEFENDANT:  Absolutely not, Your Honor.

8          You know, when I had people write those letters

9     for me -- I never -- I never told them what to say.  You

10    know, there are still people out there who do believe that,

11    Your Honor; and I can't change people's minds.  I can talk

12    to them afterwards, but I never asked anybody -- I never

13    told anybody what to put in the letter.  I just said, you

14    know, please just write a letter about how you know me and

15    you know, maybe, my kids and -- you know, because my kids

16    are my biggest concern for me here.

17         I accept full responsibility.  I accept full -- I

18    am willing to be fully accountable; I just don't want it to

19    impact my children, that's my main concern.  I feel that I

20    need to be held accountable, you know.

21         Will I learn a lesson from this through probation

22    or through an ankle -- absolutely.  I have already learned

23    my lesson.  Any time I have ever been in trouble with the

24    law I've learned my lesson.  I never did no major jail

25    time -- throughout any of the other criminal acts I

1    committed, I learned it through probation, through -- you

2    know.  You have to want to rehabilitate.

3         You can't just give somebody rehabilitation and

4    they're going to rehabilitate; they have to want to

5    rehabilitate.  And I want to rehabilitate, Your Honor.  I

6    want to make amends for this.

7         THE COURT:  Well, Mr. Croy, your counsel has said

8    in the sentencing memos, and you have echoed that somewhat

9    in your letter to me, saying you were guilty of being an

10   idiot; that you were a lemming.

11        THE DEFENDANT:  Right.

12        THE COURT:  That you were -- you know, that you

13   were a follower and not a leader.  So I do hope that one of

14   the lessons you learn from this is that you do have to think

15   for yourself, not accept what people just tell you as the

16   truth.

17        Don't just follow directions.  You have a

18   responsibility, both as a mature adult --

19        THE DEFENDANT:  Right.

20        THE COURT:  -- but certainly as a citizen in this

21   democracy to figure out what the facts are before you act

22   and to respect what is a foundation of our democracy that

23   was undone by January 6th in significant part --

24        THE DEFENDANT:  Yes, ma'am.

25        THE COURT:  -- that we believe in fair elections

1     and peaceful transitions of power.

2               THE DEFENDANT:  Yes, ma'am.

3               THE COURT:  I hope those are some of the lessons

4     that you take from this experience.

5               THE DEFENDANT:  Absolutely.

6               THE COURT:  Are you done, Mr. Croy?

7               THE DEFENDANT:  I am, Your Honor.  Thank you.

8               THE COURT:  All right.  I am now going to

9     explain -- no.  I want you to stand right there.

10              THE DEFENDANT:  Yes, ma'am.

11              THE COURT:  I am going to explain the sentence I

12    am about to impose and impose sentence, Mr. Croy.

13              So after considering the sentencing memoranda

14    submitted by the parties, the presentence investigation

15    report, the probation department's sentencing

16    recommendation, and hearing argument, I must now consider

17    the relevant factors set up by Congress, in 18 U.S.C.

18    Section 3553(a), and ensure I impose a sentence sufficient

19    but not greater than necessary to comply with the purposes

20    of sentencing; and these purposes include:  The need for the

21    sentence imposed to reflect the seriousness of the offense,

22    and this was a serious offense; to promote respect for the

23    law; provide just punishment for the offense, deter criminal

24    conduct generally by others who might want to mimic what

25    happened on January 6th; and protect the public from future

1    crimes by you, Mr. Croy; that's the specific deterrence

2    aspect of what we have talked about during the course of

3    this hearing.

4            I also have to promote rehabilitation.

5            And so pursuant to this statute, I must consider

6    specifically the nature and circumstances of the offense;

7    your history and characteristics; the types of sentences

8    available; the need to avoid unwarranted sentence

9    disparities among defendants with similar records found

10   guilty of similar conduct, and the need to provide

11   restitution to any victims of the offense.

12           I am going to begin with the restitution amount

13   owed by this defendant.  The statute of conviction here is

14   not covered by the two general restitution statutes codified

15   at 18 U.S.C. Section 3663 and 3663(a); and the Court has no

16   authority to determine -- to determine any restitution

17   amount.  This is limited by what the government agrees to in

18   the plea agreement.  And the plea agreement here provides

19   for a restitution payment of $500, which this Court will

20   order pursuant to 18 U.S.C. Section 3663(a)(3).

21           Regarding the nature and circumstances of the

22   offense, the defendant's been convicted of parading,

23   demonstrating, or picketing in a Capitol Building, in

24   violation of 40 U.S.C. Section 5104(e)(2)(G), which is a

25   petty offense Class B misdemeanor.

1            And as I have made it clear before, though this

2      defendant pleaded guilty to a criminal statute titled

3      parading, demonstrating, or picketing in a Capitol Building,

4      what happened on January 6th at the U.S. Capitol was not

5      protected First Amendment parade or demonstration, or a

6      picket or a protest.

7            Mr. Croy's criminal conduct helped facilitate a

8      riot that overwhelmed law enforcement and succeeded in

9      disrupting the proceedings of Congress.

10            This defendant traveled all the way from Colorado,

11      joined in this crowd, this mob, intentionally, and followed

12      them into the Capitol knowing it was unlawful to be inside

13      the Capitol Building.  As he approached the Capitol

14      Building, he witnessed officers shooting pepper balls and

15      throwing smoke and gas grenades at rioters climbing up the

16      rails of the steps to the Capitol and into the crowd.

17            And in the course of that time, before he went

18      into the Capitol Building the first time, he taunted at

19      officers, calling them oath breakers; yelled at the officers

20      to go protect their precious fucking building.  And in his

21      letter to the Court, he admits that he saw officers

22      attempting to bar rioters from breaching the doors of the

23      Capitol Building; but since they weren't guarding another

24      entry, he chose to enter that one instead.  And the door he

25      entered was the Senate wing door that -- just minutes before

1    the defendant walked in -- had been broken into, basically

2    kicked down, because rioters broke down the side windows,

3    got in, and then kicked down that door; so it was open for

4    other members of the crowd to get in.

5            He took advantage of this opportunity to enter the

6    Capitol even while he knew officers were trying to keep them

7    out because there were very important proceedings going on

8    inside the Capitol that day.

9            And then, once entering the Capitol Building for

10   the first time, he joined this crowd in letting them know

11   that they did not have control over the building, chanting,

12   "Whose house?" "Our house" -- as he was in the building and

13   walking through the halls.

14           The sheer numbers of people that he participated

15   with in walking into the building the first time he went in

16   not only broke the police line in the crypt but, in another

17   video, shows that they were -- forced a police line down a

18   hallway that was by the House wing door.

19           While he was part of this crowd going in, someone

20   very close to him, if not him, yelled, "Where are you

21   motherfuckers hiding?"  "Get out of the basement with

22   Biden" -- suggesting that they were -- if not this

23   defendant -- other people in this crowd who were looking for

24   members of Congress.

25           While inside the Capitol, Mr. Croy messaged a

1      friend telling them that he was inside and considered it a

2      "good mosh," and that "we stormed that shit."  He knew he

3      was storming the Capitol.  And then after exiting, when he

4      was told to leave by police officers, he did leave.  And

5      then, while standing around outside the Capitol, he messaged

6      a friend at around 3:17 claiming, again, "We stormed the

7      Capitol."  And when the friend responded, "Did congressmen

8      bail?  He wrote back, "Absolutely, I got videos."

9            It strains credulity -- in the government's memo

10     it says -- for the defendant to claim he aimlessly followed

11     the crowd to the Capitol that day; and that the evidence

12     shows his lack of intent to do something in the Capitol that

13     day, his lack of understanding where he was in the Capitol,

14     and his herd mentality, rather than a desire to execute a

15     plan to stop the vote that was taking place in the Senate.

16           This is -- based on the videos that I have seen,

17     this was a defendant who knew -- who followed this crowd

18     into the Capitol hearing all around them what was going on.

19     And he left when asked to by the police, but this is after

20     breaking two police lines while inside the Capitol Building.

21           Then, when he was outside the building, he says he

22     saw somebody leave the Capitol with a bloody T-shirt; and he

23     went in again knowing, even after the first incursion, that

24     he shouldn't be there.

25           The defendant admits he knew he wasn't supposed to

1    be there, but he was in the thick of it; he followed the

2    crowd like a lemming.  And he, again, went into the Capitol

3    a second time.

4           And while the defense brief suggests that he was

5    just pulled in by the crowd, the video evidence shows that

6    this defendant had plenty of opportunities to not go in the

7    second time around because there were many -- a steady

8    stream of people trying to exit the building successfully,

9    and he could have joined them in not going into the

10   building; but he went in a second time where, for the third

11   time, a police line was broken with defendant's

12   participation in this crowd.

13          So among the factors that I look at in assessing

14   this defendant's role and the overall crowd action on

15   January 6th, are that he was in the Capitol Building twice;

16   the first time for about 17 minutes and then, after being

17   told to leave, he left but he came right back in about 45

18   minutes later; and he was in, again, for about 9 minutes.

19          It is to his credit, I guess, he didn't physically

20   attack any police officer or any other person.  But he did

21   engage in a verbal altercation outside of the Capitol

22   Building with officers; and he did force police to retreat

23   two to three times as part of the crowd inside the Capitol

24   Building.

25          He didn't personally damage any property inside

1    the Capitol, but he certainly took advantage of the damage

2    that other rioters effected to get into the Capitol

3    Building, starting with his first entrance where the video

4    shows rioters breaking the two windows on the side of the

5    Senate wing door and kicking down the Senate wing door for

6    him to get in.  He took advantage of the opportunities

7    provided by the other rioters.

8         He didn't carry posters or signs or brandish a

9    weapon; but he did engage in chants that were going on while

10   he was inside the building, shouting, "Whose house?" "Our

11   house."

12        He didn't publicly post any inflammatory language

13   on social media before, during, or after January 6th, or

14   make public calls for political violence; but he did, while

15   he was inside the building, not only brag about his actions:

16   "We stormed that shit."  "We stormed the Capitol."  He

17   answered the friend that Congress members did flee, in

18   response to the question whether those Congress members had

19   been found.  So his private messages were disturbing.

20        He did promptly agree to enter a plea agreement

21   when the plea offer was extended; and he did, at some point

22   after his arrest, cooperate with police.

23        It is an aggravating circumstance in this case

24   that this defendant made a deliberate choice to follow the

25   mob twice into the Capitol Building.

1            So, in sum, the nature and circumstances of the

2     offense, and the need for the sentence to reflect the

3     seriousness of the offense and promote respect for the law,

4     would generally favor a custodial sentence.

5            The particular circumstances of the defendant's

6     conduct of not physically engaging in violence does put him

7     in a less troublesome category than some other, more

8     aggressive, rioters that day; but, at the same time, his

9     conduct -- placing himself in the early crowds to break into

10    the Capitol Building, so he was part of the crowds that

11    actually broke police lines in two different parts of the

12    Capitol; and then going back into the Capitol after being

13    told to leave the first time and seeing somebody leave with

14    a bloody T-shirt -- so he knew the conduct inside the

15    Capitol was getting to be more violent, does make his and

16    distinguishes his conduct as being more aggravating than

17    some of the other defendants I have seen.

18            Regarding his history and characteristics, he does

19    have several adult criminal convictions, one including for a

20    third degree assault which took place over 20 years ago.

21    And he hasn't had any serious interactions with the criminal

22    justice system since the birth of his son, almost 16 years

23    ago.  He is the primary caregiver of his two teenage sons,

24    and he does have steady employment as a bricklayer mason.

25            Although I do find it troubling that, in the days

1     immediately following the Capitol attack, he showed no

2     remorse for his actions and, in fact, sent friends the video

3     showing him entering the Capitol Building while the alarm is

4     blaring and the crowd shouting, "Whose house?" "Our house";

5     and he did basically minimize his conduct that day.  He

6     didn't, at the same time, try and post public messages or

7     incite other people to join him in more political violence

8     or in his view; and I do accept that he does have remorse

9     now.  He has expressed his apology to America and everyone

10    affected for his role in participating.  And there are a

11    number of letters that have been submitted on his behalf

12    that speak to his work ethic, and people who do respect his

13    judgment.  And he -- I credit his desire to be a good role

14    model and provider for his sons.  It is very unfortunate

15    that those traits and behaviors were not at the forefront of

16    his thinking on January 6th.

17              The need for the sentence imposed to deter

18    criminal behavior and protect the public from further crimes

19    by this defendant are critical considerations for every

20    sentencing judge; and the seriousness of the criminal

21    conduct witnessed on January 6th only highlights the need

22    for deterrence in the form of a sufficient sentence to deter

23    the defendant and others from engaging in this kind of

24    conduct in the future.

25              He claims -- this defendant claims he got caught

1    up in the fervor of a crowd.  But being a crowd follower

2    does not create absolution for criminal activity, especially

3    when being a follower, as in this case, as part of a huge

4    mob facilitates and amplifies the criminal conduct of

5    others.

6            There are consequences to going along with the

7    crowd when the crowd is engaging in absolutely clear and

8    obvious criminal conduct that disrupts the peaceful

9    transition of power after an election, that every legitimate

10   and reputable review has found to be a fair election with

11   the results unassailable.

12           I do find it to be an aggravating circumstance

13   here that the defendant went into the Capitol Building two

14   times even after seeing the disruption and chaos his actions

15   produced, and being told by the police the first time around

16   not to go in again.

17           When determining the sentence to impose the

18   importance of deterring future malcontents from disrupting

19   the peaceful transition of power after an election weighs

20   heavily in this Court's consideration.

21           Now regarding the types of sentences available.

22   He was convicted of a petty offense, a Class B misdemeanor,

23   which provides a maximum term of imprisonment of up to 6

24   months and up to 5 years' probation.  And the government has

25   posited that both a term of probation and a term of

1   imprisonment may be imposed for a petty offense based on a

2   government statutory construction of 18 U.S.C. Section

3   3561(a)(3); but the government has also plainly declined to

4   recommend such a split sentence to this or any other judge

5   in this court fashioning a sentence for a petty offense, so

6   the government's position does not inspire confidence.  But,

7   at the same time, the statute governing the discretionary

8   conditions of probation that may be imposed by a court does

9   provide, as a condition of probation, that intermittent

10  confinement in the custody of the Bureau of Prisons may be

11  imposed under Section 3563(b)(10), or that the defendant be

12  directed to reside at a community corrections facility,

13  including a facility maintained or under contract to the

14  Bureau of Prisons for all or part of the term of probation

15  under Section 3563(b)(11).

16          And I do plan -- since Colorado doesn't provide

17  for intermittent confinement, I am going to provide a period

18  of residence at a community corrections facility near where

19  the defendant resides to account for the aggravating conduct

20  in this case.

21          Regarding the need to avoid unwarranted sentencing

22  disparity, the defendant raises the fact that other

23  January 6th defendants charged with petty offense

24  misdemeanors have received probationary sentences, and

25  suggests that a custodial sentence here would be an

1   unwarranted sentencing disparity.  There have been a range

2   of sentences, both probationary and custodial, imposed on

3   January 6th defendants convicted of the same petty offense

4   misdemeanor.

5            And I do find that here, generally, a sentence of

6   probation would be appropriate mostly to ensure that he is

7   subject to supervision, and he doesn't engage in any

8   political violence -- a repeat performance of that, that

9   occurred on January 6th.

10           Due to the aggravating factors for his offense

11   conduct already noted, his term of probation, as I said,

12   will include special conditions of a 90-day period of home

13   detention, and a 14-day period of residence in a community

14   correctional facility as an alternative to straight

15   imprisonment.  This will permit him to work and to support

16   his children, while affording appropriate punishment for his

17   two disruptive trips into the Capitol Building on

18   January 6th.

19           The message should be clear:  Defendants who join

20   a mob to breach police lines and barriers to break into the

21   Capitol to stop the Vice President and joint session of

22   Congress from doing their constitutionally-mandated duty of

23   certifying a presidential election are criminals.

24           Based on my consideration of these and other

25   factors, I will now state the sentence to be imposed:

1          Pursuant to the Sentencing Reform Act of 1984 and,

2     in consideration of the provisions of 18 U.S.C. Section

3     3553, it is the judgment of the Court that you, Glenn Wes

4     Lee Croy, are hereby sentenced to a term of 36 months, 3

5     years, of probation, on Count 4 of the information.

6          In addition, you are ordered to pay a special

7     assessment of $10 in accordance with 18 U.S.C. Section 3013.

8          The Court authorizes supervision and jurisdiction

9     of this case to be transferred to the U.S. District Court

10    for the District of Colorado.

11         While on supervision, you shall abide by the

12    following mandatory conditions, as well as the standard

13    conditions of supervision which are imposed to establish the

14    basic expectations for your conduct while on supervision.

15         The mandatory conditions include:  One, you must

16    not commit another federal, state, or local crime; two, you

17    must not unlawfully possess a controlled substance; three,

18    you must refrain from any unlawful use of a controlled

19    substance.  You must submit to one drug test within 15 days

20    of placement on supervision, and at least two periodic drug

21    tests thereafter as determined by the Court.

22         You must make restitution in accordance with your

23    plea agreement, in accordance with 18 U.S.C. Section 3663.

24         You are ordered to make restitution to the

25    Architect of the Capitol in the amount of $500.

1          The Court determined you do not have the ability

2     to pay interest and, therefore, waives any interest or

3     penalties that may accrue on the balance.

4          You shall comply with the following special

5     conditions:

6          First, substance abuse testing:  You must submit

7     to substance abuse testing to determine if you have used a

8     probative substance.  You must not attempt to obstruct or

9     tamper with the testing methods.

10          Residential reentry center:  Pursuant to 18 U.S.C.

11     Section 3563(b)(11), you must reside in a residential

12     reentry center for a term of 14 days as promptly as space in

13     a center near your residence becomes available.  You must

14     follow the rules and regulations of the center.

15          After completion of this confinement, the

16     defendant shall participate in a location monitoring program

17     and shall comply with the conditions of home detention set

18     forth next.

19          You will be monitored in the form of location

20     monitoring technology indicated herein for a period of 90

21     days, and you must follow the rules and regulations of the

22     location monitoring program.  The cost of the program is

23     waived.

24          Location monitoring technology, at the discretion

25     of the probation officer, including radio frequency

1    monitoring, GPS monitoring -- including hybrid GPS --

2    SmartLINK or voice recognition; this form of location

3    monitoring technology will be used to monitor the following

4    restriction on your movement in the community:  You are

5    restricted to your residence at all times, except for

6    employment, education, religious services, medical,

7    substance abuse or mental health treatment, attorney visits,

8    court appearances, court-ordered obligations, or other

9    activities as preapproved by the probation officer.

10           The Court finds you do not have the ability to pay

11   a fine and, therefore, waives imposition of a fine in this

12   case.

13           Restitution payments shall be made to the Clerk of

14   the Court for the United States District Court, District of

15   Columbia, for disbursement to the following victim:  The

16   Architect of the Capitol, in the amount of $500, Office of

17   the Chief Financial Officer, attention Kathy Sherrill, CPA,

18   Ford House Office Building, Room H2-205B, Washington, D.C.

19   20515.

20           The financial obligations are immediately payable

21   to the Clerk of the Court for the U.S. District Court, 333

22   Constitution Avenue, Northwest, Washington, D.C. 20001.

23   Within 30 days of any change of address, you shall notify

24   the Clerk of the Court of the change until such time as the

25   financial obligation is paid in full.

1          The probation office shall release the presentence

2     investigation report to all appropriate agencies which

3     includes the U.S. Probation Office in the approved district

4     of residence in order to execute the sentence of the Court.

5          Treatment agencies shall return the presentence

6     report to the probation office upon the defendant's

7     completion or termination from treatment.

8          Pursuant to 18 U.S.C. Section 3742, you have a

9     right to appeal the sentence imposed by this Court if the

10    period of imprisonment is longer than the statutory maximum.

11    If you choose to appeal, you must file any appeal within 14

12    days after the Court enters judgment.

13          As defined in 28 U.S.C. Section 2255, you also

14    have the right to challenge the conviction entered or

15    sentence imposed if new and currently unavailable

16    information becomes available to you or on a claim you

17    received ineffective assistance of counsel in entering a

18    plea of guilty to the offense of conviction or in connection

19    with sentencing.  If you are unable to afford the cost of an

20    appeal, you may request permission from the Court to file an

21    appeal without cost to you.

22          Are there any objections to the sentence imposed

23    not already noted on the record from the government?

24          MR. O'CONNOR:  No, Your Honor.

25          THE COURT:  And Ms. West?

```
 1              MS. WEST:  No objections, Your Honor.  But I did
 2     want to state for the record that he has already paid his
 3     restitution.
 4              THE COURT:  I did notice that, but I have to order
 5     it.
 6              MS. WEST:  Yes.  I understand.
 7              THE COURT:  Okay.  You may be seated, Mr. Croy.
 8              THE DEFENDANT:  Thank you, Your Honor.
 9              THE COURT:  Does the government have a motion to
10     dismiss the open counts against Mr. Croy?
11              MR. O'CONNOR:  Yes, Your Honor.  We would like to
12     dismiss those counts at this time.
13              THE COURT:  Okay.  That motion is granted.
14              Is there anything left to address today from the
15     government?
16              MR. O'CONNOR:  No, Your Honor.
17              THE COURT:  Ms. West?
18              MS. WEST:  No, Your Honor.
19              THE COURT:  All right.  You are all excused.
20              MR. O'CONNOR:  Thank you, Your Honor.
21              THE DEFENDANT:  Thank you.
22              THE PROBATION OFFICER:  Your Honor, I have a
23     transfer of jurisdiction form.
24              THE COURT:  Yes.  Thank you very much.
25              (Whereupon, the proceeding concludes, 11:42 a.m.)
```

## **CERTIFICATE**

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 15th day of November, 2021.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

## $

**$10** [1] - 92:7
**$500** [4] - 8:14, 81:19, 92:25, 94:16

## /

**/s** [1] - 97:16

## 1

**1** [1] - 59:20
**10** [1] - 23:5
**11** [1] - 49:4
**11:42** [1] - 96:25
**12** [1] - 8:24
**1301** [1] - 1:11
**14** [2] - 93:12, 95:11
**14-day** [1] - 91:13
**15** [1] - 92:19
**15th** [1] - 97:14
**16** [3] - 55:14, 55:16, 87:22
**17** [2] - 23:4, 85:16
**18** [11] - 12:6, 20:15, 80:17, 81:15, 81:20, 90:2, 92:2, 92:7, 92:23, 93:10, 95:8
**1984** [1] - 92:1
**1:57** [1] - 60:3

## 2

**2** [2] - 37:2, 50:13
**20** [2] - 65:21, 87:20
**20-20** [1] - 3:10
**20001** [1] - 94:22
**20002** [1] - 1:19
**20044** [1] - 1:16
**202** [3] - 1:12, 1:16, 1:20
**2020** [5] - 55:19, 56:11, 57:5, 57:19, 58:1
**2021** [3] - 1:4, 12:25, 97:14
**20515** [1] - 94:19
**20530** [1] - 1:12
**21** [3] - 18:6, 18:12, 66:2
**21-162** [2] - 1:3, 2:4
**2255** [1] - 95:13
**236-2042** [1] - 1:20
**28** [1] - 95:13
**2:02** [1] - 60:3

## 3

**3** [7] - 17:15, 18:5, 18:12, 19:1, 36:14, 58:15, 92:4
**30** [3] - 23:4, 65:21, 94:23
**3013** [1] - 92:7
**305-7917** [1] - 1:16
**333** [1] - 94:21
**3553** [1] - 92:3
**3553(a** [2] - 7:17, 80:18
**3553(a)(6** [2] - 26:21, 27:9
**3561(a)(3** [2] - 18:13, 90:3
**3561(a)(3)** [1] - 12:6
**3563(b)(10** [1] - 90:11
**3563(b)(11** [1] - 93:11
**3563(b)(11)** [1] - 90:15
**36** [1] - 92:4
**3663** [2] - 81:15, 92:23
**3663(a** [1] - 81:15
**3663(a)(3)** [1] - 81:20
**3742** [1] - 95:8
**3:17** [1] - 84:6

## 4

**4** [1] - 92:5
**40** [3] - 23:8, 69:11, 81:24
**40-4** [1] - 46:24
**400** [2] - 58:18, 58:20
**41** [1] - 3:21
**42** [1] - 3:22
**45** [3] - 23:8, 42:16, 85:17
**46** [1] - 4:1
**47** [1] - 4:4
**48** [1] - 4:5
**48-2** [2] - 4:14, 4:15
**48-4** [1] - 4:17

## 5

**5** [2] - 1:4, 89:24
**51** [1] - 4:6
**5104(e)(2)(G** [1] - 81:24
**52** [1] - 4:12
**55** [1] - 1:15

## 6

**6** [2] - 22:3, 89:23

## 6

**60** [1] - 22:24
**616-3308** [1] - 1:12
**6th** [31] - 6:1, 8:10, 9:19, 9:22, 10:2, 10:16, 13:13, 13:23, 15:2, 22:4, 43:12, 43:21, 44:14, 53:8, 54:15, 58:5, 62:25, 77:3, 77:25, 78:2, 79:23, 80:25, 82:4, 85:15, 86:13, 88:16, 88:21, 90:23, 91:3, 91:9, 91:18

## 7

**7** [2] - 63:22, 64:2
**700** [1] - 58:19
**712** [1] - 1:19
**7th** [1] - 43:10

## 8

**8** [2] - 63:22, 66:1
**8th** [1] - 43:13

## 9

**9** [2] - 20:16, 85:18
**90** [1] - 93:20
**90-day** [1] - 91:12
**9:24** [1] - 1:5

## A

**a.m** [1] - 1:5, 96:25
**abide** [1] - 92:11
**abiding** [2] - 14:8, 19:20
**ability** [5] - 15:13, 15:14, 93:1, 94:10, 97:7
**able** [7] - 10:25, 12:13, 27:2, 47:9, 53:13, 54:10, 66:17
**absolutely** [11] - 6:22, 7:24, 25:3, 43:10, 59:9, 78:3, 78:7, 78:22, 80:5, 89:7
**Absolutely** [1] - 84:8
**absolution** [1] - 89:2
**abuse** [3] - 93:6, 93:7, 94:7
**academic** [1] - 6:15
**accept** [6] - 7:9, 74:3, 78:17, 79:15, 88:8
**acceptable** [1] - 76:9

**accepted** [1] - 17:16
**access** [1] - 3:5
**accompanied** [1] - 20:13
**accordance** [3] - 92:7, 92:22, 92:23
**according** [2] - 23:25, 58:22
**account** [3] - 37:3, 45:25, 90:19
**accountable** [6] - 58:1, 58:2, 74:5, 78:2, 78:18, 78:20
**accrue** [1] - 93:3
**accuracy** [1] - 22:9
**accurate** [2] - 23:10, 97:4
**achieved** [1] - 41:20
**acknowledged** [1] - 46:10
**act** [1] - 79:21
**Act** [1] - 92:1
**acted** [2] - 28:7, 42:6
**acting** [1] - 40:7
**Action** [1] - 1:2
**action** [2] - 43:23, 85:14
**actions** [9] - 35:23, 39:19, 43:3, 46:23, 74:4, 86:15, 88:2, 89:14
**activities** [1] - 94:9
**activity** [1] - 89:2
**acts** [1] - 78:25
**adamant** [1] - 25:7
**add** [1] - 45:12
**addition** [2] - 42:23, 92:6
**additional** [3] - 4:7, 29:25, 30:1
**address** [6] - 5:13, 27:8, 28:20, 62:4, 94:23, 96:14
**addressed** [1] - 28:21
**admits** [2] - 82:21, 84:25
**adopt** [1] - 19:10
**adult** [3] - 20:14, 79:18, 87:19
**advance** [1] - 3:24
**advantage** [3] - 83:5, 86:1, 86:6
**advocate** [1] - 9:25
**affected** [1] - 88:10
**afford** [1] - 95:19
**affording** [1] - 91:16
**afraid** [1] - 73:1
**afterwards** [3] - 44:14, 72:15, 78:12
**agencies** [2] - 95:2,

**95:5
aggravating** [49] - 8:11, 8:16, 8:18, 9:5, 22:18, 22:20, 22:23, 22:25, 26:8, 26:10, 28:11, 29:21, 29:25, 30:14, 30:17, 31:6, 31:14, 31:16, 31:19, 31:21, 32:9, 33:18, 33:20, 34:6, 37:24, 38:7, 39:9, 39:24, 39:25, 40:19, 41:4, 41:9, 42:4, 42:10, 42:21, 43:1, 43:25, 44:15, 49:11, 49:19, 49:20, 63:7, 63:8, 86:23, 87:16, 89:12, 90:19, 91:10
**aggression** [1] - 67:13
**aggressive** [6] - 35:22, 36:24, 67:25, 68:11, 68:21, 87:8
**ago** [4] - 11:10, 11:11, 87:20, 87:23
**agree** [14] - 15:20, 19:17, 21:13, 24:19, 24:22, 50:1, 53:20, 56:1, 58:7, 60:13, 62:13, 86:20
**agreed** [9] - 21:1, 22:15, 24:21, 25:18, 31:20, 38:14, 50:2, 53:7
**agreement** [9] - 24:6, 24:11, 24:20, 53:3, 53:6, 81:18, 86:20, 92:23
**agrees** [1] - 81:17
**ahead** [1] - 58:20
**aided** [1] - 1:25
**aimlessly** [1] - 84:10
**air** [2] - 71:23, 71:24
**alarm** [1] - 88:3
**alarms** [2] - 40:4, 64:8
**alleging** [1] - 30:9
**allow** [4] - 14:21, 16:5, 27:6, 61:14
**allowable** [1] - 11:17
**allowed** [2] - 11:25, 12:1
**allowing** [1] - 14:24
**almost** [3] - 44:3, 70:17, 87:22
**alone** [4] - 34:7, 34:12, 35:5, 41:25
**ALSO** [1] - 1:21
**altercation** [1] - 85:21
**alternative** [2] - 27:8, 91:14
**altogether** [1] - 31:2

**Amendment** [1] - 82:5
**amends** [1] - 79:6
**AMERICA** [1] - 1:2
**America** [3] - 2:3, 67:16, 88:9
**American** [2] - 62:12, 63:1
**Americans** [2] - 61:25, 62:3
**amount** [7] - 44:14, 44:25, 45:1, 81:12, 81:17, 92:25, 94:16
**amplifies** [1] - 89:4
**amusement** [1] - 39:20
**analogized** [1] - 30:9
**analogy** [1] - 30:21
**ANDREW** [1] - 1:14
**angst** [1] - 61:9
**ankle** [2] - 60:22, 78:22
**Ann** [1] - 2:14
**ANN** [1] - 1:18
**ANNE** [1] - 1:18
**answer** [6] - 12:16, 13:16, 13:20, 13:21, 18:18, 18:22
**answered** [2] - 13:1, 86:17
**antagonism** [1] - 37:11
**antagonistic** [2] - 35:22, 38:7
**anyway** [2] - 41:5, 57:24
**apartment** [1] - 74:1
**apologize** [2] - 19:1, 74:16
**apology** [2] - 19:4, 88:9
**apparatus** [1] - 27:1
**appeal** [5] - 95:9, 95:11, 95:20, 95:21
**appearance** [1] - 16:20
**appearances** [1] - 94:8
**APPEARANCES** [1] - 1:9
**application** [2] - 7:17, 27:19
**applied** [1] - 18:4
**apply** [1] - 18:1
**appointed** [1] - 51:8
**appreciate** [3] - 9:18, 28:14, 72:11
**appreciating** [1] - 25:17
**approach** [2] - 13:18, 16:13

**approached** [1] - 82:13
**approaches** [1] - 16:9
**appropriate** [3] - 91:6, 91:16, 95:2
**approved** [1] - 95:3
**Architect** [2] - 92:25, 94:16
**areas** [1] - 38:9
**argument** [3] - 20:22, 57:12, 80:16
**arguments** [2] - 19:12, 63:11
**arraignment** [1] - 49:3
**arrange** [1] - 13:20
**arrest** [2] - 24:8, 86:22
**arrested** [3] - 24:1, 55:8, 56:10
**articulated** [3] - 10:23, 14:14, 15:11
**aside** [1] - 22:9
**asked-for** [1] - 24:2
**aspect** [2] - 21:22, 81:2
**assault** [1] - 87:20
**assaulting** [2] - 36:23, 72:21
**assess** [2] - 29:12, 34:12
**assessing** [1] - 85:13
**assessment** [1] - 92:7
**assist** [1] - 48:2
**assistance** [2] - 66:10, 95:17
**associate** [2] - 30:6, 34:23
**associated** [1] - 26:10
**associating** [1] - 32:2
**atmospheric** [1] - 45:5
**attack** [4] - 23:22, 43:13, 85:20, 88:1
**attacking** [1] - 22:3
**attempt** [3] - 31:18, 33:21, 93:8
**attempting** [1] - 82:22
**attention** [1] - 94:17
**attorney** [2] - 6:20, 94:7
**attorneys** [1] - 12:24
**audio** [1] - 37:10
**August** [1] - 29:14
**authority** [2] - 76:20, 81:16
**authorization** [2] - 14:18, 97:11
**authorized** [1] - 11:17
**authorizes** [1] - 92:8
**available** [8] - 3:6, 15:21, 15:23, 15:24,

81:8, 89:21, 93:13, 95:16
**Ave** [1] - 1:11
**Avenue** [1] - 94:22
**average** [1] - 27:3
**avoid** [4] - 15:6, 27:4, 81:8, 90:21
**avoiding** [2] - 26:21, 27:9
**aware** [5] - 17:20, 30:8, 44:20, 49:21, 52:24

## B

**baby** [1] - 62:15
**background** [1] - 64:7
**bad** [6] - 54:22, 63:1, 72:14, 72:15, 72:24, 72:25
**bail** [2] - 43:9, 84:8
**balance** [1] - 93:3
**balls** [2] - 59:3, 82:14
**banding** [1] - 77:12
**bank** [3] - 55:13, 55:14, 56:2
**banned** [1] - 50:9
**bar** [1] - 82:22
**barred** [1] - 11:21
**barricade** [1] - 73:14
**barricades** [1] - 73:10
**barrier** [1] - 71:7
**barriers** [1] - 91:20
**base** [1] - 72:14
**based** [11] - 8:23, 11:1, 29:24, 30:25, 31:2, 48:10, 54:22, 54:23, 84:16, 90:1, 91:24
**basement** [2] - 50:23, 83:21
**basic** [1] - 92:14
**bathroom** [3] - 48:5, 48:6, 69:1
**bay** [4] - 31:18, 32:7, 33:21, 37:8
**became** [2] - 50:8, 50:11
**becomes** [3] - 11:11, 93:13, 95:16
**BEFORE** [1] - 1:8
**begin** [4] - 3:2, 3:17, 7:22, 81:12
**beginning** [1] - 70:1
**behalf** [2] - 4:4, 88:11
**behaving** [1] - 77:3
**behavior** [12] - 15:2, 36:4, 40:14, 40:18, 40:23, 41:12, 41:14,

55:1, 57:9, 72:24, 72:25, 88:18
**behaviors** [1] - 88:15
**behind** [9] - 13:2, 35:17, 39:2, 65:12, 65:16, 65:22, 66:4, 68:11, 71:20
**believes** [3] - 26:15, 66:5, 76:23
**below** [2] - 55:16, 97:12
**Ben** [1] - 1:15
**benchmark** [1] - 28:20
**BERYL** [1] - 1:8
**best** [1] - 97:6
**better** [10] - 10:11, 10:14, 12:16, 25:25, 29:4, 29:6, 29:7, 58:19, 60:18, 61:3
**between** [6] - 4:9, 11:10, 18:12, 23:7, 30:18, 35:15
**beyond** [3] - 53:9, 53:17, 56:15
**Biden** [2] - 50:24, 83:22
**big** [2] - 38:10, 42:6
**biggest** [1] - 78:16
**birth** [1] - 87:22
**bit** [9] - 8:19, 14:16, 17:1, 33:16, 38:17, 46:17, 48:5, 67:19, 70:22
**Black** [1] - 55:5
**blank** [1] - 42:13
**blaring** [1] - 40:4, 64:8, 88:4
**BLM** [1] - 70:13
**blocked** [1] - 46:3
**bloody** [4] - 42:18, 69:14, 84:22, 87:14
**blown** [3] - 76:24, 77:25, 78:6
**blur** [1] - 11:11
**body** [4] - 48:1, 48:7, 48:12, 48:19
**body-worn** [4] - 48:1, 48:7, 48:12, 48:19
**bombs** [1] - 75:6
**bother** [1] - 21:16
**bottom** [1] - 67:18
**Box** [1] - 1:15
**brag** [1] - 86:15
**bragged** [1] - 43:2
**brandish** [1] - 86:8
**breach** [2] - 31:24, 91:20
**breached** [2] - 31:23, 32:8
**breaching** [2] - 43:2,

82:22
**break** [4] - 46:22, 73:5, 87:9, 91:20
**breakers** [2] - 59:24, 82:19
**breaking** [2] - 84:20, 86:4
**breakthrough** [1] - 8:1
**bricklayer** [1] - 87:24
**brief** [10] - 12:19, 17:8, 22:2, 22:3, 49:4, 52:16, 58:19, 62:8, 63:11, 85:4
**briefing** [4] - 7:19, 18:20, 19:5, 57:1
**briefly** [1] - 45:15
**bring** [2] - 16:11, 50:2
**broke** [7] - 32:11, 32:18, 55:13, 73:1, 83:2, 83:16, 87:11
**broken** [9] - 33:2, 33:3, 33:5, 33:8, 58:16, 65:3, 70:25, 83:1, 85:11
**brought** [8] - 23:13, 52:11, 55:3, 55:4, 55:11, 55:12, 57:14, 57:20
**brutality** [1] - 58:2
**Building** [29] - 9:22, 23:3, 23:16, 23:20, 31:17, 38:9, 42:12, 42:20, 43:6, 43:11, 63:13, 81:23, 82:3, 82:13, 82:14, 82:18, 82:23, 83:9, 84:20, 85:15, 85:22, 85:24, 86:3, 86:25, 87:10, 88:3, 89:13, 91:17, 94:18
**building** [24] - 21:5, 38:12, 59:24, 63:15, 64:17, 65:6, 65:24, 68:2, 68:8, 68:20, 68:21, 69:9, 70:19, 72:12, 73:22, 82:20, 83:11, 83:12, 83:15, 84:21, 85:8, 85:10, 86:10, 86:15
**buildings** [3] - 33:17, 43:16, 57:7
**bunch** [1] - 76:19
**Bureau** [3] - 15:16, 90:10, 90:14
**burning** [2] - 43:16, 57:7
**business** [1] - 76:10
**businesses** [1] - 57:7
**Bustle** [3] - 44:3, 44:4, 44:11

# C

calculate [1] - 35:1
camaraderie [1] - 77:11
camera [3] - 48:1, 48:7, 48:19
cameras [2] - 48:12, 48:16
camp [1] - 34:13
Capitol [121] - 8:17, 9:22, 13:16, 20:9, 20:10, 20:14, 21:15, 22:3, 22:6, 23:3, 23:6, 23:7, 23:16, 23:20, 23:24, 28:7, 29:15, 29:16, 29:17, 30:25, 31:1, 31:2, 31:17, 31:24, 32:1, 32:8, 33:17, 34:1, 35:25, 36:2, 36:6, 36:10, 36:18, 38:9, 39:13, 39:20, 40:4, 40:18, 41:19, 41:23, 42:11, 42:14, 42:16, 42:17, 42:18, 42:20, 43:3, 43:6, 43:7, 43:11, 43:13, 44:4, 45:1, 45:2, 48:15, 48:18, 49:15, 58:17, 58:24, 59:2, 59:4, 59:18, 62:6, 62:18, 62:21, 62:22, 63:2, 63:6, 63:12, 68:4, 68:6, 73:6, 73:9, 74:23, 74:24, 74:25, 75:8, 75:9, 76:10, 76:11, 81:23, 82:3, 82:4, 82:12, 82:13, 82:16, 82:18, 82:23, 83:6, 83:8, 83:9, 83:25, 84:3, 84:5, 84:7, 84:11, 84:12, 84:13, 84:18, 84:20, 84:22, 85:2, 85:15, 85:21, 85:23, 86:1, 86:2, 86:16, 86:25, 87:10, 87:12, 87:15, 88:1, 88:3, 89:13, 91:17, 91:21, 92:25, 94:16
care [2] - 54:10, 61:14
caregiver [1] - 87:23
cares [1] - 13:2
carriages [1] - 62:16
carried [1] - 63:14
carry [1] - 86:8
case [49] - 5:10, 6:21, 7:12, 8:24, 10:13,

12:9, 12:22, 13:13, 13:23, 16:19, 17:8, 18:7, 18:22, 19:7, 20:4, 21:5, 21:7, 21:9, 21:11, 25:22, 26:15, 28:23, 29:11, 29:12, 30:15, 30:23, 44:12, 47:2, 49:6, 49:14, 50:3, 52:21, 53:2, 54:2, 54:11, 58:3, 58:12, 60:8, 61:10, 61:12, 61:15, 62:19, 63:9, 86:23, 89:3, 90:20, 92:9, 94:12
Case [1] - 2:4
cases [17] - 8:1, 8:21, 8:25, 11:15, 11:16, 12:18, 13:17, 13:19, 16:10, 19:18, 31:12, 35:7, 48:11, 49:6, 57:22, 61:10, 62:8
category [4] - 22:23, 49:19, 58:6, 87:7
caught [7] - 68:18, 75:20, 75:24, 77:16, 88:25
caused [1] - 36:21
causing [1] - 30:6
caveats [1] - 14:13
CCB [1] - 36:14
CCTV [1] - 64:19
CCV [1] - 36:18
cell [3] - 37:1, 37:3, 50:14
center [4] - 93:10, 93:12, 93:13, 93:14
centers [1] - 14:20
certainly [15] - 13:19, 15:12, 20:20, 23:16, 36:23, 38:2, 38:3, 38:5, 38:21, 45:3, 47:12, 50:25, 56:13, 79:20, 86:1
CERTIFICATE [1] - 97:1
certificate [1] - 97:9
certification [1] - 41:17
certify [1] - 97:4
certifying [1] - 91:23
challenge [1] - 95:14
Chamber [2] - 23:17
change [4] - 18:10, 78:11, 94:23, 94:24
chant [3] - 36:1, 37:16, 59:10
chanting [1] - 83:11
chants [3] - 37:12, 37:14, 86:9

chaos [1] - 89:14
chaotic [1] - 51:6
characteristics [2] - 81:7, 87:18
characterize [1] - 25:4
characterized [1] - 8:11
charge [5] - 2:16, 18:3, 55:25, 56:16
charged [9] - 13:25, 20:2, 20:17, 20:25, 21:3, 26:7, 34:15, 56:6, 90:23
charges [1] - 55:12, 57:20
charging [2] - 21:19, 21:21
checked [1] - 15:24
checks [1] - 77:9
chemical [2] - 64:24, 75:7
chest [2] - 71:5, 71:24
CHIEF [1] - 1:8
Chief [1] - 94:17
children [7] - 61:15, 67:16, 73:23, 74:11, 77:14, 78:19, 91:16
choice [1] - 27:6, 86:24
choose [1] - 95:11
chose [1] - 82:24
Churchill [1] - 41:2
Circuit [2] - 13:6
circumstance [3] - 61:11, 86:23, 89:12
circumstances [10] - 8:11, 9:10, 25:19, 42:2, 44:19, 49:19, 81:6, 81:21, 87:1, 87:5
cites [2] - 39:18, 42:25
citizen [2] - 77:4, 79:20
citizens [2] - 62:3, 77:12
claim [2] - 84:10, 95:16
claiming [1] - 84:6
claims [2] - 88:25
Class [10] - 11:1, 11:21, 13:24, 13:25, 14:2, 27:23, 48:21, 51:8, 81:25, 89:22
Clayton [1] - 2:10
CLAYTON [1] - 1:10
clayton.Oconnor@usdoj.gov [1] - 1:13
clear [9] - 14:3, 34:15, 51:16, 51:24, 52:1, 66:17, 82:1, 89:7,

91:19
clearly [7] - 38:24, 38:25, 39:4, 43:19, 50:9, 50:18, 50:21
Clerk [3] - 94:13, 94:21, 94:24
client [1] - 6:7
climbing [2] - 59:4, 82:15
close [9] - 14:21, 31:25, 32:3, 50:22, 51:16, 51:25, 59:13, 65:19, 83:20
clothe [1] - 54:6
co [2] - 41:14, 43:4
co-rioters [2] - 41:14, 43:4
coalesced [1] - 52:22
coat [1] - 5:5
codefendant [6] - 4:9, 16:19, 20:6, 20:24, 52:21, 53:16
codified [1] - 81:14
cohesive [1] - 22:4
collaborative [1] - 22:5
colleague [4] - 2:11, 2:15, 12:11, 16:18
colleagues [2] - 19:14, 41:13
collect [1] - 27:17
collected [2] - 27:25, 47:3
collecting [2] - 27:1, 77:8
collection [5] - 22:4, 27:11, 27:23, 28:7, 34:22
collective [1] - 27:19
collectively [1] - 45:1
colloquy [1] - 32:4
Colorado [4] - 15:24, 82:10, 90:16, 92:10
Columbia [1] - 94:15
COLUMBIA [1] - 1:1
coming [6] - 15:17, 28:17, 33:13, 49:2, 59:22, 65:24
comment [1] - 17:8
commenting [1] - 42:1
commission [4] - 27:1, 27:11, 27:24, 27:25
commit [3] - 30:10, 30:11, 92:16
committed [2] - 34:14, 79:1
committing [1] - 30:6
commotion [1] - 75:17
community [4] -

90:12, 90:18, 91:13, 94:4
companion [2] - 20:7, 20:18
comparable [2] - 31:4, 58:11
comparators [1] - 44:13
compared [1] - 44:8
comparison [2] - 55:3, 57:12
comparisons [1] - 56:9
complete [2] - 13:18, 97:6
completely [4] - 40:9, 41:21, 66:15, 68:4
completion [2] - 93:15, 95:7
complied [1] - 19:20
complies [1] - 66:15
comply [4] - 26:20, 80:19, 93:4, 93:17
complying [1] - 66:19
comprehensive [2] - 16:12, 18:18
computer [1] - 1:25
computer-aided [1] - 1:25
concern [6] - 19:15, 20:23, 45:17, 46:12, 78:16, 78:19
concerned [1] - 61:20
concerning [1] - 24:2
concerns [4] - 12:22, 15:18, 15:21, 19:24
concert [2] - 65:14, 71:2
concerts [1] - 71:4
concludes [1] - 96:25
condition [1] - 90:9
conditions [11] - 14:17, 15:8, 16:3, 90:8, 91:12, 92:12, 92:13, 92:15, 93:5, 93:17
condone [1] - 67:13
conduct [35] - 8:10, 10:16, 20:2, 20:24, 24:3, 24:23, 25:12, 25:20, 26:7, 26:11, 26:12, 41:5, 41:20, 43:21, 44:10, 44:18, 49:20, 57:6, 75:10, 77:25, 80:24, 81:10, 82:7, 87:6, 87:9, 87:14, 87:16, 88:5, 88:21, 88:24, 89:4, 89:8, 90:19, 91:11, 92:14

**conference** [1] - 3:11
**confidence** [1] - 90:6
**confinement** [12] -
14:19, 14:20, 14:21,
15:23, 16:6, 22:22,
29:19, 30:2, 30:24,
90:10, 90:17, 93:15
**confirm** [1] - 17:16
**confirmed** [2] - 17:21,
21:6
**confirms** [1] - 19:11
**confused** [1] - 47:11
**congenial** [1] - 69:24
**Congress** [8] - 51:19,
60:5, 80:17, 82:9,
83:24, 86:17, 86:18,
91:22
**congressional** [1] -
4:10
**congressmen** [3] -
43:9, 51:19, 84:7
**connection** [8] - 3:19,
7:4, 7:13, 19:5,
20:16, 47:1, 56:10,
95:18
**consequence** [2] -
17:20, 41:19
**consequences** [2] -
43:20, 89:6
**conservative** [1] -
13:3
**consider** [2] - 80:16,
81:5
**consideration** [4] -
22:18, 89:20, 91:24,
92:2
**considerations** [1] -
88:19
**considered** [2] - 84:1,
97:9
**considering** [1] -
80:13
**consistent** [4] - 28:12,
30:22, 31:6, 35:8
**constitutes** [1] - 97:4
**Constitution** [2] -
59:21, 94:22
**constitutionally** [2] -
56:4, 91:22
**constitutionally-
mandated** [2] - 56:4,
91:22
**construction** [1] -
90:2
**contained** [1] - 6:12
**containing** [1] - 38:6
**context** [7] - 42:20,
67:21, 70:2, 70:8,
72:17, 76:4, 76:6
**continue** [2] - 21:5,

36:16
**continued** [1] - 21:10
**continuing** [1] - 21:22
**contract** [1] - 90:13
**contrast** [1] - 8:21
**control** [3] - 39:2,
75:7, 83:11
**controlled** [2] - 92:17,
92:18
**conversation** [3] - 4:9,
12:12, 34:11
**conversations** [3] -
16:8, 28:25, 37:25
**convicted** [3] - 81:22,
89:22, 91:3
**conviction** [4] - 14:1,
81:13, 95:14, 95:18
**convictions** [3] -
11:21, 11:22, 87:19
**cooperate** [3] - 52:13,
52:19, 86:22
**cooperated** [1] - 23:25
**cooperation** [1] - 53:1
**cooperative** [1] -
52:18
**cordial** [1] - 72:13
**correct** [19] - 6:4, 6:5,
15:9, 17:5, 23:12,
23:18, 23:21, 24:9,
24:12, 24:18, 32:20,
32:23, 40:7, 42:9,
45:18, 46:14, 60:6,
65:10
**correctional** [1] -
91:14
**corrections** [2] -
90:12, 90:18
**cost** [3] - 93:22, 95:19,
95:21
**counsel** [11] - 2:5,
3:24, 5:8, 27:14,
28:21, 28:25, 30:3,
45:15, 49:24, 79:7,
95:17
**counsel's** [2] - 2:15,
2:19
**count** [2] - 8:23, 68:16
**Count** [1] - 92:5
**counting** [1] - 58:20
**country** [6] - 27:2,
37:13, 55:6, 61:22,
62:10, 70:14
**counts** [2] - 96:10,
96:12
**couple** [4] - 6:14,
11:8, 52:8, 52:10
**course** [6] - 3:20,
21:7, 25:16, 48:10,
81:2, 82:17
**Court** [63] - 1:22, 1:23,

2:18, 3:18, 4:14,
5:13, 5:14, 7:9,
13:20, 14:3, 15:19,
17:16, 17:17, 18:3,
18:7, 18:8, 29:23,
30:8, 44:20, 49:6,
49:11, 50:1, 52:11,
52:12, 52:20, 52:23,
53:3, 53:20, 53:25,
54:1, 54:18, 55:8,
55:9, 56:12, 56:23,
60:7, 60:9, 60:13,
60:20, 60:22, 61:1,
61:12, 62:13, 66:2,
81:15, 81:19, 82:21,
92:3, 92:8, 92:9,
92:21, 93:1, 94:10,
94:14, 94:21, 94:24,
95:4, 95:9, 95:12,
95:20, 97:16
**COURT** [165] - 1:1,
1:8, 2:12, 2:20, 2:23,
3:1, 4:20, 4:23, 5:1,
5:7, 5:21, 5:23, 6:6,
6:10, 6:16, 6:18,
6:23, 7:1, 7:7, 7:24,
8:1, 8:18, 11:3, 11:8,
12:14, 13:4, 13:10,
13:21, 14:15, 15:5,
15:22, 16:1, 16:5,
16:14, 16:16, 16:21,
16:23, 17:6, 19:4,
19:23, 20:21, 21:12,
21:24, 22:16, 23:11,
23:13, 23:19, 23:22,
24:5, 24:7, 24:10,
24:13, 24:16, 24:19,
24:22, 25:1, 25:4,
25:9, 25:13, 25:19,
25:25, 26:4, 26:20,
26:25, 27:20, 27:22,
28:13, 29:2, 29:5,
29:9, 30:11, 30:15,
31:8, 31:11, 32:10,
32:14, 32:19, 32:21,
32:24, 33:2, 33:4,
33:10, 33:19, 34:4,
34:6, 34:17, 34:20,
35:4, 35:6, 35:11,
35:21, 38:8, 38:15,
38:24, 39:7, 39:17,
40:12, 40:25, 41:8,
42:3, 42:10, 42:25,
43:19, 43:24, 44:23,
45:10, 45:21, 46:1,
46:16, 47:7, 47:13,
47:15, 48:9, 48:15,
49:14, 50:12, 50:15,
51:15, 51:22, 52:3,
55:2, 55:16, 55:22,
56:2, 56:6, 56:9,

56:15, 56:25, 57:4,
57:12, 57:22, 58:8,
59:1, 59:8, 59:19,
60:2, 61:16, 63:5,
63:19, 63:22, 66:19,
66:25, 67:3, 74:17,
74:22, 75:4, 76:17,
77:22, 78:5, 79:7,
79:12, 79:20, 79:25,
80:3, 80:6, 80:8,
80:11, 95:25, 96:4,
96:7, 96:9, 96:13,
96:17, 96:19, 96:24
**court** [12] - 2:16, 3:10,
3:13, 19:10, 51:8,
55:12, 55:20, 57:23,
90:5, 90:8, 94:8
**Court's** [3] - 15:10,
56:7, 89:20
**court-issued** [1] - 3:13
**court-ordered** [1] -
94:8
**courthouse** [1] - 61:2
**COURTROOM** [2] -
2:2, 2:8
**courtroom** [2] - 8:3,
8:4
**courts** [1] - 26:20
**covered** [1] - 81:14
**COVID** [2] - 16:2, 77:7
**COVID-19** [1] - 54:2
**coworkers** [1] - 4:16
**CPA** [1] - 94:17
**crafting** [1] - 16:8
**create** [1] - 89:2
**creating** [1] - 19:25
**creative** [1] - 15:7
**credentials** [1] - 3:14
**credit** [5] - 49:9, 53:1,
53:18, 85:19, 88:13
**credulity** [1] - 84:9
**crime** [4] - 11:1,
22:12, 49:17, 92:16
**crimes** [2] - 81:1,
88:18
**criminal** [25] - 8:10,
21:21, 24:23, 25:16,
25:22, 26:7, 26:11,
26:12, 27:18, 34:19,
44:18, 53:17, 57:6,
74:8, 78:25, 80:23,
82:2, 82:7, 87:19,
87:21, 88:18, 88:20,
89:2, 89:4, 89:8
**Criminal** [2] - 1:2, 2:4
**criminals** [1] - 91:23
**critical** [2] - 26:6,
88:19
**CRM** [1] - 1:11
**crowd** [51] - 22:3,

22:10, 34:4, 36:19,
37:10, 37:18, 38:21,
39:1, 39:3, 39:10,
39:13, 39:14, 45:6,
50:15, 50:18, 59:5,
60:2, 63:14, 63:15,
63:25, 64:5, 64:10,
64:21, 65:2, 65:3,
68:6, 68:12, 69:1,
73:13, 73:21, 74:25,
75:7, 82:11, 82:16,
83:4, 83:10, 83:19,
83:23, 84:11, 84:17,
85:2, 85:5, 85:12,
85:14, 85:23, 88:4,
89:1, 89:7
**crowds** [2] - 87:9,
87:10
**crowds'** [1] - 15:2
**croy** [1] - 96:10
**CROY** [1] - 1:4
**Croy** [83] - 2:3, 2:14,
3:4, 5:1, 6:10, 6:19,
8:16, 9:2, 11:18,
13:25, 20:6, 20:13,
20:17, 21:3, 22:11,
30:6, 30:9, 33:8,
36:20, 38:4, 38:10,
38:20, 39:3, 40:24,
41:13, 43:14, 44:9,
45:24, 47:22, 47:25,
48:2, 48:4, 49:10,
50:7, 50:21, 50:24,
51:1, 51:4, 51:13,
51:16, 52:6, 52:13,
52:15, 52:23, 53:1,
53:8, 53:13, 53:14,
54:5, 54:6, 54:12,
54:17, 54:21, 55:4,
58:22, 59:11, 59:12,
61:5, 61:6, 61:12,
61:24, 62:1, 62:5,
62:11, 62:24, 64:9,
65:8, 65:11, 66:3,
66:15, 66:23, 67:4,
74:18, 75:13, 76:17,
79:7, 80:6, 80:12,
81:1, 83:25, 92:4,
96:7
**Croy's** [15] - 4:13,
4:14, 8:10, 31:3,
37:1, 40:17, 44:13,
44:18, 46:3, 46:19,
49:3, 50:14, 51:5,
56:22, 82:7
**crush** [1] - 71:2
**crushed** [2] - 71:6,
71:21
**crushing** [1] - 71:4
**crypt** [6] - 36:12, 37:2,

38:11, 50:14, 68:22, 83:16
**CRYSTAL** [1] - 1:21
**Cubbage** [3] - 2:15, 51:2, 51:9
**CUBBAGE** [1] - 1:18
**curfew** [2] - 73:3, 73:5
**custodial** [3] - 87:4, 90:25, 91:2
**custody** [1] - 90:10

## D

**D.C** [10] - 1:5, 8:2, 13:6, 53:24, 55:7, 61:18, 62:25, 94:18, 94:22
**damage** [3] - 23:23, 85:25, 86:1
**dangerous** [1] - 23:13
**data** [5] - 27:2, 27:11, 27:17, 27:23, 27:25
**Dated** [1] - 97:14
**days** [10] - 22:24, 25:5, 44:14, 48:24, 87:25, 92:19, 93:12, 93:21, 94:23, 95:12
**daze** [1] - 66:11
**DC** [3] - 1:12, 1:16, 1:19
**decades** [1] - 27:2
**decide** [1] - 18:11
**decided** [2] - 21:15, 51:6
**decision** [4] - 18:17, 31:16, 54:22, 63:1
**decision-making** [1] - 18:17
**decisions** [1] - 21:19
**declined** [1] - 90:3
**deemed** [1] - 3:15
**defend** [1] - 12:20
**DEFENDANT** [22] - 1:18, 5:6, 5:20, 5:22, 6:25, 7:6, 67:6, 74:21, 75:3, 75:15, 77:5, 78:3, 78:7, 79:11, 79:19, 79:24, 80:2, 80:5, 80:7, 80:10, 96:8, 96:21
**Defendant** [1] - 1:5
**defendant** [43] - 4:3, 4:5, 4:8, 4:9, 7:13, 9:23, 10:14, 12:3, 14:8, 17:22, 20:24, 22:23, 23:1, 23:3, 25:22, 29:22, 34:8, 36:4, 36:9, 42:11, 43:5, 43:9, 46:20,

59:25, 61:17, 81:13, 82:2, 82:10, 83:1, 83:23, 84:10, 84:17, 84:25, 85:6, 86:24, 88:19, 88:23, 88:25, 89:13, 90:11, 90:19, 90:22, 93:16
**defendant's** [15] - 4:11, 22:1, 25:15, 26:11, 31:16, 35:16, 35:22, 39:13, 39:18, 42:14, 81:22, 85:11, 85:14, 87:5, 95:6
**defendants** [21] - 9:25, 20:1, 26:12, 28:17, 30:23, 31:7, 33:23, 39:10, 40:1, 40:15, 40:22, 53:7, 53:17, 54:7, 60:19, 61:13, 81:9, 87:17, 90:23, 91:3, 91:19
**defenders** [1] - 44:10
**defending** [2] - 43:3, 43:19
**defense** [14] - 8:7, 12:21, 12:24, 27:14, 28:21, 28:24, 30:3, 35:13, 45:15, 45:16, 45:18, 49:24, 59:19, 85:4
**Defense** [1] - 59:19
**defensive** [1] - 23:14
**defined** [1] - 95:13
**definitely** [1] - 68:13
**degree** [1] - 87:20
**delayed** [1] - 41:16
**deleted** [2] - 45:24, 50:7
**deliberate** [1] - 86:24
**democracy** [3] - 40:19, 79:21, 79:22
**democratic** [1] - 58:9
**demonstrating** [3] - 45:6, 81:23, 82:3
**demonstration** [1] - 82:5
**denial** [1] - 3:14
**denigrating** [1] - 40:18
**Department** [2] - 1:14, 48:11
**department's** [2] - 7:1, 80:15
**depth** [1] - 12:12
**DEPUTY** [2] - 2:2, 2:8
**described** [8] - 4:11, 28:5, 52:16, 53:9, 65:9, 65:25, 66:24, 77:1
**describes** [1] - 57:8
**describing** [1] - 53:9

**description** [1] - 22:9
**deserve** [1] - 22:20
**deserves** [1] - 41:4
**desire** [2] - 84:14, 88:13
**despite** [1] - 41:4
**details** [1] - 24:2
**detain** [1] - 67:22
**detention** [10] - 8:14, 8:23, 26:14, 33:25, 39:12, 40:3, 40:17, 44:2, 91:13, 93:17
**deter** [3] - 80:23, 88:17, 88:22
**determinations** [2] - 6:3, 6:11
**determine** [4] - 5:7, 81:16, 93:7
**determined** [1] - 92:21, 93:1
**determining** [1] - 89:17
**deterrence** [19] - 9:3, 9:6, 9:11, 9:15, 9:20, 10:3, 10:11, 10:13, 10:20, 12:8, 14:5, 14:7, 15:1, 19:16, 19:17, 19:19, 60:14, 81:1, 88:22
**deterring** [1] - 89:18
**develop** [1] - 21:23
**development** [1] - 21:9
**diabetes** [1] - 61:20
**died** [1] - 54:9
**different** [15] - 5:16, 17:1, 22:7, 26:22, 28:9, 31:7, 34:19, 38:9, 58:6, 60:11, 62:12, 75:21, 75:22, 76:14, 87:11
**differently** [1] - 28:8
**difficult** [8] - 17:9, 17:12, 17:14, 27:10, 28:6, 29:12, 35:3, 38:1
**diligently** [1] - 49:16
**directed** [2] - 72:5, 90:12
**directions** [2] - 64:14, 79:17
**directly** [7] - 5:13, 30:6, 32:6, 37:23, 45:8, 67:5, 67:10
**disagreement** [1] - 22:14
**disassembled** [1] - 97:10
**disbursement** [1] - 94:15

**discovery** [6] - 45:17, 45:20, 46:15, 49:5, 49:7, 50:5
**discretion** [1] - 93:24
**discretionary** [4] - 14:17, 15:8, 16:3, 90:7
**discuss** [1] - 7:16
**discussed** [5] - 6:8, 16:10, 44:22, 51:2, 51:3
**discussing** [1] - 47:6
**discussion** [4] - 14:3, 45:12, 48:6, 59:14
**dismiss** [2] - 96:10, 96:12
**disparities** [4] - 26:22, 27:5, 27:10, 81:9
**disparity** [7] - 20:1, 21:14, 28:4, 35:14, 40:14, 90:22, 91:1
**dispersed** [1] - 75:17
**displayed** [1] - 43:22
**dispositive** [4] - 42:20, 44:22, 45:3, 63:7
**disregard** [2] - 39:18, 41:12
**disregarded** [2] - 40:10, 41:23
**disrespectful** [1] - 76:20
**disrupting** [2] - 82:9, 89:18
**disruption** [1] - 89:14
**disruptive** [1] - 91:17
**disrupts** [2] - 74:2, 89:8
**distinction** [2] - 34:16, 37:19
**distinguish** [2] - 26:6, 34:8
**distinguishable** [1] - 40:23
**distinguishes** [2] - 26:12, 87:16
**distraction** [1] - 33:16
**DISTRICT** [3] - 1:1, 1:1, 1:8
**district** [1] - 95:3
**District** [5] - 92:9, 92:10, 94:14, 94:21
**disturbing** [1] - 86:19
**diverse** [1] - 22:7
**docketed** [10] - 3:21, 3:22, 4:3, 4:5, 4:12, 4:14, 4:15, 4:16, 46:24
**document** [4] - 70:18, 70:19, 72:23, 72:25

**documentary** [1] - 69:17
**documented** [1] - 70:7
**documenting** [3] - 70:12, 70:15, 72:23
**documents** [3] - 3:23, 4:18, 4:24
**DOJ** [1] - 1:11
**DOJ-CRM** [1] - 1:11
**Donald** [4] - 54:23, 61:25, 62:21, 62:22
**done** [2] - 51:3, 80:6
**Donnelly** [2] - 76:22, 76:24
**door** [16] - 31:22, 32:15, 32:18, 33:6, 33:13, 38:12, 38:20, 64:3, 64:19, 72:5, 82:24, 82:25, 83:3, 83:18, 86:5
**doors** [11] - 32:10, 36:11, 58:17, 64:5, 64:11, 64:12, 64:19, 73:17, 74:24, 82:22
**down** [14] - 32:14, 33:5, 38:23, 53:7, 71:7, 72:7, 72:8, 73:8, 76:10, 83:2, 83:3, 83:17, 86:5
**downloaded** [1] - 2:17
**drawing** [3] - 30:4, 30:21, 37:18
**draws** [1] - 33:12
**dreaming** [1] - 47:10
**dressed** [1] - 41:3
**dressing** [1] - 39:21
**drug** [2] - 92:19, 92:20
**due** [2] - 15:15, 91:10
**dumps** [1] - 49:5
**during** [10] - 2:21, 5:19, 29:14, 32:4, 34:25, 43:16, 55:18, 56:11, 81:2, 86:13
**duty** [1] - 91:22
**dying** [1] - 54:8

## E

**e-filing** [1] - 4:2
**early** [6] - 25:23, 31:24, 36:10, 45:2, 50:20, 87:9
**easier** [1] - 53:16
**easy** [3] - 26:17, 27:10, 53:20
**ECF** [12] - 3:21, 3:22, 4:1, 4:3, 4:4, 4:5, 4:6, 4:12, 4:14, 4:15, 4:17, 46:24

**echoed** [1] - 79:8
**edge** [1] - 54:4
**educated** [1] - 26:1
**education** [2] - 25:21, 94:6
**effected** [1] - 86:2
**effort** [3] - 27:11, 28:19, 30:22
**efforts** [4] - 21:8, 28:4, 28:11, 32:5
**either** [9] - 7:8, 8:22, 14:19, 14:24, 26:13, 30:15, 32:12, 33:24, 50:21
**elaborate** [1] - 38:17
**elaborated** [1] - 15:15
**elaborating** [1] - 12:15
**election** [6] - 41:17, 68:15, 89:9, 89:10, 89:19, 91:23
**elections** [1] - 79:25
**Elizabeth** [2] - 1:22, 97:16
**ELIZABETH** [1] - 97:3
**Ellipse** [1] - 20:8
**elsewhere** [1] - 74:1
**Elton** [1] - 62:16
**Email** [3] - 1:13, 1:17, 1:20
**email** [1] - 46:8
**emotion** [1] - 61:9
**emotional** [1] - 75:25
**empathize** [1] - 28:3
**empathy** [1] - 28:5
**employment** [2] - 87:24, 94:6
**encounter** [1] - 73:13
**encouraged** [1] - 24:17
**end** [3] - 25:11, 46:11, 69:1
**endeavor** [1] - 35:1
**ended** [1] - 65:6
**enforcement** [18] - 24:1, 24:2, 31:18, 33:21, 34:1, 35:23, 35:24, 36:17, 37:7, 37:18, 37:19, 37:21, 38:5, 38:22, 39:2, 67:17, 82:8
**engage** [5] - 10:1, 23:11, 85:21, 86:9, 91:7
**engaged** [8] - 15:1, 22:18, 22:20, 36:4, 40:22, 41:21, 45:8, 49:20
**engaging** [7] - 10:15, 20:23, 37:23, 41:14, 87:6, 88:23, 89:7

**enjoying** [1] - 40:9
**enormously** [1] - 28:16
**ensure** [6] - 9:21, 10:15, 14:7, 21:20, 80:18, 91:6
**enter** [8] - 23:15, 24:19, 31:16, 33:16, 63:12, 82:24, 83:5, 86:20
**entered** [13] - 16:19, 21:15, 29:15, 30:25, 31:21, 36:10, 42:11, 42:17, 42:24, 45:2, 58:17, 82:25, 95:14
**entering** [8] - 36:18, 41:22, 42:14, 42:19, 44:25, 83:9, 88:3, 95:17
**enters** [2] - 36:11, 95:12
**entire** [3] - 20:8, 21:18, 27:1
**entirety** [1] - 13:17
**entrance** [1] - 86:3
**entry** [2] - 3:14, 82:24
**environment** [1] - 38:7
**equally** [2] - 54:1, 56:20
**equipped** [2] - 12:16, 18:18
**erratic** [2] - 75:25, 76:1
**error** [1] - 25:15
**especially** [1] - 89:2
**essentially** [1] - 74:19
**establish** [1] - 92:13
**estimation** [1] - 23:9
**ethic** [1] - 88:12
**evacuated** [2] - 51:20, 60:5
**evaluate** [1] - 49:24
**evaluating** [1] - 35:11
**event** [4] - 27:15, 27:18, 38:1, 53:22
**eventually** [8] - 24:4, 24:5, 24:25, 25:1, 25:10, 29:24, 32:25, 36:25
**everywhere** [1] - 15:23
**evidence** [9] - 29:21, 29:25, 30:17, 38:16, 46:22, 49:23, 76:3, 84:11, 85:5
**exactly** [5] - 20:23, 26:4, 44:3, 59:8, 65:8
**example** [1] - 44:2
**except** [2] - 77:14,

94:5
**exchange** [1] - 15:15
**excuse** [1] - 16:24
**excused** [1] - 96:19
**execute** [2] - 84:14, 95:4
**exemplar** [2] - 51:3, 59:15
**exhibit** [1] - 8:8
**Exhibit** [5] - 36:14, 37:2, 50:13, 58:15, 59:20
**exhibits** [2] - 4:11, 7:12
**exist** [1] - 47:1
**exists** [1] - 48:8
**exit** [2] - 66:21, 85:8
**exited** [2] - 69:9, 72:12
**exiting** [2] - 64:5, 65:2, 84:3
**expectations** [1] - 92:14
**experience** [6] - 55:19, 56:11, 57:18, 57:19, 75:14, 80:4
**experienced** [1] - 54:3
**expert** [1] - 51:3
**explain** [5] - 5:3, 5:15, 47:9, 80:9, 80:11
**explaining** [1] - 71:10
**explains** [1] - 22:17
**explore** [1] - 14:15
**express** [1] - 54:19
**expressed** [4] - 24:23, 25:6, 25:12, 88:9
**extended** [2] - 24:20, 86:21
**extent** [1] - 55:10
**eyes** [2] - 44:7, 66:17

## F

**face** [2] - 71:17
**face-to-face** [1] - 71:17
**Facebook** [5] - 43:14, 45:25, 46:2, 50:9, 50:10
**facilitate** [1] - 82:7
**facilitates** [1] - 89:4
**facility** [4] - 90:12, 90:13, 90:18, 91:14
**facing** [4] - 34:18, 37:18, 57:20, 64:11
**fact** [12] - 7:11, 13:24, 15:16, 22:6, 31:8, 49:11, 50:3, 52:16, 60:15, 64:12, 88:2, 90:22

**factor** [28] - 26:21, 27:9, 31:16, 31:19, 31:21, 32:9, 33:20, 34:7, 34:12, 35:2, 35:5, 35:21, 39:9, 39:24, 41:4, 41:9, 41:22, 42:1, 42:5, 42:11, 42:21, 43:1, 43:2, 43:25, 44:15, 44:21, 44:22, 63:8
**factors** [28] - 7:17, 8:16, 8:19, 9:4, 9:5, 22:18, 22:20, 22:24, 22:25, 26:6, 26:8, 26:10, 28:9, 28:15, 28:17, 31:6, 31:14, 34:22, 35:7, 35:9, 40:11, 40:24, 45:4, 63:7, 80:17, 85:13, 91:10, 91:25
**facts** [8] - 7:12, 20:15, 23:2, 30:14, 30:16, 30:25, 31:3, 79:21
**factual** [7] - 5:9, 6:3, 6:11, 7:9, 19:24, 52:11, 62:8
**failed** [1] - 53:12
**fair** [4] - 34:9, 38:25, 79:25, 89:10
**fairly** [2] - 25:1, 31:3
**fake** [1] - 54:23
**fall** [1] - 27:17
**falling** [1] - 49:18
**falls** [1] - 22:23
**family** [1] - 61:21
**far** [3] - 28:2, 52:25, 60:14
**fashion** [1] - 35:18
**fashioning** [3] - 40:11, 44:20, 90:5
**fashions** [1] - 60:20
**fast** [1] - 18:6
**favor** [1] - 87:4
**FBI** [3] - 21:7, 53:10, 53:13
**FCRR** [3] - 1:22, 97:3, 97:16
**fear** [1] - 77:7
**federal** [3] - 10:9, 25:22, 92:16
**feed** [1] - 54:6
**felony** [6] - 11:21, 55:12, 55:25, 56:6, 56:11, 57:20
**felt** [7] - 51:6, 51:7, 54:18, 65:22, 70:17, 72:24, 77:10
**female** [3] - 20:7, 20:14, 20:18
**fervor** [1] - 89:1

**few** [2] - 44:14, 60:4
**fifth** [1] - 43:1
**figure** [3] - 76:13, 76:20, 79:21
**figuring** [1] - 35:17
**file** [2] - 95:11, 95:20
**filed** [4] - 5:10, 5:24, 6:1, 7:4
**filing** [5] - 4:2, 4:11, 8:23, 46:9
**filings** [1] - 44:12
**final** [1] - 43:1
**finally** [1] - 60:13
**Financial** [1] - 94:17
**financial** [2] - 94:20, 94:25
**findings** [1] - 7:10
**fine** [1] - 94:11
**First** [1] - 82:5
**first** [24] - 5:7, 23:4, 23:7, 31:15, 31:17, 31:19, 31:22, 33:20, 58:15, 58:17, 66:20, 69:4, 72:17, 73:12, 76:8, 82:18, 83:10, 83:15, 84:23, 85:16, 86:3, 87:13, 89:15, 93:6
**firsthand** [1] - 37:3
**fit** [2] - 22:12, 49:17
**five** [7] - 17:25, 26:10, 31:13, 31:22, 32:1, 32:8, 53:5
**flag** [1] - 71:1
**flags** [1] - 76:15
**flee** [1] - 86:17
**floats** [1] - 63:16
**flooding** [2] - 32:17, 33:9
**Floyd** [1] - 70:13
**Floyd's** [2] - 55:6, 58:3
**focus** [4] - 9:20, 33:20, 40:12, 40:14
**focused** [1] - 63:11
**focusing** [1] - 31:5
**follow** [7] - 9:13, 10:13, 17:19, 79:17, 86:24, 93:14, 93:21
**followed** [11] - 11:22, 14:5, 68:9, 68:12, 69:1, 73:18, 73:21, 82:11, 84:10, 84:17, 85:1
**follower** [3] - 79:13, 89:1, 89:3
**following** [12] - 3:23, 25:6, 64:14, 64:15, 74:25, 75:21, 77:18, 88:1, 92:12, 93:4, 94:3, 94:15

foolishly [2] - 68:8, 70:6
footage [5] - 48:13, 48:19, 50:13, 64:19, 67:12
footnote [1] - 60:25
FOR [3] - 1:1, 1:10, 1:18
force [1] - 85:22
forced [3] - 35:24, 36:25, 83:17
Ford [1] - 94:18
forefront [1] - 88:15
foregoing [1] - 97:4
form [4] - 88:22, 93:19, 94:2, 96:23
formalities [1] - 3:3
forth [1] - 93:18
fortunate [1] - 61:7
forward [10] - 2:4, 2:5, 7:20, 18:6, 21:19, 64:11, 64:13, 64:15, 65:10, 66:3
foundation [1] - 79:22
fourth [1] - 42:10
Franklin [1] - 1:15
frankly [2] - 14:6, 52:4
free [1] - 18:2
frequency [1] - 93:25
friend [5] - 43:6, 84:1, 84:6, 84:7, 86:17
friend's [1] - 43:8
friends [4] - 4:16, 25:6, 39:23, 43:4, 43:14, 44:7, 46:20, 47:23, 76:18, 77:22, 77:24, 88:2
front [11] - 11:1, 11:15, 31:25, 37:6, 49:22, 61:2, 61:10, 68:23, 71:5, 71:9, 72:22
frustrated [3] - 76:1, 77:9, 77:10
frustration [1] - 56:7
fucking [3] - 59:22, 59:23, 82:20
full [6] - 14:4, 76:6, 78:17, 94:25, 97:5
fully [4] - 6:20, 17:19, 25:11, 78:18
fun [1] - 39:21
functioning [1] - 58:9
fundamentals [2] - 9:7, 9:9
future [4] - 3:14, 80:25, 88:24, 89:18

## G

Garland [1] - 56:19
gas [2] - 59:3, 82:15
gassing [1] - 64:24
gazillions [1] - 47:21
gear [1] - 23:14
general [1] - 81:14
generally [4] - 49:6, 80:24, 87:4, 91:5
gentlemen [1] - 48:22
George [3] - 55:6, 58:3, 70:13
gift [1] - 61:2
girl [1] - 70:21
given [6] - 9:19, 12:6, 12:18, 14:1, 53:18, 55:24
glad [1] - 44:6
glasses [5] - 66:6, 66:7, 72:1, 72:3
Glenn [4] - 2:3, 2:14, 3:4, 92:3
GLENN [1] - 1:4
goal [2] - 57:25, 60:25
governing [1] - 90:7
government [79] - 3:25, 4:18, 4:21, 5:8, 5:11, 6:2, 7:16, 8:7, 8:11, 8:20, 8:21, 8:24, 9:1, 9:2, 9:11, 9:15, 10:4, 11:14, 12:7, 12:8, 12:19, 13:2, 13:11, 14:10, 14:23, 15:7, 16:2, 18:10, 18:21, 18:23, 20:5, 21:4, 21:14, 22:13, 22:16, 22:22, 23:25, 26:5, 26:9, 26:11, 26:13, 27:15, 28:3, 28:14, 29:13, 29:15, 29:21, 30:5, 30:8, 30:18, 30:23, 31:5, 33:24, 39:10, 39:17, 40:1, 40:15, 42:4, 42:21, 42:25, 43:5, 44:12, 45:17, 49:16, 49:24, 51:10, 52:12, 53:8, 55:17, 58:9, 67:15, 81:17, 89:24, 90:2, 90:3, 95:23, 96:9, 96:15
GOVERNMENT [1] - 1:10
government's [25] - 7:18, 9:6, 9:8, 9:18, 11:13, 12:3, 12:6, 13:18, 16:13, 18:7, 19:9, 19:25, 23:9,

26:15, 27:6, 28:10, 31:15, 35:12, 35:15, 38:15, 39:8, 53:16, 63:7, 84:9, 90:6
GPS [2] - 94:1
granted [1] - 96:13
gravity [1] - 25:17
great [1] - 10:8
greater [3] - 38:2, 38:3, 80:19
grenades [3] - 59:3, 75:6, 82:15
Griffith [5] - 11:15, 12:21, 18:7, 18:22, 19:6
ground [3] - 66:15, 71:14, 71:22
grounds [2] - 23:6, 74:23
group [8] - 22:6, 62:11, 65:21, 68:5, 68:18, 69:16, 72:16, 72:17
guarding [1] - 82:23
guess [2] - 10:17, 85:19
guidance [2] - 26:23, 53:3
guidelines [5] - 26:18, 26:23, 26:25, 27:7, 53:4
guilty [8] - 17:23, 49:5, 49:8, 60:10, 79:9, 81:10, 82:2, 95:18
guy [8] - 32:21, 55:13, 56:2, 62:9, 67:20, 68:1, 69:13, 72:19
guys [1] - 69:6

## H

H2-205B [1] - 94:18
half [2] - 29:16, 31:1
halls [1] - 83:13
hallway [6] - 38:11, 38:20, 38:23, 39:3, 69:2, 83:18
hallways [1] - 44:18
hand [2] - 65:23, 71:1
handle [1] - 49:7
hands [3] - 69:2, 71:5, 71:23
hanging [2] - 23:8, 42:16
happiness [1] - 77:13
hard [11] - 25:20, 28:12, 28:13, 29:8, 34:12, 41:8, 49:10, 51:17, 54:17, 56:23,

61:8
harder [1] - 61:1
hats [1] - 22:10
Havel [1] - 41:3
HBO [1] - 69:16
head [1] - 76:21
headed [1] - 71:8
health [1] - 94:7
hear [17] - 5:11, 5:12, 5:13, 7:16, 37:10, 37:11, 50:15, 50:20, 51:17, 56:9, 62:10, 64:6, 69:20, 71:20, 75:2, 75:12, 75:19
heard [8] - 46:24, 61:9, 68:17, 70:4, 73:3, 75:11, 75:22, 76:15
hearing [23] - 3:4, 3:8, 3:25, 5:4, 5:17, 7:8, 7:14, 7:16, 17:7, 17:9, 17:11, 17:13, 17:15, 34:25, 37:16, 60:24, 61:8, 74:19, 75:4, 75:12, 80:16, 81:3, 84:18
hearings [1] - 3:15
heart [1] - 56:22
heavily [1] - 89:20
heavy [1] - 71:3
held [5] - 3:5, 3:11, 74:4, 78:1, 78:20
help [2] - 53:13, 72:9
helped [3] - 47:25, 66:9, 82:7
helpful [4] - 15:6, 28:1, 28:16, 45:12
HENRY [1] - 1:10
herd [1] - 84:14
hereby [2] - 92:4, 97:3
herein [1] - 93:20
hesitancy [1] - 19:9
hiding [1] - 50:23, 83:21
highlight [2] - 8:16, 28:10
highlights [1] - 88:21
highly [1] - 48:18
himself [4] - 22:11, 36:4, 54:19, 87:9
hindsight [1] - 73:22
history [5] - 27:16, 29:12, 81:7, 87:18
hit [1] - 10:22
hitting [1] - 68:1
Hogan [1] - 62:19
hold [3] - 25:20, 25:21, 58:1
holding [1] - 50:21
home [9] - 8:23,

22:21, 26:14, 33:25, 39:12, 40:2, 40:16, 91:12, 93:17
Honor [56] - 2:9, 2:13, 2:25, 4:19, 4:22, 4:25, 6:5, 6:9, 7:21, 7:22, 8:6, 10:21, 12:10, 14:12, 15:4, 16:18, 17:4, 18:16, 19:22, 21:1, 24:24, 29:3, 34:9, 38:6, 39:16, 40:7, 41:7, 42:9, 44:16, 47:14, 47:20, 50:25, 57:21, 58:13, 66:18, 66:23, 67:1, 68:9, 73:20, 74:15, 75:24, 77:5, 77:19, 78:4, 78:7, 78:11, 79:5, 80:7, 95:24, 96:1, 96:8, 96:11, 96:16, 96:18, 96:20, 96:22
HONORABLE [1] - 1:8
hoodie [1] - 72:4
hope [5] - 25:14, 50:25, 51:24, 79:13, 80:3
hopeful [1] - 47:24
hotel [2] - 53:14, 61:19
hour [7] - 5:19, 29:16, 29:18, 31:1, 31:2, 31:18, 33:22
hours [1] - 62:15
House [5] - 23:17, 38:11, 38:20, 83:18, 94:18
house [13] - 36:1, 37:14, 50:16, 59:23, 83:12, 86:10, 86:11, 88:4
HOWELL [1] - 1:8
Howell [1] - 61:7
huge [2] - 77:21, 89:3
human [1] - 34:25
hundreds [1] - 62:15
hurt [1] - 72:11
hybrid [1] - 94:1

## I

idea [5] - 68:7, 69:21, 73:6, 76:15, 77:18
identification [1] - 21:5
identified [2] - 21:20, 26:5
identify [3] - 48:25, 50:6, 51:4

**identifying** [2] - 21:8, 46:6
**idiot** [1] - 79:10
**illegal** [1] - 46:23
**illustrates** [1] - 41:12
**illustrative** [1] - 36:13
**image** [1] - 33:13
**imagine** [2] - 51:17, 51:23
**immediate** [1] - 25:5
**immediately** [9] - 13:5, 52:13, 52:19, 69:6, 70:24, 71:23, 73:4, 88:1, 94:20
**impact** [1] - 78:19
**importance** [1] - 89:18
**important** [14] - 9:20, 10:22, 13:19, 14:7, 14:25, 53:11, 53:19, 53:25, 60:9, 70:11, 70:13, 73:23, 83:7
**impose** [6] - 5:16, 18:8, 80:12, 80:18, 89:17
**imposed** [13] - 5:15, 17:24, 80:21, 88:17, 90:1, 90:8, 90:11, 91:2, 91:25, 92:13, 95:9, 95:15, 95:22
**imposition** [1] - 94:11
**impression** [1] - 68:15
**imprisonment** [8] - 12:1, 12:5, 17:18, 18:2, 89:23, 90:1, 91:15, 95:10
**improve** [1] - 58:3
**in-depth** [1] - 12:12
**incarcerated** [1] - 73:25
**incarceration** [20] - 9:2, 9:13, 9:17, 10:5, 10:7, 10:12, 10:19, 11:20, 11:23, 14:5, 14:9, 14:10, 15:13, 15:14, 22:19, 22:21, 31:9, 35:16, 49:12, 60:19
**incident** [4] - 27:24, 49:25, 67:10, 76:23
**incidents** [1] - 55:11
**incite** [1] - 88:7
**incited** [1] - 24:17
**include** [4] - 45:9, 80:20, 91:12, 92:15
**includes** [1] - 95:3
**including** [9] - 3:11, 3:13, 21:11, 39:20, 42:17, 87:19, 90:13, 93:25, 94:1
**incompatible** [1] - 4:2

**incursion** [1] - 84:23
**Indian** [1] - 62:12
**indicated** [2] - 8:6, 93:20
**indication** [1] - 51:25
**individual** [9] - 10:7, 21:15, 27:18, 28:17, 34:11, 34:13, 36:19, 36:20
**individuals** [2] - 28:7, 36:21
**ineffective** [1] - 95:17
**inflammatory** [2] - 24:13, 86:12
**information** [4] - 46:6, 60:12, 92:5, 95:16
**initial** [6] - 28:22, 29:13, 29:18, 30:4, 30:18, 42:23
**inside** [29] - 20:14, 23:3, 23:16, 23:20, 23:24, 32:18, 33:25, 36:1, 39:13, 42:15, 64:19, 64:23, 65:6, 68:20, 68:21, 69:14, 70:19, 73:22, 76:11, 82:12, 83:8, 83:25, 84:1, 84:20, 85:23, 85:25, 86:10, 86:15, 87:14
**insofar** [2] - 30:7, 46:13
**inspire** [1] - 90:6
**instances** [1] - 38:2
**instead** [2] - 64:9, 82:24
**institutional** [1] - 22:19
**intent** [5] - 17:11, 41:22, 43:22, 45:6, 84:12
**intentionally** [1] - 82:11
**intentions** [1] - 69:10
**interaction** [2] - 48:16, 72:19
**interactions** [2] - 72:14, 87:21
**interest** [2] - 93:2
**interested** [1] - 11:12
**interesting** [2] - 11:3, 17:7
**intermittent** [5] - 14:19, 15:13, 15:22, 90:9, 90:17
**internally** [1] - 35:8
**interpretation** [1] - 18:13
**interrupting** [1] - 16:24

**interview** [1] - 53:13
**intricacies** [1] - 27:17
**investigate** [1] - 50:8
**investigated** [1] - 21:11
**investigation** [12] - 3:21, 5:10, 5:24, 5:25, 6:8, 6:13, 7:2, 7:10, 20:11, 21:22, 80:14, 95:2
**investigations** [1] - 21:19
**involved** [5] - 25:16, 27:18, 34:11, 42:1, 49:15
**irksome** [1] - 75:2
**irony** [1] - 61:5
**issue** [7] - 12:25, 13:6, 19:7, 19:13, 19:24, 20:3, 61:15
**issued** [1] - 3:13
**items** [2] - 4:2, 6:12
**itself** [1] - 41:25

**J**

**jail** [10] - 26:15, 40:20, 41:4, 41:9, 42:5, 42:7, 42:21, 43:2, 56:12, 78:24
**January** [32] - 8:10, 9:19, 9:22, 10:2, 10:16, 13:13, 13:23, 15:2, 22:4, 43:10, 43:12, 43:13, 43:21, 44:14, 53:8, 54:15, 58:5, 62:25, 77:3, 77:25, 78:2, 79:23, 80:25, 82:4, 85:15, 86:13, 88:16, 88:21, 90:23, 91:3, 91:9, 91:18
**jeer** [1] - 37:17
**Jessica** [2] - 44:2, 44:11
**job** [4] - 49:16, 53:16, 61:1, 73:25
**John** [1] - 62:16
**join** [2] - 88:7, 91:19
**joined** [4] - 2:10, 82:11, 83:10, 85:9
**joining** [2] - 2:14, 35:25, 45:6, 64:9
**joint** [4] - 4:1, 8:8, 50:13, 91:21
**Joint** [1] - 50:13
**Jordan** [2] - 2:11, 16:18
**JORDAN** [1] - 1:14

**jordan.a.konig@ usdoj.gov** [1] - 1:17
**journalists** [1] - 70:15
**judge** [3] - 3:16, 10:25, 11:4, 35:13, 88:20, 90:4
**Judge** [4] - 56:17, 56:19, 61:7, 62:19
**JUDGE** [1] - 1:8
**judges** [5] - 8:3, 19:10, 25:14, 27:3, 49:22
**judgment** [4] - 76:22, 88:13, 92:3, 95:12
**jurisdiction** [2] - 92:8, 96:23
**justice** [1] - 87:22
**Justice** [1] - 1:14
**justify** [1] - 37:15
**juxtaposition** [1] - 40:6

**K**

**Kathy** [1] - 94:17
**keep** [10] - 7:24, 31:18, 33:21, 34:2, 36:17, 37:8, 64:22, 71:7, 75:8, 83:6
**keeping** [3] - 7:23, 8:2, 32:6
**keeps** [1] - 49:2
**kept** [1] - 77:17
**Kezer** [4] - 46:20, 47:9, 47:10, 76:21
**Kezer's** [1] - 47:16
**kicked** [5] - 32:14, 32:17, 33:5, 83:2, 83:3
**kicked-down** [1] - 33:5
**kicking** [3] - 32:19, 32:22, 86:5
**kids** [5] - 54:6, 57:2, 74:1, 78:15
**kind** [13] - 10:1, 10:15, 12:25, 23:15, 40:22, 60:23, 66:11, 69:12, 71:7, 73:18, 73:20, 88:23
**kinds** [3] - 75:6, 75:21, 75:22
**Kira** [1] - 2:14
**KIRA** [1] - 1:18
**kiraannewest@ gmail.com** [1] - 1:20
**knocked** [1] - 71:7
**knowing** [2] - 82:12, 84:23

**knows** [3] - 49:6, 60:7, 63:3
**KONIG** [2] - 1:14, 17:3
**Konig** [4] - 2:11, 16:17, 16:19, 16:25

**L**

**lack** [4] - 60:8, 60:10, 84:12, 84:13
**lady** [1] - 70:4
**Lamberth** [1] - 56:17
**language** [2] - 24:13, 86:12
**large** [3] - 13:16, 31:4, 68:5
**largely** [3] - 8:9, 32:13, 38:18
**larger** [1] - 16:9
**last** [4] - 5:14, 6:2, 54:3, 54:9
**lastly** [1] - 5:12
**law** [27] - 14:8, 19:7, 19:20, 24:1, 24:2, 31:17, 33:21, 34:1, 35:23, 35:24, 36:17, 37:7, 37:18, 37:19, 37:21, 38:5, 38:21, 38:22, 39:2, 53:22, 61:2, 67:17, 73:5, 78:24, 80:23, 82:8, 87:3
**law-abiding** [2] - 14:8, 19:20
**lawyer** [1] - 61:3
**lax** [1] - 8:3
**leader** [1] - 79:13
**leading** [2] - 18:22, 28:25
**learn** [4] - 25:15, 74:5, 78:21, 79:14
**learned** [12] - 29:21, 30:18, 48:10, 61:3, 74:9, 74:14, 74:18, 75:13, 75:23, 78:22, 78:24, 79:1
**least** [6] - 25:20, 35:8, 58:10, 58:18, 58:20, 92:20
**leave** [8] - 65:1, 66:21, 84:4, 84:22, 85:17, 87:13
**leaves** [1] - 48:4
**leaving** [2] - 29:22, 64:17
**lectern** [1] - 2:8
**led** [1] - 31:4
**Lee** [4] - 2:3, 2:14, 3:4, 92:4

**LEE** [1] - 1:4
**left** [11] - 26:22, 65:23, 66:21, 68:3, 68:13, 72:4, 73:4, 75:18, 84:19, 85:17, 96:14
**left-hand** [1] - 65:23
**legal** [1] - 52:20
**legally** [1] - 62:4
**legit** [1] - 43:15
**legitimate** [1] - 89:9
**lemming** [3] - 73:20, 79:10, 85:2
**length** [1] - 32:4
**lengthy** [1] - 25:2
**less** [4] - 22:20, 33:17, 46:11, 87:7
**lesser** [1] - 49:19
**lesson** [7] - 74:12, 74:14, 74:17, 78:21, 78:23, 78:24
**lessons** [2] - 79:14, 80:3
**letter** [15] - 4:13, 25:2, 46:19, 47:8, 47:17, 47:18, 55:4, 56:25, 57:8, 57:16, 73:19, 78:13, 78:14, 79:9, 82:21
**letters** [5] - 4:14, 4:16, 76:18, 78:8, 88:11
**letting** [1] - 83:10
**level** [3] - 60:19, 61:9, 76:21
**liability** [1] - 34:21
**life** [2] - 17:12, 49:7
**light** [1] - 71:8
**light-headed** [1] - 71:8
**likely** [1] - 48:18
**limit** [1] - 51:9
**limitation** [1] - 10:24
**limited** [1] - 81:17
**Lindsey** [5] - 4:10, 20:13, 20:17, 21:3, 76:25
**line** [18] - 3:5, 3:9, 18:24, 22:21, 34:10, 36:16, 37:6, 37:8, 39:3, 39:6, 45:23, 64:22, 65:3, 66:13, 68:23, 83:16, 83:17, 85:11
**lines** [11] - 9:23, 30:20, 31:20, 36:7, 38:11, 39:15, 47:6, 75:8, 84:20, 87:11, 91:20
**links** [1] - 36:9
**list** [1] - 62:22
**listed** [2] - 4:1, 26:9
**listen** [2] - 3:6, 10:23

**listening** [2] - 3:8, 62:16
**litigation** [1] - 18:20
**live** [1] - 60:11
**live-streamed** [1] - 60:11
**lived** [1] - 11:9
**Lives** [1] - 55:5
**lives** [2] - 70:10, 74:2
**living** [1] - 77:24
**Lloyd** [3] - 44:2, 44:5, 44:11
**local** [1] - 92:16
**location** [6] - 31:23, 93:16, 93:19, 93:22, 93:24, 94:2
**locations** [1] - 39:14
**look** [11] - 14:16, 19:19, 23:2, 28:9, 29:23, 44:2, 48:17, 49:10, 54:1, 63:24, 85:13
**looked** [3] - 4:7, 21:10, 63:22
**looking** [13] - 11:5, 14:23, 28:15, 29:12, 33:11, 34:23, 35:9, 48:24, 51:11, 51:18, 61:17, 64:20, 83:23
**looting** [1] - 57:7
**lose** [1] - 73:25
**lost** [2] - 77:20
**LOTH** [1] - 97:3
**Loth** [2] - 1:22, 97:16
**love** [2] - 67:16
**lower** [1] - 60:19
**lower-level** [1] - 60:19
**Lustig** [1] - 6:14
**LUSTIG** [1] - 1:21

# M

**ma'am** [6] - 5:20, 7:6, 67:6, 79:24, 80:2, 80:10
**maced** [4] - 71:14, 71:21, 71:24, 72:8
**machine** [1] - 1:24
**machines** [1] - 35:1
**MAGA** [1] - 22:10
**magnitude** [1] - 49:15
**main** [1] - 78:19
**maintained** [1] - 90:13
**major** [2] - 67:11, 78:24
**malcontents** [1] - 89:18
**mandated** [2] - 56:4, 91:22

**mandatory** [2] - 92:12, 92:15
**manner** [4] - 40:7, 42:24, 44:17, 97:11
**marching** [1] - 38:21
**mask** [1] - 7:23
**masks** [1] - 8:2
**mason** [1] - 87:24
**mass** [1] - 64:3
**materials** [2] - 3:18, 7:18
**Matter** [1] - 55:5
**matter** [2] - 2:2, 18:11
**mature** [1] - 79:18
**max** [1] - 56:15
**maximum** [3] - 55:24, 89:23, 95:10
**mean** [24] - 12:15, 13:22, 14:13, 17:6, 20:21, 25:13, 26:17, 33:23, 35:1, 36:9, 39:25, 41:1, 42:3, 47:4, 52:17, 59:5, 61:19, 62:11, 62:17, 65:14, 71:15, 73:24, 76:8, 76:12
**meaning** [1] - 11:18
**means** [1] - 11:19
**mechanisms** [1] - 27:8
**media** [3] - 3:13, 24:16, 86:13
**median** [1] - 27:3
**medical** [1] - 94:6
**meetings** [1] - 18:17
**member** [2] - 2:16, 38:10, 39:9
**members** [5] - 60:4, 83:4, 83:24, 86:17, 86:18
**memo** [8] - 3:25, 4:6, 8:12, 8:13, 20:6, 22:2, 31:15, 84:9
**memoranda** [2] - 4:4, 80:13
**memory** [2] - 51:5, 71:15
**memos** [1] - 79:8
**mental** [1] - 94:7
**mentality** [1] - 84:14
**mention** [2] - 45:14, 53:12
**mentioned** [10] - 34:24, 48:4, 49:4, 52:9, 56:17, 58:14, 60:9, 60:21, 61:16, 62:7
**mentioning** [1] - 60:24
**merely** [1] - 39:9
**merit** [1] - 22:18

**mess** [1] - 69:4
**message** [2] - 43:5, 91:19
**messaged** [2] - 83:25, 84:5
**messages** [3] - 44:13, 86:19, 88:6
**messes** [1] - 73:25
**met** [1] - 72:13
**metal** [1] - 71:3
**methods** [1] - 93:9
**Metropolitan** [1] - 48:11
**microphone** [1] - 29:2
**might** [3] - 27:25, 41:5, 80:24
**milling** [1] - 69:11
**millions** [2] - 61:24, 63:4
**mimic** [1] - 80:24
**minds** [1] - 78:11
**minimize** [1] - 88:5
**minimizing** [3] - 43:20, 75:10
**minor** [1] - 22:21
**minutes** [15] - 23:4, 23:5, 23:8, 31:22, 32:1, 32:8, 38:25, 42:16, 60:4, 69:11, 82:25, 85:16, 85:18
**misdemeanor** [10] - 11:2, 11:22, 13:24, 14:2, 27:23, 48:21, 51:8, 81:25, 89:22, 91:4
**misdemeanors** [2] - 13:25, 90:24
**misevaluate** [1] - 49:18
**misled** [1] - 63:3
**missed** [2] - 47:18, 67:23
**missing** [4] - 4:20, 20:5, 47:17, 50:5
**mission** [1] - 22:5
**misspoke** [1] - 19:1
**mistake** [8] - 49:18, 74:5, 74:6, 74:9, 74:13, 74:14, 77:20, 77:21
**mistakes** [2] - 74:10, 74:11
**misunderstanding** [1] - 15:10
**mob** [12] - 35:24, 36:5, 37:12, 37:24, 37:25, 38:10, 39:5, 42:5, 82:11, 86:25, 89:4, 91:20
**model** [1] - 88:14

**mom** [1] - 70:10
**moment** [2] - 63:23, 73:21
**moms** [2] - 57:2, 62:10
**monitor** [2] - 60:22, 94:3
**monitored** [2] - 10:14, 93:19
**monitoring** [7] - 93:16, 93:20, 93:22, 93:24, 94:1, 94:3
**month** [3] - 9:1, 30:24, 31:9
**months** [21] - 8:14, 10:6, 10:7, 10:9, 10:18, 29:25, 30:2, 31:10, 31:11, 40:20, 54:12, 54:25, 55:14, 55:16, 56:15, 71:16, 73:24, 77:15, 89:24, 92:4
**months'** [6] - 12:1, 14:11, 29:19, 35:15, 42:7, 49:12
**moot** [1] - 50:11
**Morgan** [3] - 44:2, 44:5, 44:11
**Morgan-Lloyd** [3] - 44:2, 44:5, 44:11
**morning** [5] - 2:9, 2:12, 2:13, 3:19, 7:5
**mosh** [1] - 84:2
**most** [8] - 17:9, 19:18, 33:16, 57:23, 62:13, 62:14, 69:22, 73:23
**mostly** [3] - 43:15, 43:17, 91:6
**mother** [1] - 54:8
**motherfuckers** [2] - 50:23, 83:21
**motion** [2] - 96:9, 96:13
**motto** [1] - 57:1
**move** [2] - 21:18, 76:13
**moved** [1] - 68:5
**movement** [1] - 94:4
**moving** [1] - 64:11
**MR** [102] - 2:7, 2:9, 4:19, 4:22, 6:5, 7:21, 7:25, 8:5, 10:21, 11:7, 12:10, 12:15, 13:8, 13:15, 14:12, 15:4, 15:9, 15:25, 16:4, 16:7, 16:15, 16:18, 16:22, 17:3, 17:4, 18:16, 19:22, 20:20, 21:1, 21:13, 22:15, 23:10, 23:12,

23:18, 23:21, 24:4, 24:6, 24:9, 24:12, 24:15, 24:18, 24:21, 24:24, 25:3, 25:5, 25:10, 25:18, 25:24, 26:2, 26:19, 26:24, 27:13, 27:21, 28:2, 28:19, 29:3, 29:10, 30:13, 30:17, 31:10, 31:20, 32:13, 32:16, 32:20, 32:23, 32:25, 33:3, 33:7, 33:12, 34:3, 34:5, 34:9, 34:18, 34:21, 35:5, 35:10, 35:20, 36:8, 38:14, 38:17, 38:25, 39:16, 40:6, 40:21, 41:7, 41:10, 42:9, 42:23, 43:18, 43:22, 44:16, 44:24, 45:13, 45:23, 46:4, 47:3, 47:12, 47:14, 95:24, 96:11, 96:16, 96:20
**MS** [44] - 2:13, 2:22, 2:24, 4:25, 6:9, 6:14, 6:17, 6:22, 29:8, 47:20, 48:14, 48:20, 50:1, 50:14, 50:25, 51:21, 52:2, 52:4, 55:15, 55:21, 56:1, 56:5, 56:7, 56:14, 56:17, 57:3, 57:11, 57:21, 58:7, 58:13, 59:6, 59:9, 60:1, 60:6, 61:23, 63:18, 63:21, 65:8, 66:22, 67:1, 67:4, 96:1, 96:6, 96:18
**multiple** [3] - 46:21, 58:18, 77:1
**murder** [2] - 55:6, 58:2
**must** [14] - 26:20, 80:16, 81:5, 92:15, 92:17, 92:18, 92:19, 92:22, 93:6, 93:8, 93:11, 93:13, 93:21, 95:11
**mystery** [5] - 20:3, 20:4, 20:5, 52:11, 52:25

**N**

**names** [1] - 2:5
**nation** [1] - 22:7
**nation's** [1] - 27:16
**native** [1] - 62:20
**nature** [6] - 42:2, 44:19, 49:25, 81:6, 81:21, 87:1

**near** [2] - 90:18, 93:13
**nec** [1] - 36:22
**necessarily** [2] - 20:22, 37:9
**necessary** [5] - 3:15, 9:3, 9:6, 14:5, 80:19
**need** [14] - 9:10, 12:7, 19:4, 19:17, 19:18, 44:5, 78:20, 80:20, 81:8, 81:10, 87:2, 88:17, 88:21, 90:21
**needed** [4] - 9:15, 54:19, 66:10, 72:24
**never** [21] - 17:11, 49:5, 61:8, 67:10, 68:20, 68:24, 69:15, 73:5, 73:9, 73:14, 73:15, 74:6, 75:15, 75:16, 76:8, 76:20, 78:9, 78:12, 78:24
**new** [4] - 12:25, 49:23, 77:23, 95:15
**New** [1] - 1:11
**news** [2] - 54:23, 70:11
**next** [2] - 5:19, 93:18
**nice** [4] - 3:1, 46:10, 48:6, 69:24
**NICOLE** [1] - 1:18
**Nicole** [1] - 2:15
**night** [1] - 56:3
**nine** [3] - 4:1, 4:15, 62:8
**nobody** [1] - 56:3
**nonissue** [1] - 50:8
**normal** [2] - 9:10, 27:4
**normally** [2] - 9:9, 77:18
**Northeast** [1] - 1:19
**Northwest** [1] - 94:22
**notable** [1] - 41:24
**note** [2] - 20:12, 59:11
**noted** [2] - 91:11, 95:23
**notes** [1] - 97:5
**nothing** [7] - 6:15, 55:14, 56:3, 60:17, 69:4
**notice** [6] - 4:2, 4:3, 4:11, 16:20, 29:22, 96:4
**noticed** [1] - 17:14
**notify** [1] - 94:23
**noting** [1] - 41:18
**novel** [3] - 27:15, 53:21, 53:22
**November** [2] - 1:4, 97:14
**nuances** [1] - 12:17
**null** [1] - 97:9

**number** [8] - 8:21, 26:6, 28:9, 35:7, 37:24, 40:1, 64:16, 88:11
**numbers** [2] - 37:9, 53:11, 53:21
**NW** [1] - 1:11

**O**

**O'Connor** [9] - 2:10, 45:11, 47:21, 48:22, 50:2, 50:4, 52:9, 53:11, 53:21
**O'CONNOR** [102] - 1:10, 2:7, 2:9, 4:19, 4:22, 6:5, 7:21, 7:25, 8:5, 10:21, 11:7, 12:10, 12:15, 13:8, 13:15, 14:12, 15:4, 15:9, 15:25, 16:4, 16:7, 16:15, 16:18, 16:22, 17:4, 18:16, 19:22, 20:20, 21:1, 21:13, 22:15, 23:10, 23:12, 23:18, 23:21, 24:4, 24:6, 24:9, 24:12, 24:15, 24:18, 24:21, 24:24, 25:3, 25:5, 25:10, 25:18, 25:24, 26:2, 26:19, 26:24, 27:13, 27:21, 28:2, 28:19, 29:3, 29:10, 30:13, 30:17, 31:10, 31:20, 32:13, 32:16, 32:20, 32:23, 32:25, 33:3, 33:7, 33:12, 34:3, 34:5, 34:9, 34:18, 34:21, 35:5, 35:10, 35:20, 36:8, 38:14, 38:17, 38:25, 39:16, 40:6, 40:21, 41:7, 41:10, 42:9, 42:23, 43:18, 43:22, 44:16, 44:24, 45:13, 45:23, 46:4, 47:3, 47:12, 47:14, 95:24, 96:11, 96:16, 96:20
**O'Connor's** [1] - 49:9
**oath** [3] - 59:21, 59:24, 82:19
**objection** [2] - 6:11, 7:8
**objections** [6] - 5:8, 6:3, 6:16, 6:17, 95:22, 96:1
**obligation** [1] - 94:25
**obligations** [2] - 94:8, 94:20

**observed** [1] - 45:24
**observing** [1] - 37:4
**obstruct** [1] - 93:8
**obstructing** [1] - 56:4
**obvious** [1] - 89:8
**obviously** [3] - 10:22, 34:14, 71:16
**occasionally** [1] - 77:9
**occurred** [3] - 10:16, 57:6, 91:9
**ocean** [1] - 63:16
**October** [4] - 6:1, 18:6, 18:12, 29:24
**odd** [1] - 21:14
**OF** [3] - 1:1, 1:2, 1:7
**offended** [1] - 57:4
**offense** [28] - 12:4, 17:17, 17:23, 19:11, 20:12, 21:21, 25:19, 27:7, 42:2, 44:20, 55:25, 56:16, 80:21, 80:22, 80:23, 81:6, 81:11, 81:22, 81:25, 87:2, 87:3, 89:22, 90:1, 90:5, 90:23, 91:3, 91:10, 95:18
**offenses** [6] - 10:9, 11:16, 11:24, 13:13, 18:14, 26:17
**offensive** [2] - 40:13, 52:7
**offer** [4] - 14:1, 14:20, 34:10, 86:21
**offered** [1] - 72:9
**office** [3] - 16:12, 95:1, 95:6
**Office** [3] - 94:16, 94:18, 95:3
**office's** [1] - 3:20
**officer** [16] - 23:23, 37:7, 48:1, 48:3, 48:12, 48:15, 48:18, 65:18, 66:9, 66:16, 66:20, 69:5, 72:6, 85:20, 93:25, 94:9
**Officer** [2] - 1:21, 94:17
**OFFICER** [1] - 96:22
**officers** [34] - 22:6, 32:5, 35:24, 36:17, 36:23, 36:25, 37:19, 37:21, 38:22, 39:6, 48:7, 48:17, 59:2, 66:13, 67:14, 67:24, 67:25, 68:5, 68:11, 68:24, 69:20, 69:23, 72:13, 72:22, 73:12, 82:14, 82:19, 82:21, 83:6, 84:4, 85:22
**offices** [1] - 23:15

**Official** [1] - 1:23
**official** [1] - 97:16
**old** [1] - 57:1
**once** [6] - 9:23, 13:7, 25:25, 66:15, 70:23, 83:9
**one** [50] - 9:14, 12:24, 16:16, 19:13, 20:3, 21:25, 22:1, 22:4, 28:6, 28:19, 31:9, 32:14, 32:21, 33:15, 34:12, 34:13, 35:5, 36:13, 36:19, 36:20, 36:21, 37:6, 38:1, 40:11, 40:23, 41:4, 44:11, 44:22, 44:24, 45:14, 46:19, 51:12, 55:12, 56:18, 58:15, 63:6, 63:8, 64:14, 65:15, 66:14, 71:1, 77:22, 77:24, 79:13, 82:24, 87:19, 92:15, 92:19
**ones** [2] - 69:25, 70:1
**ongoing** [1] - 15:16
**open** [8] - 19:11, 32:18, 44:7, 68:4, 73:17, 74:24, 83:3, 96:10
**opened** [3] - 32:10, 32:12, 32:24
**opportunities** [2] - 85:6, 86:6
**opportunity** [2] - 67:4, 83:5
**opposed** [2] - 25:25, 44:1
**opposition** [1] - 37:20
**opting** [2] - 10:5, 10:18
**option** [1] - 15:19
**options** [5] - 11:6, 11:14, 14:4, 14:24, 17:17
**oral** [2] - 52:21, 52:22
**order** [4] - 18:24, 81:20, 95:4, 96:4
**Order** [1] - 3:10
**ordered** [2] - 92:6, 92:24, 94:8
**Oregon** [1] - 70:10
**outset** [1] - 26:16
**outside** [12] - 27:7, 34:1, 42:16, 43:6, 43:11, 64:3, 64:18, 65:25, 69:12, 84:5, 84:21, 85:21
**overall** [1] - 85:14
**overran** [4] - 9:22, 36:6, 38:10, 39:15

**overrun** [2] - 22:5, 60:4
**overwhelmed** [2] - 35:24, 82:8
**owed** [1] - 81:13
**own** [2] - 39:22, 44:10

# P

**P.O** [1] - 1:15
**pack** [1] - 36:16
**page** [2] - 6:2, 22:3
**paid** [2] - 94:25, 96:2
**pandemic** [2] - 15:16, 16:2
**panoply** [1] - 14:4
**papers** [4] - 7:3, 26:9, 55:4, 57:15
**parade** [1] - 82:5
**parading** [2] - 81:22, 82:3
**paragraph** [3] - 20:15, 20:16, 62:7
**parallel** [2] - 28:22, 30:4
**paraphernalia** [1] - 41:3
**parents** [1] - 54:13
**park** [1] - 39:20
**parsing** [1] - 35:6
**part** [19] - 31:4, 37:7, 37:11, 37:12, 38:21, 39:12, 42:1, 43:9, 44:18, 44:19, 45:7, 60:2, 69:22, 79:23, 83:19, 85:23, 87:10, 89:3, 90:14
**participant** [1] - 42:5
**participate** [1] - 93:16
**participated** [3] - 55:11, 55:18, 83:14
**participating** [1] - 88:10
**participation** [2] - 39:14, 40:18, 85:12
**particular** [4] - 36:5, 36:6, 49:25, 87:5
**particularly** [2] - 9:20, 14:9
**parties** [2] - 2:2, 80:14
**parts** [4] - 36:5, 36:6, 38:3, 87:11
**party** [2] - 42:6, 97:11
**path** [2] - 14:8, 19:20
**pay** [4] - 51:9, 92:6, 93:2, 94:10
**payable** [1] - 94:20
**payment** [1] - 81:19
**payments** [1] - 94:13

**pays** [1] - 61:18
**peaceful** [5] - 43:15, 43:17, 80:1, 89:8, 89:19
**peacefully** [3] - 46:24, 62:5, 62:17
**penalties** [3] - 17:22, 18:4, 93:3
**people** [74] - 9:21, 15:1, 15:17, 17:1, 21:19, 22:7, 30:9, 33:4, 33:9, 33:14, 33:16, 36:17, 38:5, 40:8, 40:9, 42:7, 46:21, 46:23, 47:11, 48:25, 49:15, 50:18, 51:18, 51:20, 51:25, 52:5, 53:23, 54:3, 54:13, 55:17, 55:18, 56:10, 56:20, 57:20, 58:20, 62:8, 62:13, 62:14, 62:16, 64:3, 64:4, 64:14, 64:16, 64:17, 64:22, 65:12, 65:15, 65:16, 65:19, 65:20, 65:21, 65:23, 66:4, 68:22, 69:13, 69:19, 70:11, 70:14, 70:21, 71:20, 73:14, 74:2, 75:8, 77:13, 77:14, 78:8, 78:10, 79:15, 83:14, 83:23, 85:8, 88:7, 88:12
**people's** [1] - 78:11
**pepper** [6] - 47:25, 59:3, 66:6, 66:8, 75:6, 82:14
**perform** [1] - 46:23
**performance** [2] - 15:3, 91:8
**perhaps** [3] - 19:13, 54:13, 54:25
**period** [38] - 9:1, 9:12, 9:13, 9:16, 9:17, 10:5, 10:10, 10:12, 10:18, 10:19, 11:19, 11:23, 11:25, 14:4, 14:6, 14:8, 14:9, 14:21, 14:22, 15:5, 16:5, 16:6, 17:25, 23:6, 30:24, 54:12, 58:10, 60:14, 60:19, 90:17, 91:12, 91:13, 93:20, 95:10
**periodic** [1] - 92:20
**periods** [3] - 14:19, 14:24, 19:19
**permission** [2] - 2:18, 95:20
**permit** [1] - 91:15

**person** [24] - 3:5, 16:16, 17:2, 20:23, 21:4, 21:8, 21:21, 23:23, 32:14, 37:6, 37:7, 38:4, 46:6, 46:7, 49:8, 49:20, 50:6, 54:5, 54:22, 54:25, 76:23, 77:1, 77:19, 85:20
**personally** [3] - 23:23, 54:24, 85:25
**persons** [1] - 3:6
**perspective** [1] - 28:10
**pertain** [1] - 28:17
**pertinent** [1] - 50:3
**petty** [18] - 11:16, 11:24, 12:4, 13:12, 17:17, 17:23, 18:14, 19:11, 26:17, 27:7, 55:24, 56:16, 81:25, 89:22, 90:1, 90:5, 90:23, 91:3
**phone** [11] - 37:3, 50:14, 50:21, 64:2, 64:20, 64:21, 70:7, 70:24, 70:25, 71:1, 73:1
**photocopied** [1] - 97:10
**photograph** [1] - 39:22
**photos** [4] - 39:21, 40:3, 40:8, 40:17
**phrase** [1] - 44:3
**physically** [5] - 23:22, 65:19, 72:21, 85:19, 87:6
**picked** [1] - 61:17
**picket** [1] - 82:6
**picketing** [2] - 81:23, 82:3
**picking** [1] - 61:21
**pictures** [3] - 41:2, 42:6, 69:9
**pierce** [4] - 12:11, 12:16, 13:21, 15:11
**pirate** [1] - 59:22
**place** [6] - 56:22, 65:5, 75:25, 76:2, 84:15, 87:20
**placed** [1] - 74:1
**placement** [1] - 92:20
**placing** [1] - 87:9
**plainly** [2] - 9:18, 90:3
**plan** [2] - 84:15, 90:16
**playing** [1] - 2:20
**plea** [29] - 7:14, 13:24, 14:1, 17:7, 17:9, 17:10, 17:13, 17:15,

17:17, 17:21, 17:23, 20:16, 24:6, 24:11, 24:20, 32:4, 53:2, 53:6, 61:6, 61:8, 74:19, 75:4, 75:11, 81:18, 86:20, 86:21, 92:23, 95:18
**pleaded** [1] - 82:2
**pleads** [1] - 49:8
**pleas** [2] - 27:6, 49:22
**pleasure** [1] - 48:23
**pled** [2] - 49:5, 60:10
**plenty** [4] - 47:4, 47:5, 85:6
**plus** [2] - 4:5, 49:24
**podium** [1] - 7:20
**point** [25] - 10:22, 12:12, 19:14, 22:12, 22:25, 25:10, 27:13, 27:22, 30:5, 31:24, 34:9, 34:22, 34:25, 35:2, 36:21, 39:4, 41:11, 42:13, 46:17, 50:11, 56:21, 59:25, 64:25, 68:14, 86:21
**pointed** [2] - 12:22, 69:8
**points** [2] - 22:1, 43:5
**Police** [1] - 48:11
**police** [67] - 9:23, 23:22, 32:5, 36:7, 38:11, 39:15, 40:4, 47:25, 48:3, 48:7, 48:12, 48:15, 48:17, 48:18, 52:14, 52:15, 58:1, 58:2, 59:13, 59:21, 60:3, 60:4, 64:7, 64:22, 65:2, 65:18, 66:6, 66:9, 66:13, 66:16, 66:20, 67:14, 67:19, 67:24, 67:25, 68:5, 68:10, 68:11, 68:21, 68:23, 69:5, 69:20, 69:23, 71:9, 71:18, 72:6, 72:13, 72:19, 72:21, 72:24, 73:12, 75:5, 75:8, 83:16, 83:17, 84:4, 84:19, 84:20, 85:11, 85:20, 85:22, 86:22, 87:11, 89:15, 91:20
**policy** [2] - 13:16, 16:9
**policy-strategy** [1] - 16:9
**political** [7] - 10:1, 20:7, 24:17, 58:3, 86:14, 88:7, 91:8
**politicians** [1] - 58:2
**portions** [2] - 5:9, 7:9

17:17, 17:21, 17:23, 20:16, 24:6, 24:11, 24:20, 32:4, 53:2, 53:6, 61:6, 61:8, 74:19, 75:4, 75:11, 81:18, 86:20, 86:21, 92:23, 95:18
**Portland** [4] - 54:8, 54:13, 56:21, 70:9
**pose** [1] - 9:25
**posed** [1] - 18:21
**posing** [1] - 39:22
**posited** [1] - 89:25
**position** [15] - 9:19, 11:14, 12:3, 12:7, 12:13, 12:20, 13:9, 13:11, 13:17, 18:8, 18:11, 18:17, 18:25, 90:6
**possess** [1] - 92:17
**possibly** [1] - 50:3
**post** [7] - 14:9, 24:7, 24:13, 43:14, 50:9, 86:12, 88:6
**post-incarceration** [1] - 14:9
**posters** [1] - 86:8
**postponed** [1] - 49:23
**posts** [1] - 43:17
**posturing** [1] - 36:24
**power** [3] - 80:1, 89:9, 89:19
**practically** [1] - 60:18
**practice** [1] - 61:2
**pragmatic** [1] - 15:18
**pray** [2] - 62:9
**preapproved** [1] - 94:9
**precious** [2] - 59:23, 82:20
**prefer** [1] - 7:23
**premise** [1] - 15:10
**preparation** [1] - 23:14
**prepared** [1] - 47:17
**preplanning** [1] - 23:11
**presence** [2] - 35:23, 37:15
**PRESENT** [1] - 1:21
**presentence** [12] - 3:21, 5:9, 5:24, 5:25, 6:8, 6:12, 7:2, 7:9, 20:11, 80:14, 95:1, 95:5
**President** [3] - 60:5, 63:3, 91:21
**presidential** [2] - 41:17, 91:23
**presiding** [1] - 3:16
**pressed** [1] - 71:9
**presumably** [1] - 37:15
**Pretrial** [1] - 1:21
**pretty** [5] - 10:3, 14:6, 35:13, 37:3, 51:24
**prevented** [1] - 38:5

**previous** [2] - 10:24, 74:8
**previously** [1] - 46:8
**pride** [3] - 43:23, 43:24, 45:6
**primary** [1] - 87:23
**prism** [1] - 54:2
**prison** [5] - 17:24, 19:25, 22:24, 26:7, 43:25
**Prisons** [3] - 15:16, 90:10, 90:14
**prisons** [1] - 15:17
**private** [4] - 23:15, 43:5, 43:14, 86:19
**privilege** [1] - 61:1
**Probation** [1] - 95:3
**probation** [51] - 3:20, 7:1, 8:22, 9:12, 10:19, 11:19, 11:24, 11:25, 12:5, 14:6, 14:18, 14:19, 14:23, 15:8, 15:15, 16:3, 16:6, 17:18, 17:24, 26:14, 33:24, 33:25, 35:17, 39:12, 40:2, 40:16, 44:1, 60:14, 60:18, 61:14, 78:21, 79:1, 80:15, 89:24, 89:25, 90:8, 90:9, 90:14, 91:6, 91:11, 92:5, 93:25, 94:9, 95:1, 95:6
**PROBATION** [1] - 96:22
**probationary** [2] - 90:24, 91:2
**probative** [1] - 93:8
**problem** [1] - 74:4
**proceed** [1] - 5:4
**proceeding** [1] - 96:25
**proceedings** [7] - 3:6, 3:11, 25:11, 25:17, 82:9, 83:7, 97:6
**Proceedings** [1] - 1:24
**process** [2] - 56:4, 58:10
**processed** [2] - 55:8, 57:23
**produced** [2] - 1:25, 89:15
**program** [3] - 93:16, 93:22
**prohibited** [1] - 3:12
**prohibitions** [1] - 3:12
**promise** [1] - 74:5
**promote** [3] - 80:22, 81:4, 87:3
**prompt** [1] - 24:10
**promptly** [3] - 24:19,

86:20, 93:12
**property** [2] - 23:24, 85:25
**proportion** [3] - 76:24, 77:25, 78:6
**prosecuted** [1] - 53:24
**prosecutions** [2] - 56:12, 57:18
**prosecutor** [1] - 67:9
**proselytizers** [1] - 44:9
**protect** [6] - 9:24, 59:23, 71:5, 80:25, 82:20, 88:18
**protected** [1] - 82:5
**protecting** [1] - 68:2
**protest** [5] - 43:15, 58:8, 62:5, 76:9, 82:6
**protesters** [1] - 55:7, 55:10, 55:24
**protests** [1] - 53:24, 54:2, 55:5, 55:7, 55:18, 57:5, 58:1, 70:14, 76:13
**proud** [1] - 25:7
**provide** [8] - 28:19, 45:17, 60:16, 80:23, 81:10, 90:9, 90:16, 90:17
**provided** [3] - 46:7, 46:8, 86:7
**provider** [1] - 88:14
**provides** [2] - 81:18, 89:23
**provisions** [1] - 92:2
**proximity** [1] - 37:9
**PSR** [3] - 6:2, 6:4, 20:15
**public** [8] - 3:5, 3:9, 9:25, 43:17, 80:25, 86:14, 88:6, 88:18
**publicly** [4] - 24:14, 24:15, 60:11, 86:12
**pull** [1] - 29:2
**pulled** [2] - 44:11, 85:5
**punch** [1] - 67:20
**punching** [2] - 67:22, 72:18
**punishment** [7] - 8:14, 22:12, 49:17, 55:19, 74:3, 80:23, 91:16
**purposes** [2] - 80:19, 80:20
**pursuant** [5] - 81:5, 81:20, 92:1, 93:10, 95:8
**push** [7] - 64:5, 64:8, 64:13, 64:15, 65:10,

66:3, 68:23
**pushed** [13] - 59:18, 63:13, 63:15, 63:24, 65:3, 65:19, 65:22, 65:23, 68:25, 70:19, 70:24, 71:17
**pushes** [1] - 34:13
**pushing** [6] - 39:5, 62:15, 64:11, 65:16, 66:4, 67:11
**put** [7] - 58:19, 70:24, 71:23, 72:4, 73:2, 78:13, 87:6
**puts** [2] - 27:7, 31:23
**putting** [2] - 22:9, 37:21
**puzzle** [1] - 46:17
**puzzled** [1] - 47:8
**puzzling** [1] - 10:4

## Q

**questions** [2] - 5:18, 66:23
**quite** [3] - 25:7, 52:4, 63:18
**quote** [6] - 20:6, 20:13, 22:4, 43:7, 46:21, 53:21
**quote-unquote** [1] - 53:21
**quoting** [1] - 39:18

## R

**races** [1] - 62:12
**radio** [1] - 93:25
**rails** [2] - 59:4, 82:16
**raised** [2] - 12:19, 19:24
**raises** [1] - 90:22
**rally** [4] - 20:7, 20:9, 73:7, 76:9
**ramp** [1] - 73:17
**ran** [1] - 59:16
**range** [2] - 34:19, 91:1
**rather** [7] - 10:19, 13:4, 30:1, 64:15, 65:1, 84:14
**re-arraignment** [1] - 49:3
**read** [3] - 6:7, 56:25
**real** [4] - 40:6, 56:22, 62:1, 70:7
**realize** [2] - 61:7, 76:6
**realized** [1] - 62:20
**really** [21] - 11:18,

18:18, 19:11, 32:21, 33:12, 34:7, 36:13, 37:16, 41:12, 48:6, 49:9, 49:10, 51:10, 54:3, 55:2, 56:22, 58:23, 61:20, 66:11, 72:10
**reason** [2] - 9:8
**reasonable** [3] - 35:18, 76:23, 77:19
**reasons** [6] - 5:15, 8:13, 19:7, 22:8, 35:14, 35:17
**rebroadcasting** [1] - 3:10
**receipt** [1] - 53:14
**received** [2] - 90:24, 95:17
**recognition** [1] - 94:2
**recognized** [3] - 27:14, 27:15
**recollection** [1] - 32:11
**recommend** [1] - 90:4
**recommendation** [15] - 3:22, 6:1, 7:3, 9:8, 13:12, 29:14, 29:18, 30:5, 30:19, 35:12, 35:14, 35:15, 35:16, 80:16
**recommendations** [4] - 9:14, 13:3, 28:4, 28:11
**recommended** [8] - 8:22, 14:10, 19:25, 26:13, 33:24, 39:11, 40:2, 40:16
**recommending** [2] - 12:9, 13:22
**recommends** [1] - 22:22
**record** [8] - 2:6, 45:19, 46:14, 67:23, 70:22, 73:2, 95:23, 96:2
**recorded** [1] - 52:22
**recording** [1] - 3:10
**records** [5] - 46:5, 46:7, 46:9, 74:8, 81:9
**Reeder** [4] - 28:23, 29:15, 30:11, 60:7
**Reeder's** [1] - 29:11
**reentering** [1] - 42:19
**reentry** [3] - 14:20, 93:10, 93:12
**referenced** [3] - 28:21, 30:7, 45:16
**reflect** [2] - 80:21, 87:2
**Reform** [1] - 92:1

**refrain** [1] - 92:18
**regard** [2] - 43:4, 50:4
**regarding** [6] - 13:16, 29:21, 81:21, 87:18, 89:21, 90:21
**regards** [1] - 19:2
**regret** [1] - 73:21
**regulations** [2] - 93:14, 93:21
**rehabilitate** [4] - 79:2, 79:4, 79:5
**rehabilitation** [2] - 79:3, 81:4
**reiterate** [1] - 12:13
**related** [1] - 20:3
**relative** [1] - 10:6
**release** [6] - 9:13, 11:23, 18:1, 54:11, 60:15, 95:1
**released** [3] - 71:13, 71:21, 72:3
**relevant** [1] - 80:17
**religious** [1] - 94:6
**reluctant** [1] - 15:17
**rely** [1] - 51:5
**remember** [4] - 45:22, 71:16, 71:17, 74:18
**remind** [1] - 45:21
**reminded** [1] - 3:9
**remorse** [7] - 24:23, 25:12, 25:16, 60:8, 60:10, 88:2, 88:8
**remotely** [1] - 3:7
**removal** [1] - 3:13
**repeat** [5] - 10:15, 15:3, 57:9, 74:10, 91:8
**replete** [1] - 57:15
**reply** [5] - 22:2, 28:21, 45:16, 46:9, 46:13
**report** [13] - 3:21, 4:10, 5:10, 5:24, 5:25, 6:8, 6:13, 7:2, 7:10, 20:11, 80:15, 95:2, 95:6
**reported** [1] - 1:24
**Reporter** [3] - 1:22, 1:23, 97:16
**reports** [1] - 47:22
**represent** [2] - 62:8, 62:20
**representation** [1] - 52:20
**representing** [1] - 37:13
**reputable** [1] - 89:10
**request** [4] - 8:13, 31:5, 46:15, 95:20
**requested** [1] - 30:24
**requesting** [1] - 31:7

**required** [1] - 48:12
**reside** [2] - 90:12,
93:11
**residence** [5] - 90:18,
91:13, 93:13, 94:5,
95:4
**residential** [3] - 14:20,
93:10, 93:11
**resides** [1] - 90:19
**resolve** [2] - 13:6,
19:13
**respect** [5] - 67:17,
79:22, 80:22, 87:3,
88:12
**respectful** [7] - 69:24,
69:25, 76:25, 77:1,
77:4, 77:19
**respectfully** [1] - 69:3
**respond** [3] - 45:20,
46:8, 46:14
**responded** [4] - 17:19,
43:9, 69:7, 84:7
**response** [4] - 16:12,
43:8, 50:5, 86:18
**responsibility** [2] -
78:17, 79:18
**restitution** [10] - 8:15,
81:11, 81:12, 81:14,
81:16, 81:19, 92:22,
92:24, 94:13, 96:3
**restricted** [2] - 3:14,
94:5
**restriction** [1] - 94:4
**restroom** [1] - 69:2
**result** [3] - 3:13,
17:22, 18:21
**results** [1] - 89:11
**retreat** [4] - 35:25,
36:25, 38:23, 85:22
**return** [1] - 95:5
**returned** [1] - 76:2
**reveals** [1] - 19:6
**revelation** [1] - 62:24
**review** [3] - 7:11,
17:10, 89:10
**reviewed** [4] - 3:18,
3:20, 3:23, 4:13
**reviewing** [1] - 3:17
**revolution** [1] - 44:5
**riot** [7] - 25:6, 34:12,
37:11, 39:5, 41:15,
45:3, 82:8
**rioters** [25] - 31:18,
32:6, 32:11, 32:17,
32:18, 33:21, 36:14,
37:8, 37:13, 39:1,
39:21, 41:14, 41:18,
43:4, 50:16, 59:3,
64:12, 64:22, 82:15,
82:22, 83:2, 86:2,

86:4, 86:7, 87:8
**riots** [3] - 13:17,
56:10, 70:9
**ripe** [1] - 54:25
**Robert** [1] - 28:23
**role** [3] - 85:14, 88:10,
88:13
**Room** [1] - 94:18
**room** [1] - 36:21
**rooms** [1] - 23:16
**Rotunda** [7] - 38:13,
64:3, 64:10, 64:18,
64:19, 64:23, 65:4
**RPR** [3] - 1:22, 97:3,
97:16
**rule** [1] - 8:5
**rules** [2] - 93:14,
93:21
**running** [1] - 51:11

**S**

**safety** [1] - 53:4
**Saint** [2] - 1:22, 97:16
**SAINT** [1] - 97:3
**Saint-Loth** [2] - 1:22,
97:16
**SAINT-LOTH** [1] -
97:3
**sanctions** [2] - 3:13,
3:15
**sat** [1] - 18:16
**satisfied** [4] - 6:20,
15:12, 15:14, 46:11
**saw** [23] - 10:2, 47:18,
57:4, 59:2, 64:1,
65:10, 67:22, 68:9,
69:1, 69:5, 69:15,
69:19, 69:25, 70:3,
73:9, 73:14, 73:15,
75:5, 75:8, 75:16,
82:21, 84:22
**scary** [3] - 52:2, 52:4
**scene** [1] - 33:12
**scheme** [1] - 10:8
**scope** [1] - 8:9
**screen** [2] - 16:24,
16:25
**screenshot** [2] - 4:8,
46:2
**seated** [3] - 5:21, 7:7,
96:7
**second** [19] - 5:11,
7:15, 23:5, 33:7,
35:21, 38:12, 39:8,
42:12, 42:14, 42:17,
42:19, 44:25, 63:5,
63:13, 63:23, 65:7,
85:3, 85:7, 85:10

**Section** [16] - 7:17,
12:6, 26:21, 80:18,
81:15, 81:20, 81:24,
90:2, 90:11, 90:15,
92:2, 92:7, 92:23,
93:11, 95:8, 95:13
**see** [30] - 2:25, 3:1,
10:9, 16:21, 17:14,
21:12, 36:8, 36:10,
36:14, 37:1, 38:19,
38:22, 38:24, 39:1,
39:3, 41:8, 43:16,
58:23, 64:23, 65:21,
65:23, 66:7, 66:8,
66:10, 67:24, 68:10,
71:25, 72:9, 72:21,
73:12
**seeing** [7] - 37:4,
42:18, 45:22, 58:24,
70:10, 87:13, 89:14
**seem** [2] - 14:23,
63:16
**seeming** [1] - 39:2
**Senate** [8] - 23:17,
31:22, 32:10, 36:11,
82:25, 84:15, 86:5
**send** [1] - 39:23
**sending** [1] - 43:5
**sense** [2] - 57:13,
57:14
**sensitive** [1] - 63:10
**sent** [2] - 6:14, 88:2
**sentence** [36] - 5:15,
5:16, 11:18, 11:20,
12:2, 12:9, 13:12,
18:9, 18:14, 19:10,
22:21, 29:19, 35:19,
40:11, 44:21, 60:21,
61:13, 80:11, 80:12,
80:18, 80:21, 81:8,
87:2, 87:4, 88:17,
88:22, 89:17, 90:4,
90:5, 90:25, 91:5,
91:25, 95:4, 95:9,
95:15, 95:22
**sentenced** [4] - 12:4,
18:1, 92:4
**sentences** [6] - 11:16,
27:3, 81:7, 89:21,
90:24, 91:2
**sentencing** [47] - 3:4,
3:8, 3:19, 3:22, 3:25,
4:4, 5:3, 5:25, 7:2,
7:4, 7:11, 8:12, 8:13,
9:21, 9:24, 10:25,
11:4, 11:5, 11:13,
13:3, 14:4, 18:8,
19:6, 20:1, 22:1,
21:14, 26:22, 26:23,
26:25, 27:1, 27:5,

27:9, 27:11, 27:24,
27:25, 29:1, 29:13,
34:25, 35:12, 79:8,
80:13, 80:15, 80:20,
88:20, 90:21, 91:1,
95:19
**Sentencing** [1] - 92:1
**SENTENCING** [1] - 1:7
**sentencings** [3] -
10:24, 11:8, 56:18
**sentiments** [1] - 25:6
**September** [5] - 17:15,
18:5, 18:12, 19:1,
29:24
**serious** [5] - 22:18,
22:20, 61:15, 80:22,
87:21
**seriously** [2] - 10:4,
35:13
**seriousness** [4] -
43:20, 80:21, 87:3,
88:20
**services** [1] - 94:6
**serving** [1] - 10:7
**session** [1] - 91:21
**set** [5] - 6:3, 7:17,
26:2, 80:17, 93:17
**several** [3] - 28:25,
61:10, 87:19
**severe** [1] - 41:19
**severity** [4] - 39:19,
40:10, 41:12, 41:23
**shall** [5] - 92:11, 93:4,
93:16, 93:17, 94:13,
94:23, 95:1, 95:5,
97:9
**share** [1] - 64:1
**sheer** [1] - 41:19
**Sherrill** [1] - 94:17
**shirt** [4] - 42:19,
69:14, 84:22, 87:14
**shit** [2] - 84:2, 86:16
**shooting** [3] - 59:2,
75:5, 82:14
**short** [4] - 10:5, 10:8,
10:12, 14:11
**shorthand** [1] - 1:24
**shortly** [1] - 9:5
**shot** [4] - 69:14,
69:20, 70:4, 70:21
**shouting** [4] - 50:16,
50:17, 86:10, 88:4
**shoving** [1] - 67:11
**show** [4] - 8:9, 28:4,
39:4, 64:3
**showed** [2] - 25:7,
88:1
**showing** [2] - 46:2,
88:3
**shown** [3] - 25:14,

25:16, 60:8
**shows** [9] - 36:18,
37:5, 38:16, 46:22,
64:19, 83:17, 84:12,
85:5, 86:4
**sic** [4] - 27:12, 36:14,
36:18, 38:21
**side** [13] - 2:7, 7:8,
19:12, 20:19, 32:12,
37:17, 37:20, 37:21,
37:22, 59:12, 65:24,
83:2, 86:4
**sides** [1] - 19:8
**signatory** [1] - 97:11
**signed** [1] - 20:11
**significant** [2] - 41:20,
79:23
**signs** [4] - 73:9, 73:15,
76:14, 86:8
**similar** [5] - 20:2,
44:16, 62:24, 81:9,
81:10
**similarly** [6] - 16:22,
20:1, 30:22, 30:23,
40:21, 61:13
**similarly-situated** [4] -
20:1, 30:23, 40:21,
61:13
**simple** [1] - 57:16
**simply** [1] - 63:24
**sincerely** [1] - 74:16
**singing** [1] - 69:12
**sit** [2] - 2:18, 53:7
**sitting** [1] - 52:6
**situated** [5] - 16:22,
20:1, 30:23, 40:21,
61:13
**situation** [8] - 8:20,
16:2, 31:3, 38:6,
60:11, 71:3
**six** [4] - 11:25, 29:25,
30:1, 56:15
**size** [2] - 36:19, 37:24
**SmartLINK** [1] - 94:2
**smoke** [3] - 59:3, 75:6,
82:15
**snippets** [1] - 76:4
**social** [2] - 24:16,
86:13
**solution** [1] - 15:20
**someone** [3] - 33:13,
65:18, 83:19
**sometimes** [1] - 26:2
**somewhat** [2] - 41:1,
79:8
**son** [2] - 61:20, 87:22
**sons** [3] - 4:15, 87:23,
88:14
**soon** [7] - 52:19,
62:20, 66:5, 72:3,

73:3, 73:4, 75:16
**sophomoric** [4] -
40:14, 40:22, 41:11,
44:17
**sorry** [3] - 16:15, 29:3,
67:7
**sort** [4] - 20:3, 63:11,
64:20
**south** [1] - 62:17
**southern** [1] - 48:22
**space** [1] - 93:12
**speaking** [2] - 50:24,
59:25
**special** [6] - 14:16,
15:8, 16:3, 91:12,
92:6, 93:4
**specific** [20] - 9:3, 9:6,
9:10, 9:15, 9:20,
10:3, 10:11, 10:13,
10:20, 12:8, 14:5,
14:7, 14:25, 19:16,
19:17, 19:19, 29:22,
30:14, 60:14, 81:1
**specifically** [2] -
36:12, 81:6
**spent** [6] - 20:8,
20:18, 29:16, 31:1,
48:24
**spewed** [1] - 54:23
**spiral** [1] - 72:6
**split** [10] - 11:16,
11:18, 11:20, 12:2,
12:9, 13:12, 18:8,
18:14, 19:10, 90:4
**spot** [2] - 73:11, 76:14
**spray** [1] - 64:24
**sprayed** [3] - 47:25,
66:6, 66:8
**spread** [1] - 44:6
**stage** [2] - 7:15, 36:10
**staircase** [1] - 72:7
**stairs** [4] - 72:8,
73:15, 73:16, 75:16
**stand** [6] - 5:2, 6:19,
8:12, 41:25, 76:14,
80:9
**standard** [1] - 92:12
**standing** [11] - 23:6,
34:7, 64:20, 64:21,
64:24, 64:25, 65:5,
69:5, 69:12, 72:6,
84:5
**Standing** [1] - 3:10
**start** [3] - 47:16,
58:20, 67:7
**started** [4] - 32:17,
60:24, 62:17, 70:23
**starting** [2] - 5:23,
86:3
**state** [5] - 2:5, 63:12,

91:25, 92:16, 96:2
**statement** [8] - 7:12,
20:12, 20:15, 47:8,
52:1, 52:17, 52:21,
52:22
**statements** [3] - 6:11,
25:23, 76:19
**STATES** [3] - 1:1, 1:2,
1:8
**States** [3] - 2:3, 2:10,
94:14
**stating** [1] - 43:6
**station** [1] - 52:15
**Station** [1] - 1:15
**statue** [1] - 39:22
**statues** [1] - 39:21
**statute** [5] - 14:18,
81:5, 81:13, 82:2,
90:7
**statutes** [1] - 81:14
**statutory** [3] - 18:4,
90:2, 95:10
**stay** [1] - 68:12
**stayed** [1] - 53:15
**stays** [1] - 14:8
**steady** [5] - 64:4, 64:6,
64:17, 85:7, 87:24
**steal** [2] - 23:19, 62:1
**stems** [1] - 13:23
**stenographic** [1] -
97:5
**step** [4] - 5:7, 5:11,
5:14, 7:20
**steps** [5] - 5:16, 9:24,
20:9, 59:4, 74:24,
82:16
**still** [5] - 13:1, 26:20,
47:23, 64:11, 78:10
**stimulus** [1] - 77:9
**stolen** [1] - 68:15
**stop** [6] - 15:1, 58:8,
58:9, 62:1, 84:15,
91:21
**stories** [1] - 75:21
**stormed** [6] - 43:7,
44:4, 84:2, 84:6,
86:16
**storming** [1] - 84:3
**straight** [9] - 8:22,
26:13, 33:24, 35:16,
39:11, 40:2, 40:16,
44:1, 91:14
**strains** [1] - 84:9
**strategy** [1] - 16:9
**stream** [5] - 64:4,
64:6, 64:9, 64:17,
85:8
**streamed** [1] - 60:11
**streaming** [2] - 33:4,
33:14

street [1] - 73:8
**Street** [1] - 1:19
**stressed** [1] - 9:3
**strictly** [1] - 3:12
**strikes** [2] - 34:7, 37:8
**striking** [1] - 64:4
**struck** [1] - 37:16
**struggle** [1] - 28:3
**stuck** [1] - 71:17
**study** [2] - 18:11,
18:24
**stuff** [2] - 70:7, 76:4
**stunned** [1] - 54:15
**subject** [4] - 17:24,
26:17, 27:23, 91:7
**submission** [1] -
28:22
**submit** [5] - 8:12,
37:5, 38:19, 92:19,
93:6
**submitted** [14] - 3:18,
3:24, 3:25, 4:4, 4:6,
4:8, 7:13, 8:8, 29:13,
46:2, 46:19, 76:18,
80:14, 88:11
**subsequent** [2] -
29:20, 30:19
**substance** [5] - 92:17,
92:19, 93:6, 93:7,
93:8, 94:7
**succeeded** [1] - 82:8
**successfully** [5] -
4:15, 41:16, 64:10,
64:16, 85:8
**sufficient** [2] - 80:18,
88:22
**suggest** [1] - 32:2
**suggesting** [3] -
15:20, 31:24, 83:22
**suggests** [2] - 85:4,
90:25
**sum** [3] - 38:2, 38:3,
87:1
**summer** [10] - 43:16,
54:3, 55:19, 56:11,
57:5, 57:18, 70:6,
77:6, 77:7
**super** [1] - 53:10
**Superior** [1] - 55:8
**superior** [1] - 57:23
**supervised** [6] - 9:13,
10:14, 11:22, 17:25,
60:15, 60:20
**supervision** [20] -
9:12, 9:17, 10:10,
10:12, 14:22, 14:25,
15:5, 16:6, 17:19,
18:2, 19:20, 60:16,
60:23, 91:7, 92:8,
92:11, 92:13, 92:14,

92:20
**supervisors** [2] - 4:16,
16:8
**supplement** [1] - 7:18
**supplemental** [1] - 4:5
**supplemented** [1] -
7:11
**support** [2] - 35:22,
91:15
**supporters** [2] - 22:5,
62:14
**supporting** [1] - 61:21
**suppose** [1] - 18:23
**supposed** [1] - 84:25
**surfaced** [1] - 49:23
**surge** [1] - 63:14
**sweatshirt** [1] - 22:11
**swell** [2] - 36:15,
36:21
**swelling** [1] - 37:10
**sworn** [1] - 7:13
**system** [2] - 58:4,
87:22

---

# T

**T-shirt** [3] - 42:19,
84:22, 87:14
**table** [2] - 2:15, 2:19
**tamper** [1] - 93:9
**task** [6] - 26:17, 27:10,
28:5, 28:12, 28:13,
53:21
**taunted** [1] - 82:18
**taunting** [1] - 60:3
**team** [1] - 50:17
**technology** [1] -
93:20, 93:24, 94:3
**teenage** [1] - 87:23
**teleconference** [1] -
3:9
**temporarily** [1] - 41:16
**ten** [2] - 49:7, 71:16
**term** [14] - 12:5, 17:18,
17:24, 18:1, 19:25,
44:1, 89:23, 89:25,
90:14, 91:11, 92:4,
93:12
**termination** [1] - 95:7
**terms** [2] - 10:6, 57:5
**test** [1] - 92:19
**testimony** [1] - 56:19
**testing** [3] - 93:6,
93:7, 93:9
**tests** [1] - 92:21
**Texan** [1] - 62:20
**text** [1] - 4:8
**thankfully** [3] - 41:15,
49:13, 54:10

**THE** [191] - 1:1, 1:8,
1:10, 1:18, 2:2, 2:8,
2:12, 2:20, 2:23, 3:1,
4:20, 4:23, 5:1, 5:6,
5:7, 5:20, 5:21, 5:22,
5:23, 6:6, 6:10, 6:16,
6:18, 6:23, 6:25, 7:1,
7:6, 7:7, 7:24, 8:1,
8:18, 11:3, 11:8,
12:14, 13:4, 13:10,
13:21, 14:15, 15:5,
15:22, 16:1, 16:5,
16:14, 16:16, 16:21,
16:23, 17:6, 19:4,
19:23, 20:21, 21:12,
21:24, 22:16, 23:11,
23:13, 23:19, 23:22,
24:5, 24:7, 24:10,
24:13, 24:16, 24:19,
24:22, 25:1, 25:4,
25:9, 25:13, 25:19,
25:25, 26:4, 26:20,
26:25, 27:20, 27:22,
28:13, 29:2, 29:5,
29:9, 30:11, 30:15,
31:8, 31:11, 32:10,
32:14, 32:19, 32:21,
32:24, 33:2, 33:4,
33:10, 33:19, 34:4,
34:6, 34:17, 34:20,
35:4, 35:6, 35:11,
35:21, 38:8, 38:15,
38:24, 39:7, 39:17,
40:12, 40:25, 41:8,
42:3, 42:10, 42:25,
43:19, 43:24, 44:23,
45:10, 45:21, 46:1,
46:16, 47:7, 47:13,
47:15, 48:9, 48:15,
49:14, 50:12, 50:15,
51:15, 51:22, 52:3,
55:2, 55:16, 55:22,
56:2, 56:6, 56:9,
56:15, 56:25, 57:4,
57:12, 57:22, 58:8,
59:1, 59:8, 59:19,
60:2, 61:16, 63:5,
63:19, 63:22, 66:19,
66:25, 67:3, 67:6,
74:17, 74:21, 74:22,
75:3, 75:4, 75:15,
76:17, 77:5, 77:22,
78:3, 78:5, 78:7,
79:7, 79:11, 79:12,
79:19, 79:20, 79:24,
79:25, 80:2, 80:3,
80:5, 80:6, 80:7,
80:8, 80:10, 80:11,
95:25, 96:4, 96:7,
96:8, 96:9, 96:13,
96:17, 96:19, 96:21,

96:22, 96:24
**Theisen** [1] - 77:2
**themselves** [2] - 8:9, 40:9
**thereafter** [1] - 92:21
**therefore** [3] - 27:7, 93:2, 94:11
**thick** [1] - 85:1
**thinking** [2] - 52:3, 88:16
**third** [3] - 39:17, 85:10, 87:20
**thousands** [1] - 42:7
**threat** [1] - 9:25
**three** [4] - 5:16, 38:9, 85:23, 92:17
**throughout** [1] - 78:25
**throwing** [2] - 59:3, 82:15
**tide** [1] - 63:17
**titled** [1] - 82:2
**today** [6] - 58:24, 74:20, 75:5, 75:12, 78:6, 96:14
**together** [2] - 20:8, 77:12
**tons** [1] - 73:13
**took** [16] - 11:14, 40:3, 40:8, 42:6, 45:7, 55:14, 56:2, 59:21, 66:6, 69:9, 72:3, 83:5, 86:1, 86:6, 87:20
**tools** [1] - 75:7
**top** [3] - 29:17, 68:10, 73:16
**topic** [1] - 16:10
**Torrens** [3] - 11:15, 12:21, 19:6
**total** [1] - 23:4
**totally** [1] - 58:5
**touch** [1] - 69:3
**touring** [1] - 40:3
**towards** [5] - 32:6, 36:24, 41:22, 64:12, 68:6
**traipse** [1] - 39:19
**traipsing** [1] - 44:17
**traits** [1] - 88:15
**TRANSCRIPT** [1] - 1:7
**transcript** [4] - 1:24, 97:5, 97:6, 97:10
**transcription** [1] - 1:25
**transfer** [1] - 96:23
**transferred** [1] - 92:9
**transition** [2] - 89:9, 89:19
**transitions** [1] - 80:1
**transparent** [1] -

28:15
**traveled** [1] - 82:10
**traveling** [1] - 61:22
**travels** [1] - 61:18
**treat** [3] - 53:25, 56:19, 61:12
**treated** [2] - 30:22, 55:23
**treatment** [4] - 56:10, 94:7, 95:5, 95:7
**trespassed** [2] - 22:17, 22:19
**trial** [2] - 11:9, 53:16
**tried** [5] - 30:5, 47:17, 67:23, 68:12, 70:22
**trips** [2] - 23:8, 91:17
**trouble** [1] - 78:23
**troubles** [1] - 41:1
**troublesome** [1] - 87:7
**troubling** [1] - 87:25
**true** [7] - 48:22, 52:14, 53:22, 75:24, 76:7, 97:4, 97:5
**Trump** [8] - 22:5, 22:11, 41:3, 54:23, 61:25, 62:14, 62:21, 62:22
**trump** [2] - 62:18, 73:8
**truth** [2] - 44:6, 79:16
**try** [1] - 88:6
**trying** [26] - 11:12, 34:1, 36:17, 37:8, 40:4, 49:10, 49:16, 54:21, 64:5, 64:8, 64:9, 64:16, 64:22, 66:14, 67:22, 68:23, 70:17, 70:18, 70:19, 70:20, 71:11, 71:19, 72:23, 75:7, 83:6, 85:8
**turn** [6] - 19:15, 19:23, 21:16, 26:9, 65:17, 65:18
**turned** [2] - 54:19, 68:3
**twice** [7] - 9:24, 20:9, 23:3, 29:16, 30:25, 85:15, 86:25
**two** [40] - 4:7, 4:14, 8:14, 9:1, 10:5, 10:7, 10:9, 10:18, 11:10, 11:14, 14:10, 17:17, 23:8, 27:12, 29:19, 30:24, 31:10, 31:11, 35:15, 36:12, 38:25, 40:20, 42:7, 49:12, 54:6, 57:2, 57:16, 58:13, 58:16, 73:24, 81:14, 84:20, 85:23, 86:4, 87:11, 87:23,

89:13, 91:17, 92:16, 92:20
**two-month** [2] - 9:1, 30:24
**types** [3] - 62:12, 81:7, 89:21
**typically** [1] - 11:21
**typos** [1] - 6:14
**tyrant** [1] - 67:20

**U**

**U.S** [6] - 1:14, 20:14, 82:4, 92:9, 94:21, 95:3
**U.S.C** [12] - 12:6, 80:17, 81:15, 81:20, 81:24, 90:2, 92:2, 92:7, 92:23, 93:10, 95:8, 95:13
**ultimately** [1] - 29:22, 30:1
**unable** [1] - 95:19
**unassailable** [1] - 89:11
**unavailable** [1] - 95:15
**uncertain** [1] - 21:9
**uncertainty** [1] - 13:1
**under** [6] - 3:9, 12:5, 68:14, 90:11, 90:13, 90:15
**underlying** [1] - 20:16
**understood** [8] - 14:12, 18:3, 25:24, 26:24, 27:21, 28:12, 35:20, 41:10
**undisputed** [1] - 7:10
**undone** [1] - 79:23
**unemployed** [2] - 54:6, 61:18
**unemployment** [1] - 77:8
**unfair** [1] - 78:1
**unfitting** [1] - 41:21
**unfortunate** [2] - 48:20, 88:14
**unfortunately** [1] - 54:20
**unique** [4] - 27:24, 54:7, 61:11, 61:12
**United** [3] - 2:3, 2:10, 94:14
**UNITED** [3] - 1:1, 1:2, 1:8
**unity** [1] - 77:16
**unlawful** [2] - 82:12, 92:18
**unlawfully** [1] - 92:17
**unless** [1] - 2:22

**unlike** [2] - 43:15, 54:12
**unquote** [1] - 53:21
**unresolved** [1] - 19:7
**unusual** [1] - 9:14
**unwarranted** [7] - 19:25, 26:21, 27:4, 27:9, 81:8, 90:21, 91:1
**up** [44] - 11:25, 13:5, 17:25, 18:22, 18:24, 28:25, 29:2, 32:24, 41:3, 49:2, 49:4, 52:11, 55:3, 55:4, 55:11, 57:15, 59:4, 61:17, 61:21, 65:6, 68:2, 68:4, 68:6, 68:10, 68:18, 68:19, 70:20, 71:5, 71:9, 71:24, 73:11, 73:17, 74:23, 75:15, 75:20, 75:24, 77:16, 80:17, 82:15, 89:1, 89:23, 89:24
**upstanding** [1] - 77:4
**urging** [1] - 19:9
**USA** [1] - 37:12

**V**

**valve** [1] - 53:4
**various** [1] - 34:22
**vein** [1] - 48:21
**verbal** [1] - 85:21
**versus** [2] - 2:3, 26:8
**Vice** [2] - 60:5, 91:21
**victim** [1] - 94:15
**victims** [1] - 81:11
**video** [36] - 3:11, 7:11, 33:11, 36:11, 36:22, 37:1, 37:3, 38:16, 38:19, 46:22, 47:5, 47:24, 48:2, 48:3, 48:4, 48:24, 50:12, 50:13, 50:20, 51:2, 51:11, 52:1, 58:18, 59:13, 59:17, 59:20, 64:2, 65:24, 66:1, 66:10, 67:12, 83:17, 85:5, 86:3, 88:2
**videos** [5] - 2:16, 2:21, 3:24, 4:1, 4:7, 7:3, 8:7, 8:8, 32:11, 36:12, 38:8, 39:21, 46:21, 46:25, 47:1, 47:5, 47:19, 47:22, 47:23, 49:3, 58:13, 62:15, 63:22, 70:5, 84:8, 84:16

**unlike** ...
**view** [7] - 9:7, 11:13, 17:2, 26:15, 38:15, 83:7, 88:8
**viewing** [1] - 42:4
**views** [1] - 34:1
**violation** [2] - 3:12, 81:24
**violence** [21] - 10:1, 23:15, 24:17, 30:7, 30:10, 30:12, 34:14, 37:23, 45:8, 45:9, 57:6, 58:23, 58:25, 67:11, 67:13, 69:15, 69:17, 86:14, 87:6, 88:7, 91:8
**violent** [3] - 35:22, 36:4, 87:15
**violently** [1] - 32:21
**visits** [1] - 94:7
**voice** [7] - 50:20, 50:22, 51:3, 59:15, 61:9, 64:6, 94:2
**voices** [4] - 46:24, 50:18, 68:17, 76:15
**void** [1] - 97:9
**voluntarily** [2] - 24:1, 63:12
**vote** [2] - 68:16, 84:15
**voucher** [1] - 51:9
**vs** [1] - 1:3
**Václav** [1] - 41:2

**W**

**waived** [1] - 93:23
**waives** [2] - 93:2, 94:11
**walk** [1] - 73:8
**walked** [9] - 55:13, 56:2, 68:8, 69:8, 73:11, 73:13, 83:1
**walking** [5] - 36:24, 39:4, 76:10, 83:13, 83:15
**Walter** [1] - 76:25
**wandered** [1] - 71:25
**wants** [2] - 55:23, 55:24
**warrant** [1] - 40:20
**warranted** [1] - 72:18
**warranting** [6] - 22:24, 26:7, 41:9, 42:5, 43:2, 43:25
**warrants** [1] - 26:15
**washed** [1] - 69:2
**Washington** [7] - 1:5, 1:12, 1:16, 1:19, 61:18, 94:18, 94:22
**watch** [2] - 54:17,

66:10

**watched** [8] - 36:22, 54:14, 54:15, 54:24, 56:18, 58:17, 66:1

**watching** [3] - 55:5, 70:5, 70:9

**water** [2] - 66:18, 72:14

**wave** [1] - 76:14

**ways** [4] - 25:15, 26:23, 44:8, 50:19

**weapon** [1] - 86:9

**weapons** [3] - 23:13, 69:18, 69:19

**wear** [3] - 48:12, 48:16, 60:22

**wearing** [3] - 22:10, 22:11, 48:1

**week** [1] - 11:10

**weeks** [2] - 11:10, 58:23

**weighing** [1] - 35:2

**weighs** [1] - 89:19

**Wes** [4] - 2:3, 2:14, 3:4, 92:3

**WES** [1] - 1:4

**West** [23] - 2:14, 3:1, 4:23, 5:12, 6:7, 6:18, 6:24, 17:8, 19:24, 20:22, 22:2, 28:24, 29:7, 46:2, 46:5, 46:18, 47:9, 47:15, 57:1, 63:10, 71:2, 95:25, 96:17

**WEST** [45] - 1:18, 2:13, 2:22, 2:24, 4:25, 6:9, 6:14, 6:17, 6:22, 29:8, 47:20, 48:14, 48:20, 50:1, 50:14, 50:25, 51:21, 52:2, 52:4, 55:15, 55:21, 56:1, 56:5, 56:7, 56:14, 56:17, 57:3, 57:11, 57:21, 58:7, 58:13, 59:6, 59:9, 60:1, 60:6, 61:23, 63:18, 63:21, 65:8, 66:22, 67:1, 67:4, 96:1, 96:6, 96:18

**West's** [3] - 17:12, 22:12, 45:20

**whole** [8] - 38:3, 55:3, 66:13, 70:20, 73:19, 77:6, 77:7

**whoops** [1] - 18:12

**willing** [3] - 60:22, 74:3, 78:18

**window** [5] - 32:16, 32:17, 33:1, 33:8,

55:13

**windows** [6] - 32:12, 33:5, 33:14, 58:16, 83:2, 86:4

**wing** [9] - 31:22, 32:10, 36:11, 38:11, 38:20, 82:25, 83:18, 86:5

**Winston** [1] - 41:2

**wish** [2] - 5:13, 67:5

**witness** [2] - 45:24, 47:6

**witnessed** [4] - 32:7, 67:10, 82:14, 88:21

**witnessing** [2] - 31:17, 33:20

**woman** [5] - 20:5, 48:3, 52:11, 52:25, 69:14

**women** [1] - 62:15

**women's** [1] - 62:10

**word** [1] - 36:15

**worn** [4] - 48:1, 48:7, 48:12, 48:19

**worried** [1] - 54:9

**worth** [3] - 41:18, 42:1, 51:7

**wow** [1] - 55:15

**write** [2] - 78:8, 78:14

**wrongdoing** [1] - 62:4

**wrongfully** [1] - 42:11

**wrongs** [2] - 57:2, 57:16

**wrote** [2] - 60:25, 84:8

## Y

**year** [1] - 54:10

**years** [6] - 17:25, 27:12, 49:7, 87:20, 87:22, 92:5

**years'** [1] - 89:24

**yell** [1] - 59:21

**yelled** [2] - 82:19, 83:20

**yelling** [6] - 64:13, 67:19, 67:24, 68:22, 70:21, 71:20

**York** [1] - 1:11

**yourself** [1] - 79:15

**YouTube** [1] - 70:5